UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHARON CHENG, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>v.<br><br>TOYOTA MOTOR CORPORATION, TOYOTA MOTOR NORTH AMERICA, INC., TOYOTA MOTOR SALES, USA, INC., and TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC.,<br><br>                    Defendants. | Case No.: 1:20-cv-00629<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Sharon Cheng ("Plaintiff") brings this class action on behalf of herself and all others similarly situated against defendants Toyota Motor Corporation, Toyota Motor North America, Inc., Toyota Motor Sales, USA, Inc., and Toyota Motor Engineering & Manufacturing North America, Inc. (collectively "Toyota" or "Defendants"). Based on personal knowledge as to matters relating to herself and her own actions, and on information and belief based on the investigation of counsel, including counsel's review of consumer complaints available on the database of the National Highway Transportation Safety Administration ("NHTSA") and other publicly available information, as to all other matters, Plaintiff alleges as follows:

## INTRODUCTION

1.     On January 13, 2020, Toyota submitted a safety recall report (the "Recall Report")[1] to NHTSA voluntarily recalling nearly 700,000 Toyota and Lexus vehicles[2]

---

[1] The Recall Report is attached hereto as Exhibit A.

[2] 2018-2019 Toyota 4Runner, 2019 Toyota Avalon, 2018-2019 Toyota Camry, 2019 Toyota Corolla, 2018-2019 Toyota Highlander, 2018-2019 Toyota Land Cruiser, 2018-2019 Toyota Sequoia, 218-2019

manufactured between August 1, 2018 through January 31, 2019 with defective low-pressure Denso fuel pumps (the "Recall").  In the Recall Report, Toyota identified a dangerous defect in the low-pressure fuel pump which can fail and cause the Recalled Vehicles to unexpectedly stall and cause engine shut down:

> These fuel pumps contain an impeller that could deform due to excessive fuel absorption. . . . [i]f impeller deformation occurs, the impeller may interfere with the fuel pump body, and this could result in illumination of check engine and master warning indicators, rough engine running, engine no start and/or vehicle stall . . . .

("Fuel Pump Defect").  Approximately 695,541 Recalled Vehicles are covered by the Recall, but the same dangerous condition is present in all 2018-2019 Toyota manufactured vehicles equipped with low-pressure fuel pumps with part number prefix 23220- or 23221- ("Class Vehicles") that gave rise to the Recall.

2.     Toyota concluded that the Fuel Pump Defect in Class Vehicles presents an immediate risk of physical injury when used in their intended manner and for their ordinary purpose.

3.     Toyota has long known of the Fuel Pump Defect in the Class Vehicles, despite marketing Class Vehicles as safe and dependable.  Toyota admitted in the Defect Information Report accompanying the Recall Report that it received thousands of warranty requests related to the Fuel Pump Defect in Class Vehicles.[3]

4.     The Fuel Pump Defect in the Class Vehicles exposes occupants and others to extreme danger, or even death.  A vehicle that stalls or suffers engine shutdown is at heightened risk for collision.  A vehicle that stalls or suffers engine shutdown causes drivers to react to

---

Toyota Sienna, 2018-2019 Toyota Tacoma, 2018-2019 Toyota Tundra, 2019 Lexus ES, 2018-2019 Lexus GS, 2018-2019 Lexus GX, 2018-2019 Lexus IS, 2018-2019 Lexus LC, 2018-2019 Lexus LS, 2018-2019 Lexus LX, 2019 Lexus NX, 2018-2019 Lexus RC, 2018-2019 Lexus RX ("Recalled Vehicles").

[3] The Defect Information Report is attached hereto as Exhibit B.

remove themselves from danger, typically by exiting the road. Drivers stranded on the side of the road experience a heightened risk of danger, whether it is from other vehicles or weather elements.

5.      Fuel pump failure can prevent the driver from accelerating at the necessary and anticipated pace.  Diminished acceleration ability creates unexpected hazards, startling drivers of the Class Vehicles and other drivers in their proximity.  Finally, once a Class Vehicle fuel pump fails, the vehicle becomes totally inoperable and will not start.

6.      While Toyota knew about the Fuel Pump Defect and the associated dangers, Toyota manufactured, marketed, sold, leased, and warranted Class Vehicles, and, in its quest for corporate profits, did not disclose to the unsuspecting public that Class Vehicles were inherently defective, dangerous and create a grave risk for bodily harm or death.  As proof of its knowledge, Toyota identified in its Defect Information Report "66 Toyota Field Technical Reports and 2,571 warranty claims" associated with the Fuel Pump Defect.[4]  Toyota did not disclose, and to this day has not fully disclosed, what it knew about the Fuel Pump Defect to prospective purchasers and lessees, and existing owners.

7.      To date, Toyota has not identified a remedy for the Fuel Pump Defect, stating only that "[t]he final corrective repair action is still under study."  Thus, whether there will be a corrective repair, if so, when, and whether it will fix the problem are all unknown.  Moreover, Toyota states it will not even notify owners and lessees of the Class Vehicles of the Fuel Pump Defect, despite its attendant risk of bodily harm or death, until March 13, 2020.[5]  Thus, owners and lessees of the Class Vehicles are unknowingly driving on roads and highways in potentially

---

[4] *See* Exhibit B.

[5] *See* Exhibit A; *see also* Exhibit B.

ticking time bombs while Toyota knowingly exposes its customers, from whom it made at least $20 million from the sale of just the Recalled Vehicles, to the risk of grave physical harm and even death.

8.      Compounding its wrongdoing, despite admitting in the Recall Report that the Fuel Pump Defect increases the likelihood of accidents, egregiously, Toyota has not recommended or advised that consumers stop driving the Class Vehicles until the Fuel Pump Defect can be repaired or replaced.  Given the inherent dangers of driving Class Vehicles, Toyota at a minimum should have contacted purchasers and lessees and offered them free loaner vehicles of the type of Class Vehicle they drive until it could devise and implement a fix or take other action to protect consumers' safety.

9.      Moreover, with or without a viable remedy for the Fuel Pump Defect, the Recall has decreased the intrinsic and resale value of the Class Vehicles.  Plaintiff and other Class members have been damaged as a result.

10.      Throughout the relevant period, Toyota's marketing of the Class Vehicles was and is replete with assurances about their safety and dependability.  A vehicle that can suddenly stall and lose power during normal operating conditions is inherently unsafe and renders Toyota's marketing of the Class Vehicles untrue and materially misleading.  Plaintiff and other Class members have been damaged as a result.

11.      Plaintiff, on behalf of herself and the Classes (defined below), seeking redress for Toyota's egregious and unconscionable misconduct, asserts claims on behalf of a statewide class for: (1)  violation of New York's consumer protection statute, New York General Business Law § 349; (2) breach of express warranty; (3) breach of implied warranty; (4) negligent recall/undertaking; (5) unjust enrichment; and on behalf of  a nationwide class; (6) a claim for

violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*.  In addition, Plaintiff seeks an order enjoining Toyota's conduct, directing it to inform Class members of the Fuel Pump Defect and to cease driving their vehicles, directing Toyota to contact Class members and advise them that it will provide free loaner vehicles of the type of Class Vehicle each owns or leases until a remedy for the Fuel Pump Defect is installed in their Class Vehicles; compensatory damages; restitution; and punitive damages.

## JURISDICTION AND VENUE

12.     Subject matter jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because Plaintiff and Class members are citizens of a state different than Toyotas' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

13.     Subject matter jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331 because Plaintiff's Magnuson-Moss Warranty Act claim arises under federal law, and this Court has supplemental subject matter jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

14.     This court has personal jurisdiction over Toyota because Toyota conducts substantial business in this District and some of the actions giving rise to this action took place in this District and/or caused injury to property in this state; and products, materials, or things processed, serviced, or manufactured by Toyota anywhere were used or consumed in this state in the ordinary course of commerce, trade, or use. Toyota is one of the largest manufacturers and sellers of automotive vehicles in the world. Defendants have, at all relevant times, conducted and continue to conduct business in New York, and every other state in the country.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, Toyota has caused harm to Plaintiff Cheng and other Class members in this District, and Toyota is a resident of this District under 28 U.S.C. § 1391(c)(2) because it is subject to personal jurisdiction in this District. Also, venue is proper in this district pursuant to 18 U.S.C. § 1965.

## THE PARTIES

### I.     PLAINTIFF

16.     Plaintiff Sharon Cheng resides in the state of New York, county of Suffolk, and town of Nesconset.

17.     Plaintiff Cheng leased a new 2019 Lexus RX 350 from Smithtown Lexus in St. James, New York, in January of 2019.  Plaintiff Cheng's Lexus has a defective Denso low-pressure fuel pump which and is a Recalled Vehicle.

18.     The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to Plaintiff Cheng and others on the road.

19.     Plaintiff Cheng leased her Class Vehicle with the Fuel Pump Defect as part of a transaction in which Toyota did not disclose material facts related to the automobile's essential purpose – safe transportation.  Plaintiff Cheng did not receive the benefit of her bargain.  She leased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  The Fuel Pump Defect has significantly diminished the value of Plaintiff Cheng's Class Vehicle.

20.     Had Toyota disclosed the Fuel Pump Defect, Plaintiff Cheng would not have leased her Class Vehicle, or certainly would have paid less to do so.

II.     **DEFENDANTS**

   **A.  Toyota Motor Corporation**

21.     Defendant Toyota Motor Corporation ("TMC") is a Japanese corporation located at 1 Toyota-Cho, Toyota City, Aichi Prefecture, 471-8571, Japan.  TMC is the parent corporation of Toyota Motor Sales, U.S.A., Inc.

22.     TMC, through its various entities, designs, manufactures, markets, distributes and sells Toyota automobiles in the United States, including New York.

   **B.  Toyota Motor North America, Inc.**

23.     Defendant Toyota Motor North America, Inc. ("TMNA") is incorporated in California, with its primary address at 6565 Headquarters Dr., Plano, Texas 75024.  TMNA is a holding company of sales, manufacturing, engineering, and research and development subsidiaries of TMC located in the United States.

   **C.  Toyota Motor Sales, U.S.A., Inc.**

24.     Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is incorporated and headquartered in the State of California, with its primary address at 6565 Headquarters Dr., Plano, Texas 75024.

25.     TMS is the United States sales and marketing division for TMC, which oversees sales and other operations across the United States.  "Every [Toyota] sold in the U.S. depends upon [TMS's] extensive network of dedicated professionals who align sales and marketing

resources for [Toyota's] dealers nationwide."[6]  TMS was responsible for Toyota's marketing of the Class Vehicles as safe and dependable.

26.     TMS distributes Class Vehicles and sells them through a network of dealerships that are the agents of TMS.  Money received from the purchase of a Toyota made vehicle from a dealership flows from the dealer to the TMS.  TMS issues the express repair warranties for the Class Vehicles.

**D.  Toyota Motor Engineering & Manufacturing North America, Inc.**

27.     Defendant Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is incorporated in Kentucky and has its primary address at 6565 Headquarters Dr., Plano, Texas 75024.

28.     TEMA is "responsible for [Toyota's] engineering design and development, R&D and manufacturing activities in the U.S., Mexico and Canada."[7]

**E.  Lexus**

29.     Lexus is a wholly owned brand, subsidiary, and/or division of TMC and/or TMS. TMC and TMS employ engineering, legal, compliance, and regulatory personnel to make decisions regarding the subject Lexus vehicles.  These employees, on behalf of TMC and TMS, ultimately made or ratified the decisions that allowed the subject Lexus vehicles to be fraudulently designed, manufactured, marketed, and sold.

## FACTUAL ALLEGATIONS

30.     Toyota is the world's second largest manufacturer of automotive vehicles and sells its vehicles across the United States through a network of over 1,200 dealers, including those in New York.

---

[6] See https://www.toyota.com/usa/operations#!/Sales-Marketing (last visited January 29, 2020).

[7] See https://www.toyota.com/usa/operations/index.html (last visited February 3, 2020).

31.     Toyota maintains a Lexus brand where it designs, manufacturers, markets and sells Lexus branded vehicles across the United States, including in New York.

32.     Toyota has branded itself as the maker of safe, dependable vehicles and has spent millions, if not billions, of dollars on extensive marketing and advertising campaigns to cement the association of safety and reliability with its Toyota and Lexus brand automobiles, including Class Vehicles.

33.     Toyota designs, manufactures, markets, and sells Class Vehicles, and has, at all times, uniformly branded the Class Vehicles as safe and dependable.

I.      **THE OPERATION OF CLASS VEHICLES' LOW-PRESSURE FUEL PUMP**

34.     The Class Vehicles are equipped with a Denso low-pressure fuel pump with a part number prefix 23220- or 23221- (the "Fuel Pump").

35.     All Class Vehicles are equipped with the same defective Fuel Pump.

36.     The Fuel Pump assembly is mounted inside of the fuel tank.  The Fuel Pump assembly consists of a fuel intake strainer at one end and a fuel output line at the other.  At the heart of the Fuel Pump assembly is an electric motor with a plastic impeller attached to a rotating shaft.  Protruding from the side of the Fuel Pump assembly is a fuel level float and a fuel level sender.  Figure One illustrates the parts of the Fuel Pump assembly.



*Figure 1 Fuel Pump Assembly Diagram*[8]

37.     As the electric motor rotates the impeller spins generating negative pressure.  The negative pressure pulls fuel into the pump housing where it passes through the electric motor assembly and exits through the output, into the fuel line and forward to the fuel filter.  After exiting the fuel filter, the fuel flow is accelerated via a high pressure pump which delivers pressurized fuel to injectors mounted in the engine.  Figure Two illustrates this sequence.

---

[8] http://www.agcoauto.com/content/news/p2_articleid/195 (last visited January 30, 2020).

*Figure 2 Fuel Pump Sequence*[9]

38.     At all times, by design, the Fuel Pump assembly and all of its components are exposed to gasoline within the tank.

## II.   THE CLASS VEHICLES SUFFER FROM A FUNDAMENTALLY DEFECTIVE FUEL PUMP

39.     As described herein, the Class Vehicles' Fuel Pump suffers from a fundamental defect causing it to prematurely fail.  Based on Toyota's own admission, and the findings of Plaintiff's counsel's independent automotive engineering consultant, the failure results from a defectively designed plastic impeller.

40.      Toyota's goal in designing a Fuel Pump must be to design one that operates safely for the life of the vehicle. The Fuel Pump assembly in the Class Vehicles was underdesigned.  Specifically, as Toyota admitted in the Recall Report, the "fuel pumps contain an impeller that could deform due to excessive fuel absorption."[10]

---

[9] https://www.autoplusdubai.net/blog/fuel-pumps-common-causes-and-how-to-identify-it/ (last visited January 30, 2020).

[10] Exhibit A.

- 11 -

41.     Plastics absorb liquids, typically.  However, the degree of absorption varies depending on the type of plastic and its environmental conditions.  When plastics absorb liquid, such as gasoline, the plastic pieces' intended dimensions change.  Therefore, manufacturers like Toyota must adequately design and validate plastic materials exposed to liquids to ensure that they remain dimensionally stable.[11]

42.     However, as Toyota admitted, it failed to design a plastic impeller that can remain dimensionally stable under its intended conditions.  Specifically, Toyota admitted in the Recall Report that the impeller deformation "may interfere with the fuel pump body" causing it to fail and become inoperable.[12]  This pump and impeller are not designed with the necessary robustness to operate safely under normal operating conditions.

## III.   THE DESIGN FLAW REDUCES ENGINE POWER, CAUSES VEHICLE STALLING, AND CAN LEAVE THE CLASS VEHICLES COMPLETELY INOPERABLE COMPROMISING CONSUMER SAFETY

43.     The Fuel Pump Defect in the Class Vehicles exposes occupants and others to extreme danger, even death.  In fact, Toyota tacitly admitted as much in the Recall Report, stating the Fuel Pump Defect can "increas[e] the risk of a crash."[13]

44.     The Fuel Pump is an integral component of safe vehicle operation.  But as described herein, the Class Vehicles suffer from a fundamental design flaw that causes the Fuel Pump to prematurely fail.  As Toyota admitted in the Recall Report, the deformed impeller comes in contact with the Fuel Pump body causing "illumination of check engine and master warning indicators, rough engine running, engine no start and/or vehicle stall . . . ."

---

[11] *See generally* https://www.ensingerplastics.com/en-us/shapes/plastic-material-selection/dimensionally-stable (last visited February 2, 2020).

[12] Exhibit A.

[13] *Id.*

45.     Engines necessarily require steady gasoline supply for proper function.  But when the Fuel Pump fails, gasoline is not supplied to the engine, causing reduced engine power, stalling, and/or engine shutdown.

46.     Compounding the problem, Fuel Pump failure occurs spontaneously with no advanced warning to the consumer.

47.     Class members' complaints exemplify the real world dangers of the Fuel Pump Defect.

48.     Vehicle manufacturers like Toyota monitor NHTSA and other databases for consumer complaints as part of their ongoing obligation to uncover and report potential safety-related defects.  Accordingly, Toyota knew, or should have known, of the many complaints lodged with NHTSA and elsewhere about the specific safety hazard that is the subject of the safety recall.

49.     By way of example, the consumer complaints set forth below demonstrate the seriousness of the Fuel Pump Defect and, further, show that Toyota knew or should have known of them.

50.     On March 11, 2019, the owner of a 2018 Toyota Camry filed the following complaint with NHTSA:

> Lag and hesitation when going to full throttle on the gas pedal. It hesitates for a second and then finally grabs on to accelerate. ***It has done this since I purchased it but was hoping it would work itself out eventually, but this hasn't happened.*** Toyota did a TSB software update for the 4 cylinder but not the v6.[14]

51.     On August 9, 2019, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA:

---

[14] NHTSA Complaint ID. No. 11185947 (emphasis added).

2019 Highlander XLE loses power, unable to accelerate, & jerks and stalls in traffic.  Bought at 200 miles, certified preowned. It is a nightmare vehicle.

Accelerator has been touchy and jumpy at times, intermittently at slow speeds. First time it stalled it started to lose power put -put and chug like jerking and all dash and electrical on dash went out, unable to accelerate, then stalled out in road, unable to steer or control vehicle. This occurrence was after a longer period of driving. Second time it stalled out began to lose power, putter and chug, unable to accelerate applying gas pedal, getting no gas, vehicle dies out, unable to steer or control vehicle. This occurrence was after a longer period of driving. Third time was yesterday 8-8-19. Left work and about 5-7 minutes into my drive, started hesitating, losing all dash and electrical power and will not accelerate when gas pedal applied, then stalls out, unable to control the steering wheel again! ***Almost got hit this time, man behind me coming fast and had to swerve into lane over to miss me. This car is going to kill me or someone by causing an accident if they do not get it fixed right.*** After the second stall it was towed into dealership and they were not sure but said fuel pressure was reading 22 and was supposed to be in the mid to high 50's. They replaced the fuel pump and it drove ok for a little while but I noticed the average fuel mileage going down from an approx in city 19.1--20 to 17.1-17.3. Has never been so low so obviously the stalling and the replacing or the fuel pump are not the real issue. Fuel economy going down since replacement of the fuel pump and now another dangerous stalling issue. Car is at Toyota dealer now. They need to dive much deeper & resolve this very dangerous safety issue! ***I bought this car to feel safe and have reliable transportation and have neither. It really scares me***.[15]

52.    On February 9, 2019, the owner of a 2018 Toyota Camry filed the following complaint with NHTSA:[16]

I have had constant problems with my 2018 Camry since purchasing May 2018. My car is always jerking as I accelerate and when I'm driving in town, feels like I'm getting rear-ended and hesitating on highway when I have to accelerate into traiffic which is very dangerous when the car won't get up and go. I have had it

---

[15] NHTSA Complaint ID No. 11242822.  (Emphasis added.)

[16] Consumer complaints posted on NHTSA are reported in all capitalized text.  That text has been reformatted into sentence case here for ease of readability.  However, all typographical errors in quoted complaints are reproduced from the originals.

> to the dealer several times. They reset the computer because it can save settings from previous drivers. That didn't help. They told me that it's a different transmission and it takes few seconds for the computer to communicate back to transmission. This is a very unsafe feature. …[17]

53.     On  September 11, 2019, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA:

> ***Severe hesitation when gas is applied, especially when crossing heavy traffic and instant power/quick acceleration needed.*** Also noted when going around corners, after car has slowed down below 5 mph to make the corner. Gas is applied with hesitation. Noted more when car is at a complete stand still/moving at slow speed then gas applied to move forward. ***Car does not move/react instantly.*** I notice this problem on a weekly (at least) basis.[18]

54.     On September 11, 2019, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA:

> ***2019 Highlander XLE jerks and stalls, then loses power.*** This occured on a newly purchased vehicle that has approximately 13k miles on it, in stop and go traffic on a sub-urban street. ***No check engine light or other alert came on, providing no indication to the driver of the issue.*** Was able to restart the vehicle and drive it to the dealership. ***They said it was a fuel pressure issue, and are replacing the fuel pump - a part that usually lasts more than 200,000 miles.*** I have no idea whether this is a fuel pump issue, or a fuel regulation issue, and if those functions are both performed by the fuel pump. The dealer did not seem to be aware of the issue, and there are no related recalls for this issue. They did find one other instance of this occurring when they researched it. I'd like to know for certain whether this is a fuel pump issue, or a fuel regulation issue. ***This presented a very dangerous situation, and I was lucky to be able to get off the road***.[19]

55.     On October 17, 2019, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA:

---

[17] NHTSA Complaint ID No. 11175845. (Emphasis added.)

[18] NHTSA Complaint ID No. 11254633.  (Emphasis added.)

[19] NHTSA Complaint ID No. 11254630.  (Emphasis added.)

The contact leases a 2019 Toyota Highlander. *While driving, the engine stalled without warning and the steering wheel seized. The contact coasted the vehicle over to the side of the road* and powered off the engine. The vehicle was restarted and was able to drive normally; however, the failure recurred twice. The vehicle was taken to page Toyota (21262 Telegraph Rd, Southfield, MI 48033, (248) 352-8580) where it was diagnosed, but the technician could not find a failure code. The vehicle was not repaired. The manufacturer was made aware of the failure and provided case number: 1910282286. The failure mileage was approximately 4,000.[20]

56.     On October 20, 2019, the owner of a 2019 Highlander filed the following

complaint with NHTSA:

Stopped at a stop light and when it turned green pushed on the gas pedal. *The entire car jerked and didn't have any power to go through the intersection*. The RPM gage began jumping as the car rolled. *I rolled on through the intersection, was almost hit.* Had no steering ability. Lights and alarms began going off. Message board said traction control turned off. Then check engine. Then visit dealer. *Then the car died at the edge of the intersection and we pushed it off the highway* onto a county road. It will not start at all. Acts like it isn't getting any gas. This is the 3 incident with this car doing this. We have towed it twice to the dealership. They replaced a valve in the engine. They said it was stuck. Apparently that wasn't what is wrong with it. *Glad this wasn't on the interstate. We could have been killed*.[21]

57.     On November 22, 2019, the owner of a 2018 Camry filed the following complaint

with NHTSA:

When driving the vehicle, the transmission does not appear to know what gear to be in and is always searching. So much so that *it will lunge at times when all you are trying to do is accelerate.* When slowing down and then slowly applying gas again, nothing happens for a good 10 seconds and then *it surges and causes my head to slam into the back of the head rest*. Also while idling the vehicle is decently loud, more so when defroster is engaged. At

---

[20] NHTSA Complaint ID No. 11277376. (Emphasis added.)

[21] NHTSA Complaint ID No. 11269776.  (Emphasis added.)

> freeway speeds it tends to do better, but most issues appear to be in
> city day to day driving from the transmission/ or fuel system.[22]

58.     Consumers also filed additional complaints about the Fuel Pump Defect on other
websites that Toyota monitored, or should have been monitoring.

59.     For example, on carcomplaints.com, a popular site that collects complaints lodged
by drivers,[23] an owner of a 2018 Toyota Camry stated:

> The response time of accelerating and the car moving is significant
> at irregular intervals. ***This is hazardous when I am planning to
> overtake*** because it takes longer than expected.[24]

60.      On carcomplaints.com, an owner of a 2018 Toyota Camry stated:

> When driving my vehicle I get a stalled response when pressing on
> the gas and ***then it jerks forward. This can be very dangerous
> when driving on the streets*** because there is a lot if stop and go
> movements. It usually happens when I come to a complete stop at
> a stop light or stop sign, even when stopping to turn down a street.
> I'm not sure why the vehicle does this, I just bought it so it should
> still be in very good shape. ***I'm reporting this because it can be a
> potential hazard for a car crash.*** Please have Toyota fix this
> problem in their 2018 Toyota Camry se.[25]

61.     As demonstrated above, Class Vehicles suffer from a uniform design defect which
causes the Fuel Pump to fail prematurely.   Compounding the issue, drivers often are not
protected from these safety risks by a warning prior to Fuel Pump failure.

62.     The Fuel Pump Defect causes vehicles to become dangerous to operate or
inoperable while on the road and therefore they are not fit for their ordinary purpose.

---

[22] NHTSA ID No. 11282087.  (Emphasis added.)

[23] The excerpts are true and correct copies of the original complaints published on carcomplants.com.

[24] http://m.carcomplaints.com/Toyota/Camry/2018/fuel_system/fuel_propulsion_system.shtml (last visited February 3, 2020).  (Emphasis added.)

[25] http://m.carcomplaints.com/Toyota/Camry/2018/engine/engine.shtml (last visited February 3, 2020). (Emphasis added.)

## IV.    TOYOTA KNEW ABOUT THE FUEL PUMP DEFECT, BUT CONTINUED TO MANUFACTURE, MARKET, AND SELL CLASS VEHICLES

63.    Toyota knew or should have known about the Fuel Pump Defect, but it concealed or failed to disclose the defect and continued to manufacture, market, and sell Class Vehicles. Specifically, Toyota knew or should have known the Class Vehicles needed enhanced Fuel Pumps, but it failed to provide corrective action.

64.    Toyota knew or should have known about the Fuel Pump Defect since the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles.  During these phases, Toyota would have gained comprehensive and exclusive knowledge about the Fuel Pumps, particularly the basic engineering principles behind the construction and function of the Fuel Pumps such as plastic absorption and deformation.  However, Toyota failed to act on that knowledge and instead installed the defective Fuel Pumps in the Class Vehicles, and subsequently marketed and sold the vehicles to unsuspecting consumers without disclosing the safety risk or warning Class members.

65.    Moreover, Toyota knew about the Fuel Pump Defect based on the large number of claims for Fuel Pump Defect repair and replacement that it admits to receiving.  Specifically, Toyota has identified at least 2,571 warranty claims associated with the Fuel Pump Defect.

66.    Further, federal law requires automakers like Toyota to be in close contact with NHTSA regarding potential defects.  *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).  Accordingly, Toyota should (and does) monitor NHTSA databases for consumer complaints regarding their automobiles as part of their obligation to identify potential defects in their vehicles, such as the Fuel Pump Defect.

67. From its monitoring of the NHTSA databases, Toyota knew or should have known of the many Fuel Pump Defect complaints lodged, such as those quoted in Section III above. However, Toyota failed to act on that knowledge by warning Class members.

68. Finally, Toyota knew about the Fuel Pump Defect through its own investigation. Toyota admitted to conducting 66 field investigations as part of which it generated Field Technical Reports. However, Toyota failed to act on that knowledge by warning Class members.

69. Despite Toyota's extensive knowledge, Toyota failed to act on that knowledge by warning Class members. Sacrificing consumer safety for profits, Toyota instead chose to enrich itself by using false and misleading marketing to sell the Class Vehicles as safe and durable at inflated prices.

## V. TOYOTA CONTINUOUSLY TOUTED CLASS VEHICLES AS SAFE AND DEPENDABLE, CONCEALING THE FUEL PUMP DEFECT

70. Toyota's overarching marketing message for the Class Vehicles was that the vehicles are safe and dependable and that their engines can be relied on to perform well. This marketing message is false and misleading given the propensity of the Fuel Pump Defect in the Class Vehicles to fail, causing the vehicles' engines to run rough, stall and become inoperable, which Toyota admits increases the risk of a crash.

71. Toyota is one of the ten biggest advertising spenders in the United States,[26] and much of that advertising budget goes toward promoting its brands as safe and dependable. For example, as of the time of the filing of this action, Toyota's main website touted the safety

---

[26] Jitendra Parashar, "Understanding Toyota's Marketing Strategy," Market Realist, May 27, 2016, Available at http://marketrealist.com/2016/05/understanding-toyotas-marketing-strategy/ (visited January 30, 2020)

features of its vehicles, attempting to induce potential customers to purchase or lease the Class

Vehicles by stating, among other things:

> Let's Go Places, Safely.
>
> Why were 9 Toyota vehicles named "Top Safety Picks" by the Insurance Institute for Highway Safety in 2017?  Because we design them with the knowledge that safety is more than features – it's the lives of the people who drive our cars.
>
> For us, the journey towards a safe road never ends.  This belief, along with our collaborative research efforts, drives us to create advancements and innovations in safety that have helped (and continue to help) prevent crashes and protect people.

72.     An image of this top section of Toyota's website is below.[27]



---

[27] https://www.toyota.com/usa/safety/ (visited January 29, 2020).

73.     This part of Toyota's website goes on to provide a vast array of information about the purported safety mechanisms Toyota offers in its vehicles, including the Class Vehicles, such as pre-collision technology, vehicle stability control and blind spot monitoring.[28] This is true of prior versions of the website as well.[29]

74.     On Toyota's main website, there is a page describing the Company's leadership that repeats its consistent and pervasive marketing message that Toyota vehicles are safe and dependable.  Toyota states: "We build cars and trucks that help you and your family go places reliably and safely."[30]

75.     Toyota's website currently contains and has contained these representations at all relevant times.

76.     Similar representations are on the Lexus website, which is operated by Toyota. Lexus.com has a detailed section with many subheadings and tabs devoted to describing a host of safety features on Lexus vehicles.[31]  While the standard availability of certain safety features may vary on certain different models, the overall consistent and pervasive marketing message that Toyota advances through its web marketing for its Lexus Class Vehicles is clearly one of safety and dependability.  An example of one image from the Safety section of the Lexus website as of March 2019 is shown below[32] (and similar language remains on the Lexus website to as of the time of the filing of this complaint).[33]  It begins with the language, "ONE STEP CLOSER

---

[28] *Id.*

[29] *See*, *e.g.*, https://web.archive.org/web/20190518011539/https://www.toyota.com/usa/safety/ (visited January 31, 2020).

[30] https://www.toyota.com/usa/our-story/ (visited January 30, 2020).

[31] https://web.archive.org/web/20190331073031/https://www.lexus.com/safety (visited January 30, 2020).
[32] *Id.*

[33] https://www.lexus.com/safety  (visited January 31, 2020).

TO A WORLD WITHOUT ACCIDENTS.  LEXUS SAFETY.  …  At Lexus, we're constantly looking out for the driver.  It's why nearly every new Lexus model comes standard with Lexus Safety System +, a comprehensive suite of active safety equipment.":



77.    This section of the website describes additional safety features ranging from airbags to GPS-based emergency assistance,[34]  which also appeared on the website in 2018.[35] An example of one image from the Lexus.com safety page as of July 10, 2018 is shown below. It begins with identical language to that used in 2019, "ONE STEP CLOSER TO A WORLD WITHOUT ACCIDENTS.  LEXUS SAFETY.  …  At Lexus, we're constantly looking out for the driver.  It's why nearly every new Lexus model comes standard with Lexus Safety System+, a comprehensive suite of active safety equipment":

---

[34] https://web.archive.org/web/20190331073031/https://www.lexus.com/safety (visited January 30, 2020).

[35] https://web.archive.org/web/20180710173356/https://www.lexus.com/safety (visited January 31, 2020).



At Lexus, we're constantly looking out for the driver. It's why nearly every new Lexus model comes standard with Lexus Safety System+, a comprehensive suite of active safety equipment.* And now, with the introduction of the 2018 LS 500 and LS 500h, we're closer than ever to realizing our ultimate vision: an accident-free world. From technology designed to automatically brake and actively steer* to sensors that can help warn you of cross-traffic* in an intersection to its 24-inch high-resolution Heads-Up Display, this is not just the most sophisticated Lexus safety system yet. It's a preview of what's to come. Scroll for more information about Lexus safety. Or, to learn more about the driver-first innovations on the all-new Lexus LS, use the link below.

78.     As in 2019, in 2018, the website went on to describe numerous additional safety features, including airbags and GPS based emergency assistance.

79.     In addition to its representations about Toyota and Lexus vehicles generally, Toyota's website contains specific representations about safety on the pages for specific models of the Class Vehicles.

80.     For example, webpages of various models of the Class Vehicles include multiple photographs and descriptions advertising the safety systems of each of the 2020 and 2019 Toyota models as well as the 2020 and, in many cases, 2019 Lexus models. On information and belief, similar representations were made about the 2018 models of the Class Vehicles when they were being marketed on the Toyota and Lexus websites.  Those sections list an array of safety features such as airbags, side impact protection, and other safety measures.

81.     The individual web pages for the Toyota models that are part of the Recall proudly proclaim that the vehicles come standard with the "Star Safety System."  For example, below is a screenshot of the page for the 2019 4Runner, which is part of the Recall. [36]



82.     Similarly, below is a screenshot of the Star Safety page for the 2019 Camry: [37]

---

[36] https://www.toyota.com/4runner/2019/4runner-features-features/4runner/2019/4runner-features (visited January 30, 2020)

[37] https://www.toyota.com/camry/2019/camry-features/ (visited January 30, 2020).

- 24 -

Safety

Smart safety. Helping you drive with confidence.



Star Safety System™

Smart tech helps keep you safe. This standard comprehensive suite of six advanced safety features helps keep you out of harm's way. The system includes enhanced Vehicle Stability Control (VSC), [61] Traction Control (TRAC), Anti-lock Brake System (ABS), Electronic Brake-force Distribution (EBD), Brake Assist (BA) [60] and Smart Stop Technology® (SST). [55]

83.     The Lexus website makes similar representations about the safety of the individual Lexus models that are part of the Recall.  For example, multiple Class Vehicles' individual pages contain the following statement: "LEXUS SAFETY SYSTEM+* … With an integrated suite of active safety equipment, security comes standard," and go on to list an array of safety features, from airbags to computerized functions.[38]

84.     A car with a defective fuel pump that can cause the engine to stutter or stall while the vehicle is in motion, as do the Class Vehicles, and thereby exposes its occupants to the risk of injury and even death *is not a safe car*.  Thus Toyota's marketing of the Class Vehicles as safe is false and misleading and omits facts that would be material to consumers such as Class members

---

[38] *See, e.g*, https://web.archive.org/web/20180506081936/http://www.lexus.com/models/RX/safety (visited January 30, 2020);
https://web.archive.org/web/20180525081736/http://www.lexus.com/models/NX/safety (visited January 30, 2020).

who purchased or leased Class Vehicles because they were consistently marketed as having the utmost safety on the road.

85.     In addition to its representations about safety, Toyota also made false and misleading representations about the durability, power and functioning of the engines of the Class Vehicles.  For example, in its marketing for the 2019 Toyota 4Runner, the Toyota webpage touts its "durability," that the 4Runner is "[f]itted to survive," and tells drivers:  "You won't fall short of power." Below is a screenshot of the relevant page from Toyota's website:



86.     Similarly, with respect to the 2018 Lexus RX, the Lexus website touts the vehicle's "exceptionally smooth performance":[39]

---

[39] https://web.archive.org/web/20180513215900/http://www.lexus.com/models/RX/features (visited January 30, 2020).

**THE FEARLESS 2018 RX**

The RX pairs leading-edge technology with exceptionally smooth performance.
Meanwhile, the first-ever three-row RXL delivers uncompromised styling with
added passenger capacity.

87.     As with Toyota's representations about the safety of the Class Vehicles, these and similar representations about their performance are false and misleading.[40]   Toyota's representations that "you won't fall short of power," and that the Lexus has an "exceptionally smooth performance," are false and misleading because, as Toyota admits by virtue of the Recall,  the Class Vehicles are unsafe and do not perform as advertised as they are prone to Fuel Pump failure that can lead to rough running, engine hesitation and stalling while the vehicle is in motion, and render the Class Vehicles inoperable while on the road.

88.     Similar representations to those that Toyota made on the Toyota and Lexus websites were also included in brochures for the Class Vehicles,[41] and Toyota's other messaging about the Class Vehicles.

89.     Toyota's marketing of the Class Vehicles conveys a clear, uniform and pervasive message that Class Vehicles are to be equated with safety and dependability.  Safety and dependability are material to consumers when purchasing or leasing a vehicle, and, as the content of Toyota's marketing makes clear, are a big if not the biggest factor driving consumers' decision to purchase or lease their Class Vehicles.

---

[40] https://web.archive.org/web/20180513215900/http://www.lexus.com/models/RX/features (visited January 30, 2020).

[41] *See, e.g.,*  https://www.toyota.com/content/ebrochure/2019/highlander_ebrochure.pdf (visited January 30, 2020) at 5, 7; https://www.lexus.com/documents/brochures/2019/MY19-Lexus-ES-and-ES-Hybrid-Brochure.pdf, at 12-13 and 24-25 (visited January 30, 2020).

90.     Toyota marketed the Class Vehicles as safe and dependable, but failed to disclose the existence and impact of the Fuel Pump Defect and/or that the Class Vehicles were not safe or dependable.  Specifically, Toyota:

        a.      Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the Fuel Pump Defect, despite its knowledge;

        b.      Failed to disclose, at and after the time of purchase, lease, and/or service, the Class Vehicles' Fuel Pumps were defective and not fit for their ordinary purpose, despite its knowledge; and

        c.      Failed to disclose and actively concealed the existence and pervasiveness of the Fuel Pump Defect, despite its knowledge.

91.     Toyota's deceptive marketing and willful and knowing failure to disclose the Fuel Pump Defect damaged, and continues to damage, Plaintiff and Class members.  If Plaintiff and Class members had known of the Fuel Pump Defect and/or that the Class Vehicles were not safe and durable, they would not have purchased or leased the Class Vehicles or certainly would have paid less to do so.

## VI.     TOYOTA ADMITTED THE FUEL PUMP DEFECT WAS DANGEROUSLY DEFECTIVE, BUT ISSUED AN INADEQUATE RECALL

92.     On January 13, 2020, Toyota instituted a voluntary safety recall of the Recalled Vehicles admitting that the defective Fuel Pump prematurely fails, compromising consumer safety.

93.     In connection with the Recall, Toyota identified as the root cause a plastic impeller which deforms due to fuel absorption.

94.     Toyota stated that it was aware of at least 66 Toyota Field Technical Reports and 2,571 warranty claims associated with the Fuel Pump Defect.  By instituting the Recall, Toyota admitted the Fuel Pump Defect is a serious safety defect that could lead to a crash, which can result in serious injury or death.

95.     Toyota, however, limited the Recall to a subset of model year 2018-2019 Class Vehicles.  Specifically, Toyota limited the Recall to the Recalled Vehicles, which are non-hybrid Toyota and Lexus Class Vehicles manufactured between August 1, 2018 through January 31, 2019 and equipped with a Denso made low-pressure fuel pump.  The Recall omits other Class Vehicles equipped with the same defective Fuel Pumps.

96.     Although Model Year 2018-2019 Hybrid variant Class Vehicles are not included in the Recall, as Toyota admits in the Recall Report, they too are equipped with the same defective Fuel Pump.  These Hybrid variant Class Vehicles also experience the Fuel Pump Defect.

97.     For example, on carcomplaints.com, an owner of a 2018 Toyota Camry Hybrid stated about their vehicle:

> The vehicle did not respond properly to the driver pressing the accelerator. When the driver attempted to drive the vehicle after it had been parked for a few hours, with no problems previously, ***the vehicle would barely accelerate***. The vehicle felt very sluggish and even with the accelerator fully pressed it would not exceed 25 mph. The driver pulled the vehicle over and turned off the vehicle and turned it back on but this did not immediately resolved the issue. The driver drove the vehicle for a few blocks to a safer parking location and turned off the vehicle again to better inspect the vehicle. ***There were no warnings on the instrument panel and no obvious signs of mechanical issues***. The driver restarted the vehicle and attempted to drive it again the issue did not re-appear. This vehicle had not yet been inspected by the dealership since the incident but ***could have resulted in a tragic collision and needs to be addressed***.[42]

---

[42] http://m.carcomplaints.com/Toyota/Camry_Hybrid/2018/engine/vehicle_speed_control.shtml (last viewed February 3, 2020).   (Emphasis added).

98.     On carcomplaints.com, an owner of a 2018 Toyota Camry Hybrid stated about their vehicle:

> The contact owns a 2018 Toyota Camry hybrid. While driving at lower speeds in both drive and reverse*, the vehicle would hesitate and jerk*. The contact indicated that the failure was more severe while driving in very cold weather temperatures and when the engine was not warmed up. In addition, ***the braking distance was extended when the brake pedal was depressed***. The vehicle was taken to the local dealer (crestmont Toyota, 730 NJ-23, pompton plains, New Jersey) where the failure was able to be duplicated, but indicated that the vehicle was operating as designed. The manufacturer was also notified and the contact was referred back to the dealer. The failure mileage was 1,000.[43]

99.     Omission of these Hybrid variants from the Recall is improper, as Toyota had ample knowledge the defect exists within these vehicles.

100.     Egregiously, Toyota, despite issuing the Recall, has not notified the owners of the Recalled Vehicles let alone the Class Vehicles of the Fuel Pump Defect.  Toyota acknowledged the defect and the serious safety consequences it poses on January 13, 2020 by submitting the Recall Report to NHTSA.  However, as Toyota states in the Recall Report, it will not notify owners of the Recalled Vehicles until March 13, 2020.[44]  Thus, while Toyota knows the Fuel Pump Defect can result in collision and serious injury, Toyota's business strategy is to remain silent and keep consumers in the dark about the dangerous defect until two months after it acknowledged the defect to NHTSA.

101.     Further, as Toyota states in the Recall Report, there is no corrective repair for the Fuel Pump Defect and it "is still under study."[45] This means Toyota is willingly and knowingly permitting a minimum of 700,000 undeniably dangerous Toyotas to be driven by its customers

---

[43] http://m.carcomplaints.com/Toyota/Camry_Hybrid/2018/engine/engine.shtml (last visited February 3, 2020).  (Emphasis added).

[44] Exhibit A at 12.

[45] *Id.*

throughout the United States, including in New York. It also means there is no guarantee that there will be a corrective repair and even, if there is one, that it will be effective.  Moreover, Toyota has provided no date by which its "study" of a potential repair will be completed let alone when the fix can be implemented.

102.    Indeed, consumers have continued to raise grave concerns after the announcement of the Recall.

103.    For example, on January 16, 2020, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA:

> ***Fuel pump stops working while driving on highway at high speeds,*** vehicle rides rough intermittently then shuts down. Vehicle will not start up again.[46]

104.    On January 24, 2019, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA, expressly complaining about the dangerous lack of recall remedy, and stating that the owner had been forced to "park" (*i.e.*, not use) the car in the interim:

> First incident occurred in Dec 2019 and then again in Jan 2020. ***While driving engine lost power and vehicle began lurching forward and back uncontrollably***. After pulling over engine shut down. ***Thankfully we did not cause an accident***. Check engine light came on, also said reduced engine power and traction control off. First time dealer said it was bad gas. Second time they tested fuel pump and it was producing 5 psi. Way below 50-60 psi norm. ***Now our vehicle is parked waiting for Toyota to develop a fix for their fuel pump.*** No idea how long that will take. Our car is part of the almost 700,000 Toyota recalled. Toyota used to mean quality, not sure any more.[47]

105.    Although Toyota undeniably knows about the grave dangers of the Fuel Pump Defect, Toyota has not indicated that it intends to take the vehicles off the road—even temporarily—or enable Class members to stop driving the dangerous vehicles until and if there is a repair by contacting them and offering them free loaner vehicles of the type of Class Vehicle

---

[46] NHTSA Complaint ID No. 11299706. (Emphasis added.)

[47] NHTSA Complaint ID No. 11301691. (Emphasis added.)

they own or lease.  Thus, Toyota is knowingly keeping at least 700,000 of its customers, if not more, in danger.

106.    Therefore, the Recall is inadequate and unconscionable.  It fails to promptly alert Class members to the admittedly dangerous Fuel Pump Defect and provide them with a safe alternative, which will inevitably lead to more Fuel Pump failures, and possibly injury or death. The Recall is also inadequate in scope, omitting hybrid versions of the Recalled Vehicles equipped with the same Fuel Pump.  These actions are deceitful, unconscionable, and expose Class members to injury and death. In addition to these dangers, Toyota's actions have deprived purchasers and lessees of the Class Vehicles of the benefit of their bargain.

## VII.    APPLICABLE WARRANTIES

107.    Toyota sold and leased the Class Vehicles with written express warranties.

108.    For the Toyota branded Class Vehicles, Toyota offered a written express basic warranty covering Toyota brand vehicles for 36 months or 36,000 miles covering all components (except normal wear and tear).  Toyota also offered a 60 month or 60,000 miles powertrain warranty.

109.    For the Lexus branded Class Vehicles, Toyota offered a written express Limited Warranty of four years or 50,000 miles.   Toyota also offered a six-year 70,000 miles powertrain warranty.

110.    Toyota provides these warranties to buyers and lessees after the purchase/lease of the Class Vehicles is completed; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.

111.    However, Toyota admitted a breach of these warrantied in the Recall Report when it reported it did not have a repair.  Class members complain to dealers about the Fuel Pump

Defect but do not receive an adequate repair, breaching the express and implied warranties provided by Toyota.

## VIII.   CLASS ACTION ALLEGATIONS

112.   Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of herself and all others similarly situated.

113.   Plaintiff seeks to represent a New York statewide class ("Statewide Class") defined as follows:

> All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of New York.

114.   Plaintiff also seeks to represent a class ("Nationwide Class") defined as:

> All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the United States.

115.   Excluded from the Statewide and Nationwide Classes ("Classes") are Toyota and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.  Plaintiff reserves the right to modify or amend definitions of the Classes, and to add additional classes and sub-classes, as appropriate, during the course of this litigation.

116.   This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

117.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the Classes are so numerous and geographically dispersed that individual joinder of all class members is impracticable.  While Plaintiff is informed and believes that there are not less than at least approximately 700,000 members of the Classes, the precise number of Class members is unknown to Plaintiff, but may be ascertained from Toyota's books and records.  Nationwide and

Statewide Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

118.    **Commonality and Predominance – Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).**   This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

a.   whether Toyota engaged in the conduct alleged herein;

b.   whether Toyota's alleged conduct violates applicable law;

c.   whether Toyota designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

d.   whether Toyota made false or misleading statements about the quality and safety of the Class Vehicles;

e.   whether the Class Vehicles contain the Fuel Pump Defect;

f.   whether Toyota had actual or implied knowledge about the alleged defect but failed to disclose it to Plaintiff and the other members of the Classes;

g.   whether Toyota's omissions and concealment regarding the quality of the Class Vehicles were likely to deceive the Statewide Class members in violation of the state consumer protection statutes alleged herein;

h.   whether Toyota breached its express warranties with respect to the Class Vehicles;

i.   whether Toyota breached its implied warranties with respect to the Class Vehicles;

j.   whether the members of the Classes overpaid for their Class Vehicles as a result of the defect alleged herein;

k.   whether the members of the Classes are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

l.   the amount and nature of relief to be awarded to Plaintiff and the other members of the Classes.

119.   **Typicality – Federal Rule of Civil Procedure 23(a)(3).**   Plaintiff's claims are typical of the claims of the other members of the Classes because Plaintiff and the members of the Classes purchased or leased Class Vehicles that contain defective Fuel Pumps, as described herein.   Neither Plaintiff nor the other members of the Classes would have purchased the Class Vehicles, or would have as much as they did for the Class Vehicles, had they known of the Fuel Pump Defect.   Plaintiff and the other members of the Classes suffered damages as a direct proximate result of the same wrongful practices in which Toyota engaged.   Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other members of the Classes.

120.   **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other members of the Classes that she seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.   The interests of the members of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

121.     **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**
Toyota has acted or refused to act on grounds generally applicable to Plaintiff and the other
members of the Classes, thereby making appropriate final injunctive relief and declaratory relief,
as described below, with respect to the Nationwide and Statewide Class members as a whole.

122.     **Superiority – Federal Rule of Civil Procedure 23(b)(3).**   A class action is
superior to any other available means for the fair and efficient adjudication of this controversy,
and no unusual difficulties are likely to be encountered in the management of this class action.
The damages or other financial detriment suffered by Plaintiff and the other members of the
Classes are relatively small compared to the burden and expense that would be required to
individually litigate their claims against Toyota, so it would be impracticable for the other
members of the Classes to individually seek redress for Toyota's wrongful conduct.   Even if
these Class members could afford individual litigation, the court system could not.   Individual
litigation creates a potential for inconsistent or contradictory judgments, and increases the delay
and expense to all parties and the court system.   By contrast, the class action device, as intended
by Congress, presents far fewer management difficulties, and provides the benefits of single
adjudication, economy of scale, and comprehensive supervision by a single court.

## IX.   CLAIMS FOR RELIEF

### A.  Claims Brought on Behalf of the Statewide Class

**COUNT I**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW,**
**N.Y. GEN. BUS. LAW § 349**
(Individually and on Behalf of the Statewide Class)

123.     Plaintiff incorporates by reference each allegation set forth in paragraphs 1 - 122.

124.    This Count is brought on behalf of Plaintiff and the Statewide Class ("Class" for the purposes of this Count) for violation of New York General Business Law § 349 ("GBL § 349"), which prohibits deceptive acts or practices in the conduct of any business, trade or commerce in New York State.

125.    GBL § 349(h) provides that "any person who has been injured by reason of any violation of this section may bring . . . an action to recover his actual damages or fifty dollars, whichever is greater."

126.    GBL § 349(h) further provides that "[t]he court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section," and that "[t]he court may award reasonable attorney's fees to a prevailing plaintiff."

127.    Toyota's design, manufacture, distribution, marketing, advertising, labeling, and sale of the Class Vehicles constitutes "business, trade or commerce" under GBL § 349(a).

128.    Toyota's conduct violates GBL § 349 because Toyota engaged in the deceptive acts and practices described above.

129.    Toyota's deceptive conduct and its false and misleading statements about Class Vehicle safety and dependability and omissions regarding the Fuel Pump Defect, which causes the Fuel Pumps to prematurely fail, are facts that a reasonable person would have considered material in deciding whether or not to purchase or lease (or how much they were willing to pay to purchase or lease) the Class Vehicles.

130.    Toyota's acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiff and members of the Class.

131.    Plaintiff and the other Class members justifiably acted or relied to their detriment upon Toyota's misrepresentations and omissions of fact, as evidenced by Plaintiff and the other Class members' leasing and purchasing of Class Vehicles.

132.    Toyota's materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiff and members of the Class.

133.    Had Toyota disclosed all material information regarding the Fuel Pump Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

134.    Toyota's deceptive acts and practices, and misrepresentations and omissions, have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

135.    Toyota also engaged in deceptive conduct by issuing a defective Recall that provides no remedy for the Fuel Pump Defect, does not notify Class members about the Fuel Pump Defect, does not instruct consumers to stop driving the dangerous Class Vehicles, does not notify consumers and offer them free loaner vehicles, and does not offer consumers free loaner vehicles of the same class as their own to enable them to cease driving their dangerous Class Vehicles until a repair is available and can be implemented.

136.    Toyota's actions impact the public interest because Plaintiff and the Class have been injured in exactly the same way as hundreds of thousands of other consumers by Toyota's deceptive acts and practices as described herein.

137.    As a direct and proximate result of Toyota's deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages. Plaintiff and the other Class members would not have purchased or leased the Class Vehicles or would have

paid less for them had Toyota disclosed the truth about the Fuel Pump Defect. Plaintiff and the other Class members also suffered diminished value of their vehicles.

138.    As a direct and proximate result of Toyota's deceptive trade practices,  Plaintiff and the other Class members were harmed by Toyota's inadequate Recall, describe above, including its failure to notify them of the Fuel Pump Defect, failure to direct them to stop driving their Class Vehicles, and failure to offer Class members a free loaner vehicle of the same make as their Class Vehicles until Toyota is able to devise a repair that works (if ever) and implement it in each Class Vehicle. Toyota's failure to do so continues to expose Plaintiff and the Class to the risk of injury and death.

139.    Toyota's violation of GBL § 349 was willful and knowing.  Toyota knowingly and willfully marketed the Class Vehicles as safe and dependable all the while knowing they were not; admits in the Recall Report the fact of the Fuel Pump Defect, the thousands of warranty claims and more than 60 field technical reports it received about the Fuel Pump Defect, and that the Fuel Pump Defect poses a serious risk of injury rendering the Class Vehicles unsafe; and the facts of the defect Recall are incontrovertible. Toyota, through its willful and knowing deceptive acts and practices, as detailed above, has willfully and knowingly exposed Plaintiff and the Class to the risk of serious injury and death, and continues to do so by virtue of having issued the deficient Recall.

140.    As a direct and proximate result of Toyota's conduct in violation of GBL § 349, Plaintiff and the members of the Class have been injured in an amount to be proven at trial, with a statutory minimum of fifty dollars per Class member. Because Toyota's violation was knowing and willful, Plaintiff is entitled to treble damages under GBL § 349(h).

141.     Plaintiff also seeks injunctive relief, including requiring Toyota to engage in a state of the art notice program to notify owners and lessees to stop using their Class Vehicles and to offer Class Members free loaner vehicles of the same class as their own Class Vehicles until their Class Vehicles can be repaired and rendered safe.

142.     Additionally, pursuant to GBL § 349, Plaintiff and the Class seek attorneys' fees and costs.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**N.Y. U.C.C. § 2-313**
(Individually and on Behalf of the Statewide Class)

143.     Plaintiff incorporates by reference each allegation set forth in paragraphs 1 - 122.

144.     Plaintiff brings this claim individually and on behalf of the other members of the Statewide Class.

145.     Toyota is and was at all relevant times a merchant with respect to the Class Vehicles.

146.     Pursuant to N.Y. U.C.C. § 2-313(i)(a), "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

147.     In its written express warranties, Toyota expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

148.     Toyota's written express warranties formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

149.     Toyota breached its express warranty to repair defective parts in the Class Vehicles. Toyota admittedly has not repaired the Class Vehicles' Fuel Pump Defect.

150.     Further, Toyota has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repairs.

151.     The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Toyota has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

152.     Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited remedy of repair, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

153.     Also, as alleged in more detail herein, at the time that Toyota warranted and sold or leased the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Toyota improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Toyota Vehicles under false pretenses.

154.     As a direct and proximate result of Toyota's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

**COUNT III**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**N.Y. U.C.C. § 2-314**
(Individually and on Behalf of the Statewide Class)

155.     Plaintiff incorporates by reference each allegation set forth in paragraphs 1 - 122.

156.    This Count is brought on behalf of Plaintiff and the Statewide Class ("Class" for the purposes of this Count).

157.    Toyota are "merchants" and the Class Vehicles are "goods" as defined in N.Y. U.C.C. §§ 2-104 and 2-105 .

158.    Pursuant to N.Y. U.C.C. § 2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the sale or lease of the product.  Toyota impliedly warranted that the Class Vehicles were of a merchantable quality.

159.    By placing the Class Vehicles in the stream of commerce, Toyota impliedly warranted that the Class Vehicles are safe, and that all claims in their advertising and marketing of the Class Vehicles were true.

160.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale or lease and at all times thereafter, the Class Vehicles were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the Fuel Pump Defect which causes the Class Vehicles' Fuel Pump to prematurely fail, which can cause the engine to run rough, and the vehicle to stall while being driven or become inoperable.

161.    Further, Toyota has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repair.

162.    Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Toyota's breach of the warranty of merchantability.

163.    At all times that Toyota warranted and sold the Class Vehicles, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Class Vehicles, and instead continued to issue false warranties, and continued to insist the products were safe.  The Class Vehicles were defective when Toyota delivered them to their resellers, dealers, and distributors which sold the Class Vehicles, and the Class Vehicles were therefore still defective when they reached Plaintiff and the Class.

164.    Toyota's resellers, dealers, and distributors are intermediaries between Toyota and consumers.  These intermediaries sell Class Vehicles to consumers and are not, themselves, consumers of Class Vehicles, and therefore have no rights against Toyota with respect to Plaintiff and all other Class members' acquisition of Class Vehicles.  Toyota's warranties were designed to influence consumers who purchased and/or owned Class Vehicles.

165.    Plaintiff and each Class member's acquisition of the Class Vehicles suffices to create privity of contract between Plaintiff and all other members of the Class, on the one hand, and Toyota, on the other hand; however, privity of contract need not be established nor is it required because Plaintiff and the Class members are intended third-party beneficiaries of contracts between Toyota and their resellers, authorized dealers, and, specifically, of Toyota's implied warranties.

166.    As a direct and proximate result of Toyota's breach of implied warranties of merchantability, Plaintiff and the Class are entitled to damages in an amount to be determined at trial.

## COUNT IV
## NEGLIGENT RECALL/UNDERTAKING
(Individually and on Behalf of the Statewide Class)

167.    Plaintiff incorporates by reference each allegation set forth in paragraphs 1 - 122.

168.    Plaintiff brings this Count individually and on behalf of the other members of the Statewide Class (the "Class," for purposes of this Count).

169.    Prior to the events made the basis of this action, Toyota designed, engineered, manufactured, marketed, and placed the Class Vehicles in the stream of commerce.

170.    On January 13, 2020, Toyota initiated a voluntary recall of the Recalled Vehicles. Toyota's recall was voluntary and not initiated by NHTSA.

171.    Toyota owed a duty to use reasonable care to Plaintiff and Class members based on its undertaking of the Recall.

172.    As described above, Toyota breached its duty by conducting the Recall negligently and/or wantonly by, among other things, failing to notify Plaintiff and the Class of the Fuel Pump Defect, failing to direct Class members to stop driving their Class Vehicles, and failing to offer Class members a free loaner vehicle of the same make as their Class Vehicles until Toyota is able to devise a repair that works (if ever) and implement it in each Class Vehicle. Toyota's failure to do so continues to expose Plaintiff and the Class to the risk of injury and death.

173.    For the reasons set for the above, Toyota knew, or should have known through the exercise of ordinary care, the Recall was not being performed in a reasonable manner.

174.    As a direct and proximate result, Plaintiff and the other Class members have been and continue to be damaged in an amount to be determined at trial.

**COUNT V**
**UNJUST ENRICHMENT**
(Individually and on Behalf of the Statewide Class)

175.    Plaintiff incorporates by reference each allegation set forth in paragraphs 1 - 122.

176.    Plaintiff brings this Count individually and on behalf of the other members of the Statewide Class (the "Class," for purposes of this Count).

177.    Toyota has benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Toyota's concealment of the Fuel Pump Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

178.    Toyota has unjustly received and retained benefits from Plaintiff and the other members of the Class, which contrary to equity and good conscience.

179.    It is inequitable and unconscionable for Toyota to retain these benefits.

180.    Because Toyota wrongfully concealed its misconduct, Plaintiff and the other members of the Class were not aware of the facts concerning the Class Vehicles and did not benefit from Toyota's misconduct.

181.    Toyota knowingly accepted the unjust benefits of its wrongful conduct.

182.    As a result of Toyota's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

**B. Claim Brought on Behalf of the Nationwide Class**

**COUNT VI**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**15 U.S.C. §§ 2301, *et seq*.**
(Individually and on Behalf of the Nationwide Class)

183.    Plaintiff incorporates by reference each allegation set forth in paragraphs 1 - 122.

184.    Plaintiff brings this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count).

185.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332 (a) and (d).

186.   Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

187.   Toyota is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

188.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

189.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

190.   In its express written warranties, Toyota expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects become apparent during the warranty period.

191.   Toyota's warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).   The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C. § 2301(7).

192.   With respect to Class members' purchases or leases of the Class Vehicles, the terms of Toyota's written warranties and implied warranty became part of the basis of the bargain between Toyota and Plaintiff and other Class members.

193.   Toyota breached the implied warranty of merchantability.  Without limitation, the Class Vehicles have Fuel Pumps that prematurely fail, as described above, which renders the Class Vehicles unmerchantable.

194.   Toyota breached its express warranties by not offering a functioning repair for the defective Fuel Pump in the Class Vehicles as evidenced by Toyota's own admission in the Recall Report that it has not identified a remedy.

195.     Further, Toyota has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile.  As stated above, Class members report Fuel Pump failure to their dealer, but Toyota has failed to repair the defect.

196.     At the time of sale or lease of each Class Vehicle, Toyota knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Fuel Pump Defect.

197.     The amount in controversy of Plaintiff's individual claim exceeds the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of costs and interest, computed on the basis of all claims to be determined in this lawsuit.

198.     Plaintiff, individually and on behalf of the Class members, seeks all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

## X.     REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief against Defendants as set forth below:

1.     Certifying the proposed Nationwide and Statewide Classes;

2.     Appointing Plaintiff as the Class representative and Wolf Haldenstein Adler Freeman & Herz LLP and Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. as Class counsel;

3.     Ordering Toyota to pay actual and statutory damages (including punitive damages) and restitution to Plaintiff and the other Class members, as allowable by law;

4.     Enjoining Toyota from continuing the unfair business practices alleged in this Complaint;

5.       Ordering Toyota to pay both pre- and post-judgment interest on any amounts awarded;

6.       Ordering Toyota to pay attorneys' fees and costs of suit;

7.       Awarding injunctive relief requiring Toyota promptly and fully inform Class members of the Fuel Pump Defect and its associated dangers and instructing such Class members to cease driving their vehicles, and ordering Toyota provide free loaner vehicles of the type of Class Vehicle each Class member owns or leases until a remedy for the Fuel Pump Defect is installed in the Class Vehicles; and

8.       Granting such additional relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial on all issues so triable.

Dated:         New York, New York
               February 4, 2020

                                        **WOLF HALDENSTEIN ADLER
                                        FREEMAN & HERZ LLP**

                                          /s/ Malcolm T. Brown
                                        Demet Basar
                                        Malcolm T. Brown
                                        Kate McGuire
                                        270 Madison Ave.
                                        New York, New York 10016
                                        (212) 545-4600
                                        basar@whafh.com
                                        brown@whafh.com
                                        mcguire@whafh.com

**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**

W. Daniel "Dee" Miles, III (*pro hac vice*
    application forthcoming)
H. Clay Barnett, III (*pro hac vice*
    application forthcoming)
J. Mitch Williams (*pro hac vice* application
    forthcoming)
272 Commerce Street
Montgomery, Alabama 36104
Telephone: 334-269-2343
Dee.Miles@Beasleyallen.com
Clay.Barnett@BeasleyAllen.com
Mitch.williams@Beasleyallen.com

*Attorneys for Plaintiff and the [Proposed]
Class*


**FORCHELLI DEEGAN TERRANA LLP**
Elbert F. Nasis
333 Earle Ovington Blvd., Suite 1010
Uniondale, New York 11553
(516) 248-1700
enasis@forchellilaw.com

*Additional Counsel for Plaintiff
Sharon Cheng*

807970