## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHARON CHENG, RHONDA SANFILIPO, CHRISTINA DIAS, ZINA PRUITT, MARLENE RUDOLPH, PATRICIA BARLOW, and KRISTI ROCK individually and on behalf of all others similarly situated, | Case No.: 1:20-cv-00629-WFK-CLP |
| Plaintiffs, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| TOYOTA MOTOR CORPORATION, TOYOTA MOTOR NORTH AMERICA, INC., TOYOTA MOTOR SALES, USA, INC., TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., DENSO CORPORATION and DENSO INTERNATIONAL AMERICA, INC., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Sharon Cheng, Rhonda SanFilipo, Christina Dias, Zina Pruitt, Marlene Rudolph, Patricia Barlow, and Kristi Rock ("Plaintiffs") bring this class action on behalf of themselves and all others similarly situated against defendants Toyota Motor Corporation, Toyota Motor North America, Inc., Toyota Motor Sales, USA, Inc., and Toyota Motor Engineering & Manufacturing North America, Inc. (collectively, "Toyota"); and Denso Corporation and Denso International America, Inc. (collectively, "Denso").[1]  Based on personal knowledge as to matters relating to themselves, and on information and belief based on the investigation of counsel, including counsel's review of consumer complaints available on the database of the National Highway Transportation Safety Administration ("NHTSA") and other publicly available information, as to all other matters, Plaintiffs alleges as follows:

---

[1] Toyota and Denso are collectively referenced as "Defendants."

## INTRODUCTION

1.     On January 13, 2020, Toyota submitted a safety recall report (the "First Recall Report" or "First Recall")[2] to NHTSA voluntarily recalling nearly 700,000 Toyota and Lexus vehicles[3] manufactured between August 1, 2018 through January 31, 2019 with defective low-pressure Denso fuel pumps.  Toyota identified a dangerous defect in the low-pressure fuel pump which can fail and cause the included vehicles to unexpectedly stall and cause engine shut down:

> These fuel pumps contain an impeller that could deform due to excessive fuel absorption. . . . [i]f impeller deformation occurs, the impeller may interfere with the fuel pump body, and this could result in illumination of check engine and master warning indicators, rough engine running, engine no start and/or vehicle stall . . . .

("Fuel Pump Defect").  Approximately 695,541 vehicles are covered by the January 13, 2020 recall.

2.     Defendants collectively designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the subject fuel pump, including the defective impeller identified in the Recall.

3.     On March 4, 2020, Toyota expanded the January 13, 2020 recall (the "Second Recall Report" or "Second Recall"),[4] enlarging it from 695,541 vehicles to 1,817,969 of its most

---

[2] The First Recall Report is attached hereto as Exhibit A.

[3] 2018-2019 Toyota 4Runner, 2019 Toyota Avalon, 2018-2019 Toyota Camry, 2019 Toyota Corolla, 2018-2019 Toyota Highlander, 2018-2019 Toyota Land Cruiser, 2018-2019 Toyota Sequoia, 218-2019 Toyota Sienna, 2018-2019 Toyota Tacoma, 2018-2019 Toyota Tundra, 2019 Lexus ES, 2018-2019 Lexus GS, 2018-2019 Lexus GX, 2018-2019 Lexus IS, 2018-2019 Lexus LC, 2018-2019 Lexus LS, 2018-2019 Lexus LX, 2019 Lexus NX, 2018-2019 Lexus RC, 2018-2019 Lexus RX.

[4] The Second Recall Report is attached hereto as Exhibit B.  The First Recall and the Second Recall are collectively referenced as the "Recalls" and, sometimes, the "Recall," for ease of reference. The vehicles covered by the Recalls are collectively referenced as the "Recalled Vehicles."

popular Toyota and Lexus vehicles.[5]  The Second Recall Report states the additional 1,122,428 recalled Toyota and Lexus vehicles suffer from the same Fuel Pump Defect that gave rise to the First Recall, announced just two months earlier.

4.      In the Second Recall Report, Toyota stated:

> The subject vehicles are equipped with a low-pressure fuel pump, located in the fuel tank, that supplies fuel pressure to the fuel injection system. These fuel pumps may include impellers which have been manufactured with lower density. If these impellers are also (1) of a type with lower surface strength or (2) of a different type but were exposed to production solvent drying for longer periods of time, higher levels of surface cracking may occur. In this condition, excessive fuel absorption may occur, resulting in increased impeller deformation. In some cases, the impeller may deform to a point that creates sufficient interference with the fuel pump body to cause the fuel pump to become inoperative. An inoperative fuel pump due to these conditions could result in illumination of check engine and master warning indicators, rough engine running, engine no start and/or vehicle stall while driving at low speed. However, in rare instances, vehicle stall could occur while driving at higher speeds, increasing the risk of a crash.[6]

5.      In fact, the same dangerous condition that plagues the Recalled Vehicles is present in all model year 2013-2019 Toyota manufactured vehicles equipped with Denso low-pressure fuel pumps with a part number prefix 23220- or 23221- ("Class Vehicles") that gave rise to the Recalls. In other words, there are additional Toyota and Lexus vehicles that suffer from the Fuel Pump Defect that have not been recalled by Toyota.

---

[5] 2014-2015 Toyota 4Runner, 2018-2019 Toyota Avalon, 2018-2019 Toyota Camry, 2018-2019 Toyota Corolla, 2014 Toyota FJ Cruiser, 2018-2019 Toyota Highlander, 2014-2015 Toyota Land Cruiser, 2018-2019 Toyota Sequoia, 2017-2019 Toyota Sienna, 2018-2019 Toyota Tacoma, 2018-2019 Toyota Tundra, 2018-2019 Lexus ES350, 2018-2019 Lexus GS300, 2013-2014 and 2018-2019 Lexus GS350, 2014-2015 Lexus GX460, 2014 Lexus IS-F, 2017 Lexus IS200t, 2018-2019 Lexus IS300, 2014-2015 and 2018-2019 Lexus IS350m 2018-2019 Lexus LC500, 2018-2019 Lexus LC500h (Hybrid), 2013-2015 Lexus LS460, 2018-2019 Lexus LS500, 2018-2019 Lexus LS500h (Hybrid), 2014-2015 Lexus LX570, 2015 Lexus NX200t, 2018-2019 Lexus RC300, 2017 Lexus Rc200t, 2015 and 2018-2019 Lexus RC350, 2017-2019 Lexus RX350, and 2018-2019 Lexus RX350L ("Recalled Vehicles").

[6] Exhibit B.

6.     Toyota's failure to recall all the Class Vehicles is particularly egregious, because Toyota admits the Fuel Pump Defect in the Class Vehicles presents an immediate risk of physical injury when used in their intended manner and for their ordinary purpose.

7.     Toyota has long known of the Fuel Pump Defect in the Class Vehicles, despite marketing the Class Vehicles as safe and dependable. Toyota admitted in both the First Recall Report and the Second Recall Report that it received thousands of warranty requests related to the Fuel Pump Defect in the Class Vehicles.[7]

8.     The Fuel Pump Defect in the Class Vehicles exposes occupants and others to extreme danger, or even death. A vehicle that stalls or suffers engine shutdown is at heightened risk for collision. A vehicle that stalls or suffers engine shutdown causes drivers to react to remove themselves from danger, typically by exiting the road. Drivers stranded on the side of the road experience a heightened risk of danger, whether it is from other vehicles, remoteness or weather elements.

9.     Fuel pump failure can prevent the driver from accelerating at the necessary and anticipated pace. Diminished acceleration ability creates unexpected hazards, startling drivers of the Class Vehicles and other drivers in their proximity. Finally, once a Class Vehicle fuel pump fails, the vehicle becomes totally inoperable and will not start.

10.     While Toyota knew about the Fuel Pump Defect and the associated dangers, Toyota manufactured, marketed, sold, leased, and warranted Class Vehicles, and, in its quest for corporate profits, did not disclose to the unsuspecting public that Class Vehicles were inherently defective, dangerous and create a grave risk for bodily harm or death. As proof of its knowledge, Toyota identified in its First Recall Report 66 Toyota Field Technical Reports and 2,571

---

[7] *See* Exhibit B.

warranty claims associated with the Fuel Pump Defect.[8]  In its Second Recall Report, Toyota expanded its incident report to "81 Toyota Field Technical Reports and 3,225 warranty claims" associated with the Fuel Pump Defect.[9]  Toyota did not disclose, and to this day has not fully disclosed, what it knew about the Fuel Pump Defect to existing and prospective purchasers and lessees.

11.    Toyota knew, or should have known, that the vehicles added in the Second Recall were equipped with the same defective Fuel Pump as the vehicles in the First Recall.  Despite this knowledge, egregiously, Toyota failed to include these vehicles in the First Recall, which delayed notice to owners and lessees of the Recalled Vehicles about the Fuel Pump Defect and the grave dangers it poses.

12.    In the First Recall Report, Toyota did not identify a remedy for the Fuel Pump Defect.  In the Second Recall Report, issued nearly two months later, Toyota stated that it still had not come up with a remedy for the Fuel Pump Defect. Toyota stated in its Second Recall Report that it will notify consumers on May 3, 2020 and intends to "replace the fuel pump assembly with an improved one," but Toyota did not state when the "improved" fuel pump assembly – if it is in fact improved and poses no danger to consumers – will be available and installed in the Class Vehicles.  As things currently stand, due to Toyota's failure to timely notify Class members and remedy the Fuel Pump Defect, owners and lessees of the Class Vehicles are unknowingly driving on roads and highways in potentially ticking time bombs while Toyota knowingly exposes its customers, from whom it made at least tens of billions of dollars from the sale of just the Recalled Vehicles, to the risk of grave physical harm and even death.

---

[8] *See* Exhibit A.

[9] *See* Exhibit B.

13.     Compounding its wrongdoing, despite admitting in both the First Recall Report and the Second Recall Report that the Fuel Pump Defect increases the likelihood of accidents, shockingly, Toyota has not recommended or advised that consumers stop driving the Class Vehicles until the Fuel Pump Defect can be repaired or the fuel pump can be replaced with another pump is demonstrably safe.  Given the inherent dangers of driving Class Vehicles, Toyota at a minimum should have made immediate direct contact with purchasers and lessees of the Class Vehicles, including through Toyota's dealers, which are Toyota's agents, and state vehicle registry lists, and warned them of the dangers posed by the dangerous Fuel Pump Defect in their vehicles and to immediately stop driving their vehicles.

14.     While certain owners and lessees of the Recalled Vehicles were offered loaner vehicles, the loaner vehicles were not of comparable make, model, or value to the Toyota or Lexus they drove, or the same or similar grade or quality as the owners' or lessees' own vehicles.

15.     Moreover, with or without a viable remedy for the Fuel Pump Defect, the Recall has decreased the intrinsic and resale value of the Class Vehicles.  Plaintiffs and other Class members have been damaged as a result.  Additionally, Class members must still honor their lease and loan payments (without proration), even while their vehicles are inoperable and devalued.

16.     Throughout the relevant period, Toyota's marketing of the Class Vehicles was and is replete with assurances about their safety and dependability.  A vehicle that can suddenly stall and lose power during normal operating conditions is inherently unsafe and not dependable and renders Toyota's marketing of the Class Vehicles untrue and materially misleading. Plaintiffs and other Class members have been damaged as a result.

17.     Denso, of which Toyota is the 25% owner, is also culpable because Denso and Toyota together designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the defective Fuel Pump.

18.     Plaintiffs, on behalf of themselves and the Classes (defined below), seek redress for Defendants' egregious and unconscionable misconduct, and assert claims on behalf of statewide classes for: (1) violations of Alabama's Deceptive Trade Practices Act, Ala. Code §§ 8-19-1 *et seq.*; (2) violations of Florida's Unfair and Deceptive Trade Practices Act, Fla. Stat. §§ 502.201*et seq.*; (3) violation of New York General Business Law, G.B.L. § 349; (4) violations of Ohio's Consumer Sales Practices Act, Oh. Rev. Code Ann. §§ 1345.01 *et seq.*; (5) strict product liability; (6) breach of express warranty; (7) breach of implied warranty; (8) negligent recall/undertaking; (9) unjust enrichment; and, on behalf of a nationwide class, and, on behalf of a nationwide class, (10) a claim for violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*  In addition, Plaintiffs seek an order enjoining Toyota's conduct, directing it to inform Class members of the Fuel Pump Defect and to cease driving their vehicles, directing Toyota to contact Class members and advise them that it will provide free loaner vehicles of comparable make, model, or value to the Class Vehicle each owns or leases until a remedy for the Fuel Pump Defect is installed in their Class Vehicles; compensatory damages; restitution; and punitive damages.

## JURISDICTION AND VENUE

19.     Subject matter jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because Plaintiffs and Class members are citizens of a state different than Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.

20.     Subject matter jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1331 because Plaintiffs' Magnuson-Moss Warranty Act claim arises under federal law, and this Court has supplemental subject matter jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over Toyota because Toyota conducts substantial business in this District and some of the actions giving rise to this action took place in this District and/or caused injury to property in this state; and products, materials, or things processed, serviced, or manufactured by Toyota anywhere were used or consumed in this state in the ordinary course of commerce, trade, or use. Toyota is one of the largest manufacturers and sellers of automotive vehicles in the world. Toyota has, at all relevant times, conducted and continue to conduct business in New York, and every other state in the country.

22.     This Court has personal jurisdiction over Denso because Denso routinely conducts business in this District and some of the actions giving rise to this action took place in this District and/or caused injury to property in this state; and products, materials, or things processed, serviced, or manufactured by Denso anywhere were used or consumed in this state in the ordinary course of commerce, trade, or use. Toyota owns a twenty-five percent share of Denso.  Vehicles all over the world, including this District, are equipped with Denso parts, including the Fuel Pump. Denso has, at all relevant times, conducted and continues to conduct business in New York, and every other state in the country.

23.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, Toyota has caused harm to Plaintiffs in this District, and Toyota is a resident of this District

under 28 U.S.C. § 1391(c)(2) because it is subject to personal jurisdiction in this District. Also, venue is proper in this district pursuant to 18 U.S.C. § 1965.

## THE PARTIES

I.    **PLAINTIFFS**

  **A. New York**

     **a. Plaintiff Sharon Cheng**

24.    Plaintiffs Cheng is a citizen of the State of New York and resides in Nesconset, New York.

25.    Plaintiff Cheng leased a new 2019 Lexus RX 350 from Smithtown Lexus in St. James, New York, in January of 2019.  Plaintiff Cheng's Lexus has a defective Denso low-pressure fuel pump and is a Recalled Vehicle.

26.    Prior to leasing her Lexus, Plaintiff Cheng reviewed Toyota's promotional materials, such as Toyota's "Lexus December to Remember" advertisements and sales brochures, and interacted with at least one sales representative without Toyota disclosing the Fuel Pump Defect.

27.    Through her exposure to Toyota's advertisements, promotional materials and Toyota's other public statements, Plaintiff Cheng was aware of Toyota's uniform and pervasive marketing message of dependability and safety, which is a primary reason she leased her Class Vehicle.  When she leased the vehicle, she believed, based on Toyota's marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable.  At no point before Plaintiff Cheng leased her vehicle did Toyota disclose to her the Fuel Pump Defect.

28.     The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to Plaintiffs Cheng and others on the road.  At no time did Toyota inform Plaintiff Cheng of the seriousness of the Fuel Pump Defect or recommend that she discontinue use of her vehicle until there is a repair or a replacement fuel pump.

29.     Plaintiffs Cheng leased her Class Vehicle with the Fuel Pump Defect as part of a transaction in which Toyota did not disclose material facts related to the automobile's essential purpose – safe and dependable transportation.  Plaintiffs Cheng did not receive the benefit of her bargain.  She leased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  The Fuel Pump Defect has significantly diminished the value of Plaintiffs Cheng's Class Vehicle.

30.     Had Toyota disclosed the Fuel Pump Defect, Plaintiffs Cheng would not have leased her Class Vehicle, or certainly would not have paid as much to do so.

### b.  Plaintiff Christina Dias

31.     Plaintiff Dias is a citizen of the State of New York and resides in Levittown, New York.

32.     Plaintiff Dias owns a 2018 Toyota Highlander which she leased new from Atlantic Toyota in West Islip, New York in April 2018.  Plaintiff Dias' Toyota Highlander has a defective Denso low-pressure fuel pump and is a Recalled Vehicle.

33.     Prior to leasing her Toyota, Plaintiff Dias reviewed Toyota's promotional materials, including Toyota's website, interacted with at least one sales representative and test drove her vehicle all without Toyota disclosing the Fuel Pump Defect.

34.     Through her exposure to Toyota's advertisements, promotional materials and other public statements, Plaintiff Dias was aware of Toyota's marketing message of dependability and safety, which is a primary reason she leased her Class Vehicle.  When she leased the vehicle, she believed, based on Toyota's uniform and pervasive marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable.  At no point before Plaintiff Dias leased her vehicle did Toyota disclose to her the Fuel Pump Defect.

35.     Plaintiff Dias experienced the Fuel Pump Defect shortly after taking possession of her vehicle.  In many instances, Plaintiff Dias's vehicle hesitated before accelerating when she depressed the accelerator pedal.   At other times, the vehicle stumbled and lurched before accelerating when Plaintiff Dias's vehicle depressed the accelerator pedal. Plaintiff Dias reported the behavior to her Toyota dealer, but it failed to repair the defect.

36.     Toyota never contacted Plaintiff Dias about the Recalls. Rather, Plaintiff Dias learned her vehicle was involved in the Recalls when she typed her VIN online.  Toyota even failed to notify Plaintiff Dias of the Recalls when she presented her vehicle for service on March 20, 2020, more than two weeks after the Second Recall on March 4, 2020.

37.     The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable risk of death or personal injury to Plaintiff Dias and others on the road. At no time did Toyota inform Plaintiff Dias of the seriousness of the Fuel Pump Defect or recommend that she discontinue use of her vehicle until there is a repair or a replacement fuel pump.

38.     Plaintiff Dias did not receive the benefit of her bargain.  She leased a vehicle that is of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that

met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Fuel Pump Defect has significantly diminished the intrinsic and resale value of Plaintiff Dias's Class Vehicle. Plaintiff Dias's and all other Class Vehicles are stigmatized as a result of being equipped with the Fuel Pump Defect and the publicity of the Recalls.

39.     Had Toyota disclosed the Fuel Pump Defect, Plaintiff Dias would not have leased her Class Vehicle, or certainly would not have paid as much to do so.

### c.  Plaintiff Rhonda SanFilipo

40.     Plaintiff SanFilipo is a citizen of New York and resides in Rochester, New York.

41.     Plaintiff SanFilipo owns a 2019 Lexus NX300 which she leased new from Dorschel Lexus in Rochester, New York on November 30, 2018. Plaintiff SanFilipo's Lexus has a defective Denso low-pressure fuel pump but is *not* a Recalled Vehicle.

42.     Prior to leasing her Lexus, Plaintiff SanFilipo reviewed Toyota's promotional materials, interacted with at least one sales representative, and test drove her vehicle all without Toyota disclosing the Fuel Pump Defect.

43.     Through her exposure to Toyota's advertisements, promotional materials and other public statements, Plaintiff SanFilipo was aware of Toyota's uniform and pervasive marketing message of dependability and safety, which is a primary reason she leased her Class Vehicle. When she leased the vehicle, she believed, based on Toyota's marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff SanFilipo leased her vehicle did Toyota disclose to her the Fuel Pump Defect.

44.     Shortly after leasing her vehicle, Plaintiff SanFilipo experienced the Fuel Pump Defect. For example, Plaintiff SanFilipo's vehicle hesitated before accelerating when she

depressed the accelerator pedal.   At other times, Plaintiff SanFilipo's vehicle stumbled and lurched before accelerating. Additionally, her vehicle experiences an occasional rough idle.  Ms. SanFilipo has reported this behavior to Dorschel Lexus, but it failed to cure the issue.

45.     On February 12, 2020, Plaintiff SanFilipo received a letter from Lexus stating the Recall affected her vehicle.   She contacted Dorschel Lexus about the Recall/repair, but they could not repair it, or offer a repair rollout date.  Ms. SanFilipo has reported this behavior to Lexus Division Toyota Motor Sales USA by certified, returned receipt mail, but it failed to cure the issue.  Despite Toyota's prior representations and the fact that her Class Vehicles exhibits the Fuel Pump Defect, Lexus recently provided a vehicle health report to Plaintiff SanFilipo stating her vehicle has no outstanding recalls.  Toyota's decision to exclude Plaintiff SanFilipo's Class Vehicle from the Recalled Vehicles will leave her without a Recall or warranty repair, even though her Class Vehicle is equipped with the same defective Fuel Pump and exhibits the Fuel Pump Defect.

46.     The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable risk of death or personal injury to Plaintiff SanFilipo and others on the road.

47.     Plaintiff SanFilipo did not receive the benefit of her bargain.  She leased a vehicle of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  The Fuel Pump Defect has significantly diminished the intrinsic and resale value of Plaintiff SanFilipo's Class Vehicle.  Plaintiff SanFilipo's and all other Class Vehicles are stigmatized as a result of being equipped with the Fuel Pump Defect and the publicity of the Recall.

48.     Had Toyota disclosed the Fuel Pump Defect, Plaintiff SanFilipo would not have leased her Class Vehicle, or certainly would not have paid as much to do so.

**B. Alabama**

49.     Plaintiff Zina Pruitt is a citizen of the State of Alabama and resides in Livingston, Alabama.

50.     Plaintiff Pruitt owns a 2019 Lexus RX 350 equipped with a defective Denso low-pressure fuel pump which she purchased new from Lexus of Birmingham in Birmingham, Alabama on January 30, 2019. Plaintiff Pruitt's Lexus has a defective Denso Fuel Pump and is a Recalled Vehicle.

51.     Prior to purchasing her Lexus, Plaintiff Pruitt reviewed Toyota's promotional materials, interacted with at least one sales representative, and test drove her vehicle all without Toyota disclosing the Fuel Pump Defect.

52.     Through her exposure to Toyota's advertisements, promotional materials and other public statements, Plaintiff Pruitt was aware of Toyota's uniform and pervasive marketing message of dependability and safety, which is a primary reason she purchased her Class Vehicle. When she purchased the vehicle, she believed, based on Toyota's marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff Pruitt purchased her vehicle did Toyota disclose to her the Fuel Pump Defect.

53.     On January 21, 2020, Plaintiff Pruitt received notice from Toyota confirming her vehicle is equipped with a defective Denso low-pressure fuel pump, but that the company offers no viable repair. When Plaintiff Pruitt contacted Lexus of Birmingham to inquire into the Recall/repair, the service manager revealed Toyota's position to not warn Class members of the

Fuel Pump Defect until March 2020.  On a separate visit to the dealership, a service technician informed her that Toyota's remedy rollout is tentatively scheduled for June 2020.  At no time did Toyota inform Plaintiff Pruitt of the seriousness of the defect or to quit driving her Class Vehicle.  Because of her distrust of her Class Vehicle, Plaintiff Pruitt finds her vehicle unreliable and refuses to drive it, incurring out of pocket expenses as a result.

54.     The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable risk of death or personal injury to Plaintiff Pruitt and others on the road.

55.     Plaintiff Pruitt did not receive the benefit of her bargain.  She purchased a vehicle of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  The Fuel Pump Defect has significantly diminished the intrinsic and resale value of Plaintiff Pruitt's Class Vehicle.  Plaintiff Pruitt's and all other Class Vehicles are stigmatized as a result of being equipped with the Fuel Pump Defect and the publicity of the Recall.

56.     Had Toyota disclosed the Fuel Pump Defect, Plaintiff Pruitt would not have purchased her Class Vehicle, or certainly would have paid less to do so.

**C. Florida**

a.  **Plaintiff Marlene Rudolph**

57.     Plaintiff Rudolph is a citizen of the State of Florida and resides in West Palm Beach, Florida.

58.     Plaintiff Rudolph owns a 2019 Lexus ES350 which she leased new from JM Lexus in Margate, Florida in March 2019.  Plaintiff Rudolph's Lexus is equipped with a defective Denso Fuel Pump and is a Recalled Vehicle.

59.     Prior to purchasing her Lexus, Plaintiff Rudoph reviewed Toyota's promotional materials, and interacted with at least one sales representative all without Toyota disclosing the Fuel Pump Defect.

60.     Through her exposure to Toyota's advertisements, promotional materials and other public statements, Plaintiff Rudolph was aware of Toyota's uniform and pervasive marketing message of dependability and safety, which is a primary reason she leased her Class Vehicle.  When she leased the vehicle, she believed, based on Toyota's marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable.  At no point before Plaintiff Rudolph leased her vehicle did Toyota disclose to her the Fuel Pump Defect.

61.     Shortly after leasing her Class Vehicle, Plaintiff Rudolph experienced rough engine running as identified in the Recall.  Specifically, her car hesitated before accelerating when she depressed the accelerator pedal.  In some instances, Plaintiff Rudolph's vehicle would fail to start, as identified in the Recall.  Plaintiff Rudolph reported her experiences to Palm Beach Lexus, but they were unable to cure the problems.

62.     Plaintiff Rudolph learned of the Recall through Lexus Enform.  When she contacted Palm Beach Lexus about the Recall/repair, they informed her that her vehicle was included in the recall, but they could not repair it, nor did they know the remedy rollout date. Palm Beach Lexus offered her a loaner vehicle of lesser value.  Despite her vehicle's inoperable status, Plaintiff Rudolph honors her monthly lease payments.

63.     The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable risk of death and personal injury to Plaintiff Rudolph and others on the road.

- 16 -

64.     Plaintiff Rudolph did not receive the benefit of her bargain.  She leased a vehicle of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  The Fuel Pump Defect has significantly diminished the intrinsic and resale value of Plaintiff Rudolph's Class Vehicle.  Plaintiff Rudolph's and all other Class Vehicles are stigmatized as a result of being equipped with the Fuel Pump Defect and the publicity of the Recall.

65.     Had Toyota disclosed the Fuel Pump Defect, Plaintiff Rudolph would not have leased her Class Vehicles, or certainly would have paid less to do so.

**b. Plaintiff Patricia Barlow**

66.     Plaintiff Barlow is a citizen of the State of Florida and resides in Clearwater, Florida.

67.     Plaintiff Barlow owns a 2019 Lexus RX350 which she purchased new from Lexus of Clearwater in Clearwater, Florida on June 19, 2019.  Plaintiff Barlow's Lexus is equipped with a defective Denso Fuel Pump and is a Recalled Vehicle.

68.     Prior to purchasing her Lexus, Plaintiff Barlow reviewed Toyota's promotional materials, including Toyota's website, interacted with at least one sales representative, and test drove her vehicle all without Toyota disclosing the Fuel Pump Defect.

69.     Through her exposure to Toyota's advertisements, promotional materials and other public statements, Plaintiff Barlow was aware of Toyota's uniform and pervasive marketing message of dependability and safety, which is a primary reason she purchased her Class Vehicle.  When she purchased the vehicle, she believed, based on Toyota's marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that

is not marketed as safe and dependable.   At no point before Plaintiff Barlow purchased her vehicle did Toyota disclose to her the Fuel Pump Defect.

70.      With approximately 4,648 miles on vehicle, Plaintiff Barlow's vehicle exhibited fuel pump failure when it hesitated before accelerating when she depressed the accelerator pedal. Plaintiff Barlow reported this behavior to Lexus of Clearwater, which failed to repair the defect. Plaintiff Barlow again experienced the Fuel Pump Defect at approximately 6,000 miles where her vehicle ran rough and failed to accelerate with enough to power to safely operate in traffic. Plaintiff Barlow again reported the behavior to JM Lexus of Clearwater, which failed to repair the defect.

71.      On January 15, 2020, Plaintiff Barlow received a notification via Lexus Enform that the First Recall affected her vehicle.  When she contacted JM Lexus about the Recall/repair, they informed her that her vehicle was included in the recall, but they could not repair it, nor did they know the remedy rollout date.  The dealer provided a loaner vehicle of lesser value.  Despite her vehicle's inoperable status, Plaintiff Barlow honors her monthly payments.

72.      The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable risk of death or personal injury to Plaintiff Barlow and others on the road.

73.      Plaintiff Barlow did not receive the benefit of her bargain.  She purchased a vehicle of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Fuel Pump Defect has significantly diminished the intrinsic and resale value of Plaintiff Barlow's Class Vehicle.  Plaintiff Barlow's and all other Class Vehicles are stigmatized as a result of being equipped with the Fuel Pump Defect and the publicity of the Recall.

74.     Had Toyota disclosed the Fuel Pump Defect, Plaintiff Barlow would not have purchased her Class Vehicle, or certainly would have paid less to do so.

**D.  Ohio**

75.     Plaintiff Rock is a citizen of Ohio and resides in Springboro, Ohio.

76.     Plaintiff Rock owns a 2018 Lexus RX350 which she purchased used with approximately 4,000 miles on it from Lexus of Dayton in Dayton, Ohio on January 21, 2020. Plaintiff Rock's Lexus is equipped with a defective Denso Fuel Pump and is a Recalled Vehicle.

77.     Prior to purchasing her Lexus, Plaintiff Rock reviewed Toyota's promotional materials, interacted with at least one sales representative, and test drove her vehicle all without Toyota disclosing the Fuel Pump Defect.

78.     Through her exposure to Toyota's advertisements, promotional materials and other public statements, Plaintiff Rock was aware of Toyota's uniform and pervasive marketing message of dependability and safety, which is a primary reason she purchased her Class Vehicle. When she purchased the vehicle, she believed, based on Toyota's marketing message, that she would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable.  At no point before Plaintiff Rock purchased her vehicle did Toyota disclose to her the Fuel Pump Defect.

79.     Plaintiff Rock purchased her Class Vehicle because Lexus of Dayton expressly represented her vehicle was not included in the Recall, and they certified it.   Nevertheless, Plaintiff Rock subsequently learned from Lexus customer service that her vehicle was subject to the Recall issued in early January 2020.  Plaintiff Rock has repeatedly reported the discrepancy to Lexus of Dayton, as well as present her vehicle for repair, but they failed to take corrective action.

- 19 -

80.     The Fuel Pump Defect creates a dangerous condition that gives rise to a clear, substantial, and unreasonable risk of death or personal injury to Plaintiff Rock and others on the road.

81.     Plaintiff Rock did not receive the benefit of her bargain.  She purchased a vehicle of a lesser standard, grade, and quality than represented, and she did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  The Fuel Pump Defect has significantly diminished the intrinsic and resale value of Plaintiff Rock's Class Vehicle.  Plaintiff Rock's and all other Class Vehicles are stigmatized as a result of being equipped with the Fuel Pump Defect and the publicity of the Recall.

82.     Had Toyota disclosed the Fuel Pump Defect, Plaintiff Rock would not have purchased her Class Vehicle, or certainly would have paid less to do so.

## II.    DEFENDANTS

### A.  Toyota Motor Corporation

83.     Defendant Toyota Motor Corporation ("TMC") is a Japanese corporation located at 1 Toyota-Cho, Toyota City, Aichi Prefecture, 471-8571, Japan.  TMC is the parent corporation of Toyota Motor Sales, U.S.A., Inc.

84.     TMC, through its various entities, designs, manufactures, markets, distributes and sells Toyota automobiles in the United States, including Plaintiffs' states.

### B.  Toyota Motor North America, Inc.

85.     Defendant Toyota Motor North America, Inc. ("TMNA") is incorporated in California, with its primary address at 6565 Headquarters Dr., Plano, Texas 75024.  TMNA is a holding company of sales, manufacturing, engineering, and research and development subsidiaries of TMC located in the United States.

### C.  Toyota Motor Sales, U.S.A., Inc.

86.    Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") is incorporated and headquartered in the State of California, with its primary address at 6565 Headquarters Dr., Plano, Texas 75024.

87.    TMS is the United States sales and marketing division for TMC, which oversees sales and other operations across the United States.  "Every [Toyota] sold in the U.S. depends upon [TMS's] extensive network of dedicated professionals who align sales and marketing resources for [Toyota's] dealers nationwide."[10]  TMS was responsible for Toyota's marketing of the Class Vehicles as safe and dependable.

88.    TMS distributes Class Vehicles and sells them through a network of dealerships that are the agents of TMS.  Money received from the purchase of a Toyota made vehicle from a dealership flows from the dealer to the TMS.  TMS issues the express repair warranties for the Class Vehicles.

### D.  Toyota Motor Engineering & Manufacturing North America, Inc.

89.    Defendant Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is incorporated in Kentucky and has its primary address at 6565 Headquarters Dr., Plano, Texas 75024.

90.    TEMA is "responsible for [Toyota's] engineering design and development, R&D and manufacturing activities in the U.S., Mexico and Canada."[11]

### E.  Lexus

91.    Lexus is a wholly owned brand, subsidiary, and/or division of TMC and/or TMS. TMC and TMS employ engineering, legal, compliance, and regulatory personnel to make

---

[10] See https://www.toyota.com/usa/operations#!/Sales-Marketing (last visited January 29, 2020).

[11] See https://www.toyota.com/usa/operations/index.html (last visited February 3, 2020).

decisions regarding the subject Lexus vehicles.  These employees, on behalf of TMC and TMS, ultimately made or ratified the decisions that allowed the subject Lexus vehicles to be fraudulently designed, manufactured, marketed, and sold.

## F.  Denso Corporation

92.     Defendant Denso Corporation ("DC") is a Japanese corporation located at 1-1, Showa-cho, Karlya, Alchi 448-9661, Japan.  DC is the parent company of Denso International America, Inc.

93.     DC, through its various entities, designed, engineered, tested, and validated the Fuel Pump that is equipped in Toyota vehicles sold/leased in the United States, including in Plaintiffs' states.

## G.  Denso International America, Inc.

94.     Denso International America, Inc. ("DIAM") is incorporated in Delaware and has its principal place of business at 2477 Denso Drive Southfield, Michigan 48033.

95.     DIAM is "Denso's North American regional headquarters and parent company for its North American operations, including design and production engineering, technical support, sales and finance."[12]

96.     DIAM, through its various entities and on behalf of DC, designed, engineered, tested, and validated the Fuel Pump that is equipped in Toyota Vehicles across the Unites States, including in Plaintiffs' states.

---

[12] https://www.denso.com/us-ca/en/about-us/company-information/diam/ (last visited April 9, 2020).

## FACTUAL ALLEGATIONS

97.     Toyota is the world's second largest manufacturer of automotive vehicles and sells its vehicles across the United States through a network of over 1,200 dealers, including those in Plaintiffs' states.

98.     Toyota also designs, manufacturers, markets and sells its Lexus branded vehicles across the United States, including in Plaintiffs' states.

99.     Toyota has branded itself as the maker of safe and dependable vehicles and has spent millions, if not billions, of dollars on extensive marketing and advertising campaigns to cement the association of safety and reliability with its Toyota and Lexus brand automobiles, including the Class Vehicles.

100.    Denso is the world's second largest Tier1 Original Equipment Manufacturer ("OEM"), producing parts and products for Toyota and other manufacturers.  According to its website, Denso recorded nearly $50 billion in consolidated net sales in 2019.[13]

101.    Denso, with Toyota's assistance, designed, engineered, tested, manufactured, and placed in the stream of commerce the defective Fuel Pump at issue in this litigation.

102.    According to Denso itself, when designing, engineering, testing, and manufacturing its products, Denso aims to "[c]ontribute to future mobility that is safer, more comfortable and convenient for everyone."[14]  The Fuel Pump fails to meet Denso's published standard.

103.    The Defendants collectively designed, engineered, tested, validated, manufactured and placed in the stream of commerce the Fuel Pump in a manner that subjects Class members to an unreasonable risk of death or injury.  Despite producing a defective Fuel Pump, Toyota

---

[13] *Id.*

[14] https://brand.denso.com/en/ourpromise (last visited April 9, 2020).

marketed and sold the Class Vehicles, and has, at all times, uniformly branded the Class Vehicles as safe and dependable.

**I.     THE OPERATION OF CLASS VEHICLES' LOW-PRESSURE FUEL PUMP**

104.    The Class Vehicles are equipped with a Denso low-pressure fuel pump with a part number prefix 23220- or 23221- (the "Fuel Pump").

105.    All Class Vehicles are equipped with the same or substantially similar defective Fuel Pump.

106.    The Fuel Pump assembly is mounted inside of the fuel tank.  The Fuel Pump assembly consists of a fuel intake strainer at one end and a fuel output line at the other.  At the heart of the Fuel Pump assembly is an electric motor with a plastic impeller attached to a rotating shaft.  Protruding from the side of the Fuel Pump assembly is a fuel level float and a fuel level sender.  Figure One illustrates the parts of the Fuel Pump assembly.



*Figure 1 Fuel Pump Assembly Diagram*[15]

107.    As the electric motor rotates, the impeller spins generating negative pressure.  The negative pressure pulls fuel into the pump housing where it passes through the electric motor assembly and exits through the output, into the fuel line and forward to the fuel filter.  After exiting the fuel filter, the fuel flow is accelerated via a high pressure pump which delivers pressurized fuel to injectors mounted in the engine.  Figure Two illustrates this sequence.  Figure Three shows the components of an exemplar Class Vehicle Fuel Pump evaluated by Plaintiffs' counsel's independent automotive engineering expert consultant ("Automotive Expert").

---

[15] http://www.agcoauto.com/content/news/p2_articleid/195 (last visited January 30, 2020).



*Figure 2 Fuel Pump Sequence*[16]



*Figure 3 Exemplar Class Vehicle Fuel Pump*

108.     At all times, by design, the Fuel Pump assembly and all of its components are

exposed to gasoline within the tank, as Figure Four demonstrates.  Fuel pumps are designed to

survive the harsh environment for at least 200,000 miles.[17]

---

[16] https://www.autoplusdubai.net/blog/fuel-pumps-common-causes-and-how-to-identify-it/ (last visited January 30, 2020).

[17] https://www.autoblog.com/2015/11/24/how-long-does-a-fuel-pump-usually-last/ (last visited April 10, 2020).



*Figure 4*

## II.    THE CLASS VEHICLES SUFFER FROM A FUNDAMENTALLY DEFECTIVE FUEL PUMP

109.    As described herein, the Class Vehicles' Fuel Pumps suffer from a fundamental defect causing them to prematurely fail.  Based on Toyota's own admission, and the findings of Plaintiffs' counsel's Automotive Expert, the failure involves a defectively designed plastic impeller.

110.    The Defendants' collective goal in designing a Fuel Pump must be to design one that operates safely and dependably for the life of the vehicle. According to the analysis of the Automotive Expert and, by Toyota's admission, the Fuel Pump assembly in the Class Vehicles was underdesigned.

111.    First, Toyota stated that the "fuel pumps contain an impeller that could deform due to excessive fuel absorption."[18]   The Denso impeller's material is unsuitable for its environment due to its excessive fuel absorption propensity, which causes swelling and premature and unexpected Fuel Pump failure.



*Figure 5 Class Vehicle Exemplar Impeller[19]*

112.    Second, the Denso impeller's unsuitable material has inferior long-term dimensional stability (it deforms, swells and changes shape), resulting in premature and unexpected failure due to component distortion and the resultant swelling induced friction.

113.    Third, the Denso impeller's material has inadequate heat resistance, potentially resulting in dimensional distortion and loss of structural integrity when exposed to high temperatures or repeated temperature cycling.

114.    Plastics absorb liquids, typically.   However, the degree of absorption varies depending on the type of plastic and its environmental conditions.   When plastic absorbs liquid,

---

[18] Exhibit A; Exhibit B.

[19] Figure Five captures an impeller from an exemplar Class Vehicle Fuel Pump.

such as gasoline, the plastic's intended dimensions change.  Therefore, manufacturers like Toyota and Denso must adequately design and validate plastic materials exposed to fuel to ensure that they remain dimensionally stable.[20] Here, Toyota and Denso clearly failed to do that with respect to the Class Vehicles.

115.    Compounding the problem, the Fuel Pumps in the Class Vehicles are repurposed from earlier model year vehicles featuring an older fuel system with different flow and duty cycle properties.  When the repurposed Fuel Pump runs on lower voltage amounts than intended, the pump may overheat and reach higher than desired temperatures for extended periods of time, thus excessively stressing and prematurely aging the already marginally durable impeller causing it to deform, swell, and/or crack under thermal stress.

116.    Toyota admitted Denso's impeller was poorly designed to the point that it cannot remain dimensionally stable under its intended conditions.  Specifically, Toyota admitted in the First and Second Recall Reports that Denso's impeller deformation "may interfere with the fuel pump body" causing it to fail and become inoperable.[21]

117.    The Defendants did not design the Fuel Pump and/or impeller with the necessary robustness to operate safely under normal operating conditions.

118.    At the time Defendants' designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the Fuel Pump, they were aware of, and had access to, reasonable alternative designs.  Such designs would mitigate or eliminate the Fuel Pump Defect.

119.    For example, Defendants could have mitigated or eliminated the Fuel Pump Defect by using different designs and/or materials where:

---

[20] *See generally* https://www.ensingerplastics.com/en-us/shapes/plastic-material-selection/dimensionally-stable (last visited February 2, 2020).

[21] Exhibit A; Exhibit B.

a.   The impeller was not fuel permeable under intended and foreseeable purposes;

b.   The impeller would not deform when exposed to operating temperatures under intended and foreseeable purposes;

c.   The impeller would not prematurely age under intended and foreseeable purposes; and

d.   The Fuel Pump would not overheat under intended and foreseeable purposes.

120.   Nevertheless, Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce Class Vehicles with the Fuel Pump Defect that elevates the risk of injury or death for Plaintiffs, Class members, and others.

## III.   THE DESIGN FLAW REDUCES ENGINE POWER, CAUSES VEHICLE STALLING, AND CAN LEAVE THE CLASS VEHICLES COMPLETELY INOPERABLE COMPROMISING CONSUMER SAFETY

121.   The Fuel Pump Defect in the Class Vehicles exposes occupants and others to extreme danger, even death.  In fact, Toyota tacitly admitted as much in the First and Second Recall Reports, stating the Fuel Pump Defect can "increas[e] the risk of a crash."[22]

122.   The Fuel Pump is an integral component of safe vehicle operation.  But as described herein, the Class Vehicles suffer from a fundamental design flaw that causes the Fuel Pump to prematurely fail.  As Toyota admitted in the First and Second Recall Reports, the deformed impeller comes in contact with the Fuel Pump body, creating excess running resistance, causing "illumination of check engine and master warning indicators, rough engine running, engine no start and/or vehicle stall . . . ."

123.   Engines necessarily require steady gasoline supply in order to function properly. The Fuel Pumps' primary purpose is to transfer gasoline from the tank to the engine. But when

---

[22] *Id.*

the Fuel Pump fails, gasoline is not supplied to the engine, causing reduced engine power, stalling, and/or engine shutdown.

124.    Compounding the problem, Fuel Pump Defect occurs spontaneously with no advance warning to the consumer, thereby creating an extremely dangerous condition for drivers, including those on the road who may be left helpless and unable to take action to get out of the way of oncoming traffic or reach safety.

125.    Class members' complaints set forth below exemplify the real-world dangers caused by the Fuel Pump Defect.

126.    Vehicle manufacturers like Toyota monitor NHTSA and other databases for consumer complaints as part of their ongoing obligation to uncover and report potential safety-related defects. Accordingly, Toyota knew, or should have known, of the many complaints lodged with NHTSA and elsewhere about the specific safety hazard that is the subject of the Recalls.

127.    By way of example, the consumer complaints set forth below demonstrate the seriousness of the Fuel Pump Defect and, further, show that Toyota knew or should have known of them.

128.    On March 11, 2019, the owner of a 2018 Toyota Camry filed the following complaint with NHTSA:

> Lag and hesitation when going to full throttle on the gas pedal. It hesitates for a second and then finally grabs on to accelerate. ***It has done this since I purchased it but was hoping it would work itself out eventually, but this hasn't happened.*** Toyota did a TSB software update for the 4 cylinder but not the v6.[23]

---

[23] NHTSA Complaint ID. No. 11185947 (emphasis added).

129.   On August 9, 2019, the owner of a 2019 Toyota Highlander filed the following

complaint with NHTSA:

> 2019 Highlander XLE loses power, unable to accelerate, & jerks
> and stalls in traffic.  Bought at 200 miles, certified preowned. It is
> a nightmare vehicle.
>
> Accelerator has been touchy and jumpy at times, intermittently at
> slow speeds. First time it stalled it started to lose power put -put
> and chug like jerking and all dash and electrical on dash went out,
> unable to accelerate, then stalled out in road, unable to steer or
> control vehicle. This occurrence was after a longer period of
> driving. Second time it stalled out began to lose power, putter and
> chug, unable to accelerate applying gas pedal, getting no gas,
> vehicle dies out, unable to steer or control vehicle. This occurrence
> was after a longer period of driving. Third time was yesterday 8-8-
> 19. Left work and about 5-7 minutes into my drive, started
> hesitating, losing all dash and electrical power and will not
> accelerate when gas pedal applied, then stalls out, unable to control
> the steering wheel again! ***Almost got hit this time, man behind me
> coming fast and had to swerve into lane over to miss me. This car
> is going to kill me or someone by causing an accident if they do
> not get it fixed right.*** After the second stall it was towed into
> dealership and they were not sure but said fuel pressure was
> reading 22 and was supposed to be in the mid to high 50's. They
> replaced the fuel pump and it drove ok for a little while but I
> noticed the average fuel mileage going down from an approx in
> city 19.1--20 to 17.1-17.3. Has never been so low so obviously the
> stalling and the replacing or the fuel pump are not the real issue.
> Fuel economy going down since replacement of the fuel pump and
> now another dangerous stalling issue. Car is at Toyota dealer now.
> They need to dive much deeper & resolve this very dangerous
> safety issue! ***I bought this car to feel safe and have reliable
> transportation and have neither. It really scares me***.[24]

130.   On February 9, 2019, the owner of a 2018 Toyota Camry filed the following

complaint with NHTSA:[25]

---

[24] NHTSA Complaint ID No. 11242822.  (Emphasis added.)

[25] Consumer complaints posted on NHTSA are reported in all capitalized text.  That text has been
reformatted into sentence case here for ease of readability.  However, all typographical errors in quoted
complaints are reproduced from the originals.

I have had constant problems with my 2018 Camry since purchasing May 2018. *My car is always jerking as I accelerate and when I'm driving in town, feels like I'm getting rear-ended and hesitating on highway when I have to accelerate into traiffic which is very dangerous when the car won't get up and go.* I have had it to the dealer several times. They reset the computer because it can save settings from previous drivers. That didn't help. They told me that it's a different transmission and it takes few seconds for the computer to communicate back to transmission. This is a very unsafe feature. …[26]

131.    On September 11, 2019, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA:

*Severe hesitation when gas is applied, especially when crossing heavy traffic and instant power/quick acceleration needed.* Also noted when going around corners, after car has slowed down below 5 mph to make the corner. Gas is applied with hesitation. Noted more when car is at a complete stand still/moving at slow speed then gas applied to move forward. *Car does not move/react instantly.* I notice this problem on a weekly (at least) basis.[27]

132.    On September 11, 2019, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA:

*2019 Highlander XLE jerks and stalls, then loses power.* This occured on a newly purchased vehicle that has approximately 13k miles on it, in stop and go traffic on a sub-urban street. *No check engine light or other alert came on, providing no indication to the driver of the issue.* Was able to restart the vehicle and drive it to the dealership. *They said it was a fuel pressure issue, and are replacing the fuel pump - a part that usually lasts more than 200,000 miles.* I have no idea whether this is a fuel pump issue, or a fuel regulation issue, and if those functions are both performed by the fuel pump. The dealer did not seem to be aware of the issue, and there are no related recalls for this issue. They did find one other instance of this occurring when they researched it. I'd like to know for certain whether this is a fuel pump issue, or a fuel

---

[26] NHTSA Complaint ID No. 11175845. (Emphasis added.)

[27] NHTSA Complaint ID No. 11254633.  (Emphasis added.)

regulation issue. ***This presented a very dangerous situation, and I was lucky to be able to get off the road***.[28]

133.     On October 17, 2019, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA:

> The contact leases a 2019 Toyota Highlander. ***While driving, the engine stalled without warning and the steering wheel seized. The contact coasted the vehicle over to the side of the road*** and powered off the engine. The vehicle was restarted and was able to drive normally; however, ***the failure recurred twice***. The vehicle was taken to page Toyota (21262 Telegraph Rd, Southfield, MI 48033, (248) 352-8580) where it was diagnosed, but the technician could not find a failure code. The vehicle was not repaired. The manufacturer was made aware of the failure and provided case number: 1910282286. The failure mileage was approximately 4,000.[29]

134.     On October 20, 2019, the owner of a 2019 Highlander filed the following complaint with NHTSA:

> Stopped at a stop light and when it turned green pushed on the gas pedal. ***The entire car jerked and didn't have any power to go through the intersection***. The RPM gage began jumping as the car rolled. ***I rolled on through the intersection, was almost hit.*** Had no steering ability. Lights and alarms began going off. Message board said traction control turned off. Then check engine. Then visit dealer. ***Then the car died at the edge of the intersection and we pushed it off the highway*** onto a county road. It will not start at all. Acts like it isn't getting any gas. ***This is the 3 incident with this car doing this. We have towed it twice to the dealership***. They replaced a valve in the engine. They said it was stuck. Apparently that wasn't what is wrong with it. ***Glad this wasn't on the interstate. We could have been killed***.[30]

135.     On November 22, 2019, the owner of a 2018 Camry filed the following complaint with NHTSA:

---

[28] NHTSA Complaint ID No. 11254630.  (Emphasis added.)

[29] NHTSA Complaint ID No. 11277376. (Emphasis added.)

[30] NHTSA Complaint ID No. 11269776.  (Emphasis added.)

When driving the vehicle, the transmission does not appear to know what gear to be in and is always searching. So much so that *it will lunge at times when all you are trying to do is accelerate.* When slowing down and then slowly applying gas again, nothing happens for a good 10 seconds and then *it surges and causes my head to slam into the back of the head rest*. Also while idling the vehicle is decently loud, more so when defroster is engaged. At freeway speeds it tends to do better, but most issues appear to be in city day to day driving from the transmission/ or fuel system.[31]

136.   On March 5, 2020, the owner of a 2014 Toyota FJ Cruiser filed the following complaint with NHTSA:

The contact owns a 2014 Toyota FJ Cruiser. The contact stated that while coming to a stop and pulling into a drive thru, *the vehicle stalled* while the check engine warning light illuminated intermittently. The contact was able to restart the vehicle. *The failure recurred multiple times.[32]*

137.   On March 25, 2017, the owner of a 2014 Lexus GS350 filed the following complaint with NHTSA:

While driving at approximately 40 mph, *I experienced an engine stall.* This caused difficulty in steering and braking *resulting in an accident*.[33]

138.   On March 5, 2020, the owner of a 2018 Toyota Sienna filed the following complaint with NHTSA:

The contact owns a 2018 Toyota Sienna. The contact stated that after coming to a complete stop, *the vehicle hesitated without warning as the accelerator pedal was depressed*. Upon investigation, the contact discovered NHTSA campaign number: 20v012000 (fuel system, gasoline) however, the parts to do the repair were unavailable. The contact stated that the manufacturer exceeded a reasonable amount of time for the recall repair.[34]

---

[31] NHTSA Complaint ID No. 11282087.  (Emphasis added.)

[32] NHTSA Complaint ID No. 11316305.  (Emphasis added).

[33] NHTSA Complaint ID No. 10968914.  (Emphasis added).

[34] NHTSA Complaint ID No. 11316449.  (Emphasis added).

139.    On January 15, 2020, the owner of a 2019 Toyota Sienna fild the following complaint with NHTSA:

> ***Pulled out into oncoming traffic and vehicle hesitated and would not accelerate.*** Dash lights came on and car stalled. Attempted to crank van and it restarted but would ***barely move with the accelerator pressed fully***. ***Had to call a tow truck to have it delivered to the dealer.*** I called Toyota road side assistance number and 2.5 later no one showed up. Called again and demanded a different tow company respond and 30 minutes later someone was at the scene. This episode stated 230 pm and van was picked up 637pm.[35]

140.    On November 8, 2019, the owner of a 2019 Toyota Sienna filed the following complaint with NHTSA:

> ***I pulled onto a highway and reaching about 25 mph the 2019 sienna hesitated for at least 10 seconds as if it was not getting gas. I pressed the gas wanting to get out of the way of traffic and it jumped slightly but would not go. Then it kicked in with a few hesitations and took off.*** Another 100' or so, it did it again. Prior to this i had already brought it to toyota complaining that there is a hesitation when the van is not warmed up yet between 20-40 mph. It is only slight, but noticeable and feels like it is not getting gas. ***The van does this every time after it has been sitting long enough to cool down.*** The long hesitation only happened twice so far (dangerous enough!), there have been a few shorter ones, and then there is the every time slight hesitation. Toyota has told me nothing shows in their diagnostics and they do not know what is wrong. They tried cutting the power to the computer to reset the memory, but this did not change anything.[36]

141.    On March 7, 2020, the owner of a 2019 Toyota Avalon filed the following complaint with NHTSA:

> My car mostly parked in the garage. ***Lately, it's getting worse and noticing engine running rough, stall at speed about 20 mph*** and humming from under rear of the car hours after it's shut off.[37]

---

[35] NHTSA Complaint ID No. 11299633.  (Emphasis added).

[36] NHTSA Complaint ID No. 11278845.  (Emphasis added).

[37] NHTSA Complaint ID No. 11316755.  (Emphasis added).

142.    On January 17, 2020, the owner of a 2018 Toyota Tacoma filed the following complaint with NHTSA:

> When slowing down before making a left turn across traffic, *after the vehicle comes to a crawl or stop and then I accelerate to turn left across traffic, the engine hesitates for 1 to 2 seconds before accelerating.* I took my 2018 Toyota Tacoma to my dealer and they were able to replicate the problem. A re-set or upgrade to the computer has not fixed the problem.[38]

143.    On November 5, 2018, the owner of a 2018 Lexus IS300 filed the following complaint with NHTSA:

> When I accelerate from a stop or while moving on a roadway*, the engine seems to stall*. I'm not talking about the normal turbo spooling stall. *It lasts for about 3 to 5 full seconds*.[39]

144.    On March 17, 2020, the lessee of a 2019 Lexus RX350 filed the following complaint with NHTSA:

> *While driving on a city street the warning lights came on and the car stalled*. I was alone in the car and in downtown city traffic with honking cars behind me. I was able to restart the car after a few attempts. *A few days after this incident, while driving on a very busy hwy at 55mph the car engine was skipping as if about to stall.* I had a passenger in my car who experienced this rough ride and made a comment about it. *A few days later, on march 8,2020, I received an email from Lexus Enform services with a vehicle health report informing me that my vehicle requires attention due to a safety recall 20la01.* When I leased my vehicle, I was never informed of this recall which goes back to 01/13/2020. *Safety is a top concern for me and I fully communicated this to the salesperson when i leased my car but i was not informed of this recall at that time*. I have exactly 2800 miles on my car. *I am not able to use it because the service department at lexus does not have a remedy available to fix the low -pressure fuel pump and they do not know when they will have it.* I want to drive a vehicle that is safe not one that increases the risk of having a crash.[40]

---

[38] NHTSA Complaint ID No. 11300086.  (Emphasis added).

[39] NHTSA Complaint ID No. 11149541.  (Emphasis added).

[40] NHTSA Complaint ID No. 11318534.  (Emphasis added).

145.    On July 17, 2018, the owner of a 2017 Lexus RX350 filed the following complaint with NHTSA:

> ***Hesitation upon acceleration***. The engine does not respond in a linear manner when pressing the gas pedal.[41]

146.    On January 3, 2017, the owner of a 2015 Lexus LS460 filed the following complaint with NHTSA:

> ***Fuel system shuts down while driving at highway speeds*** band new car with 7,623 miles. ***Had to have the entire low end fuel pump system replaced. Issue still ongoing. Car will not start now.***[42]

147.    Consumers also filed additional complaints about the Fuel Pump Defect on other websites that Toyota monitored, or should have been monitoring.

148.    For example, on carcomplaints.com, a popular site that collects complaints lodged by drivers,[43] an owner of a 2018 Toyota Camry stated:

> The response time of accelerating and the car moving is significant at irregular intervals. ***This is hazardous when I am planning to overtake*** because it takes longer than expected.[44]

149.     On carcomplaints.com, an owner of a 2018 Toyota Camry stated:

> When driving my vehicle I get a stalled response when pressing on the gas and ***then it jerks forward. This can be very dangerous when driving on the streets*** because there is a lot if stop and go movements. It usually happens when I come to a complete stop at a stop light or stop sign, even when stopping to turn down a street. I'm not sure why the vehicle does this, I just bought it so it should still be in very good shape. ***I'm reporting this because it can be a***

---

[41] NHTSA Complaint ID No. 11150133.  (Emphasis added).

[42] NHTSA Complaint ID No. 10939537.  (Emphasis added).

[43] The excerpts are true and correct copies of the original complaints published on carcomplants.com.

[44] http://m.carcomplaints.com/Toyota/Camry/2018/fuel_system/fuel_propulsion_system.shtml (last visited February 3, 2020).  (Emphasis added.)

***potential hazard for a car crash.*** Please have Toyota fix this problem in their 2018 Toyota Camry se.[45]

150.    As demonstrated above, Class Vehicles suffer from a uniform design defect that causes the Fuel Pump to malfunction and fail prematurely.  Compounding the issue, drivers often are not protected from these safety risks by a warning prior to Fuel Pump failure.

151.    The Fuel Pump Defect causes vehicles to become dangerous to operate or inoperable while on the road and therefore they are not fit for their ordinary purpose.

## IV.    TOYOTA KNEW ABOUT THE FUEL PUMP DEFECT, BUT CONTINUED TO MANUFACTURE, MARKET, AND SELL CLASS VEHICLES

152.    Toyota knew or should have known about the Fuel Pump Defect, but it concealed or failed to disclose the defect and continued to manufacture, market, and sell its popular Class Vehicles – more than 1.8 million model year 2013-2019 Toyota and Lexus vehicles – equipped with the Fuel Pump Defect.  Specifically, Toyota knew or should have known the defective Fuel Pumps in the Class Vehicles exposed Class members to extreme danger and, in order to render them safe, the Class Vehicles needed new or enhanced Fuel Pumps that functioned safely and as intended. Nonetheless, Toyota failed to take corrective action.

153.    In fact, Toyota knew or should have known about the Fuel Pump Defect since the pre-release process of designing, manufacturing, engineering, and testing the Class Vehicles. During these phases, Toyota would have gained comprehensive and exclusive knowledge about the Fuel Pumps, particularly the basic engineering principles behind the construction and function of the Fuel Pumps such as their impellers' susceptibility to fuel absorption and deformation.   However, Toyota failed to act on that knowledge and instead installed the

---

[45] http://m.carcomplaints.com/Toyota/Camry/2018/engine/engine.shtml (last visited February 3, 2020). (Emphasis added.)

defective Fuel Pumps in the Class Vehicles, and subsequently marketed and sold the vehicles to unsuspecting consumers without disclosing the safety risk or warning Class members.

154.    Moreover, Toyota knew about the Fuel Pump Defect based on the large number of claims for Fuel Pump Defect repair and replacement that it admits to receiving.  Specifically, Toyota has identified at least 3,225 warranty claims associated with the Fuel Pump Defect.[46]

155.    Further, federal law requires automakers like Toyota to be in close contact with NHTSA regarding potential defects.  *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).  Accordingly, Toyota should (and does) monitor NHTSA databases for consumer complaints regarding their automobiles as part of their obligation to identify potential defects in their vehicles, such as the Fuel Pump Defect.

156.    From its monitoring of the NHTSA databases, Toyota knew or should have known of the many Fuel Pump Defect complaints lodged, such as those quoted in Section III above.  However, Toyota failed to act on that knowledge by warning Class members.

157.    Finally, Toyota knew about the Fuel Pump Defect through its own investigation. Toyota admitted to conducting 81 field investigations as part of which it generated Field Technical Reports.   However, Toyota failed to act on that knowledge by warning Class members.

158.    Despite Toyota's extensive knowledge, Toyota failed to act on that knowledge by warning Class members.  Sacrificing consumer safety for profits, Toyota instead chose to enrich itself by using false and misleading marketing to sell the Class Vehicles as safe and durable at inflated prices.

---

[46] Exhibit B.

## V.      TOYOTA CONTINUOUSLY TOUTED CLASS VEHICLES AS SAFE AND DEPENDABLE, CONCEALING THE FUEL PUMP DEFECT

159.    Toyota's overarching marketing message for the Class Vehicles was that the vehicles are safe and dependable and that their engines can be relied on to perform well.  This marketing message is false and misleading given the propensity of the Fuel Pumps in the Class Vehicles to fail, causing the vehicles' engines to run rough, stall and become inoperable, which Toyota admits increases the risk of a crash.

160.    In late 2010, after suffering public embarrassment over widespread unintended acceleration claims, Toyota's top executives "decided to revamp its marketing message and shift the focus to safety in a big way."[47]  As detailed in an article in Advertising Age titled, "Toyota to Push Safety in Upcoming Ad Blitz":

> Toyota Motor Sales U.S.A.'s overall sales fell 34% in August and are down 1% for the year -- it's the only major manufacturer with a decline for 2010. Executives admit that consumers have doubts about the safety and quality of Toyota vehicles, so the automaker is planning an advertising blitz to counter that perception.
>
> For  years, Toyota's brand message has been based on quality, durability and reliability, with a dash of value thrown in at the tagline. But with both Toyota loyalists and possible converts now skeptical of that message, the automaker is putting safety first.
>
> "What we're dealing with is a perception issue, and brand perceptions are not brand realities," said Bob Carter, Toyota Division general manager. "If a customer has removed us from their consideration list, it was because of a perception of Toyota safety."
>
> …

---

[47] Mark Rechtin, "Toyota to Push Safety in Upcoming Ad Blitz," September 6, 2010, AdvertisingAge. Available at http://adage.com/article/news/advertising-toyota-push-safety-upcoming-ad-blitz/145729/ (last visited April 9, 2020), referencing statement made by top Toyota executives to Automotive News.

Mr. Carter said the safety theme will continue in Toyota's brand advertising until consumer attitudes change.

…

Said Mr. Fay [the Toyota Marketing VP in charge of the campaign] of the coming ad campaign: "We need to make an emotional connection with people who own or are considering our product. We need to address the concerns of the customer, based on what we've been through this year."

…

"This is not a short-term thing where we run an execution or two," Mr. Fay said. "We still have QDR.  We just have to assure customers that's the case." [48]

161.    In furtherance of its safety centric campaign, Toyota produced a video commercial with a voiceover that stated: "Everyone deserves to be safe. That's why every Toyota now comes with the Star Safety System, standard. … We always think of safety, even in the concept design of our vehicles … we know there's nothing more important to you than your safety."[49]

162.    Additionally, in January 2011, Toyota added a page to its website called "Toyota Safety" which highlighted Toyota's array of safety features. A video imbedded in this page featured the following text, "Everyone deserves to be safe.  Which is why Toyota is doing even more to enhance our cars' safety and technology."[50]  Toyota also boasted,  "[a]t Toyota, we're currently investing one million dollars an hour to enhance the safety and technology of our vehicles."[51]

---

[48] *Id.*

[49] https://www.youtube.com/watch?v=a_vaFypz8xk (last visited April 9, 2020).

[50] https://web.archive.org/web/20110103143210/http://www.toyota.com:80/safety/ (last visited April 9, 2020).

[51] *Id.*

163.     Toyota's 2010 message of safety first continues through present day.

164.     Toyota is one of the ten biggest advertising spenders in the United States,[52] and much of that advertising budget goes toward promoting its brands as safe and dependable.

165.     Through its marketing efforts, Toyota induced potential customers to purchase or lease the Class Vehicles by stating, among other things:

> Let's Go Places, Safely.
>
> Why were 9 Toyota vehicles named "Top Safety Picks" by the Insurance Institute for Highway Safety in 2017?  Because we design them with the knowledge that safety is more than features – it's the lives of the people who drive our cars.
>
> For us, the journey towards a safe road never ends.  This belief, along with our collaborative research efforts, drives us to create advancements and innovations in safety that have helped (and continue to help) prevent crashes and protect people.

166.      An image of this top section of Toyota's website is below.[53]

---

[52] Jitendra Parashar, "Understanding Toyota's Marketing Strategy," Market Realist, May 27, 2016, Available at http://marketrealist.com/2016/05/understanding-toyotas-marketing-strategy/ (last visited April 9, 2020).
[53] https://www.toyota.com/usa/safety/ (last visited April 9, 2020).



167.     This part of Toyota's website goes on to provide a vast array of information about the purported safety mechanisms Toyota offers in its vehicles, including the Class Vehicles, such as pre-collision technology, vehicle stability control and blind spot monitoring.[54] This is true of prior versions of the website as well.[55]

168.     On Toyota's main website, there is a page describing the Company's leadership that repeats its consistent and pervasive marketing message that Toyota vehicles are safe and dependable.  Toyota states: "We build cars and trucks that help you and your family go places reliably and safely."[56]

169.     Toyota's website currently contains and has contained these representations at all relevant times.

---

[54] *Id.*

[55] *See*, *e.g.*, https://web.archive.org/web/20190518011539/https://www.toyota.com/usa/safety/ (last visited April 9, 2020).

[56] https://www.toyota.com/usa/our-story/ (last visited April 9, 2020).

170.    Similar representations are on the Lexus website, which is operated by Toyota. Lexus.com has a detailed section with many subheadings and tabs devoted to describing a host of safety features on Lexus vehicles.[57]   While the standard availability of certain safety features may vary on certain different models, the overall consistent and pervasive marketing message that Toyota advances through its web marketing for its Lexus Class Vehicles is clearly one of safety and dependability.  An example of one image from the Safety section of the Lexus website as of March 2019 is shown below[58] (and similar language remains on the Lexus website to as of the time of the filing of this complaint).[59]   It begins with the language, "ONE STEP CLOSER TO A WORLD WITHOUT ACCIDENTS.  LEXUS SAFETY.  …  At Lexus, we're constantly looking out for the driver.  It's why nearly every new Lexus model comes standard with Lexus Safety System +, a comprehensive suite of active safety equipment.":

---

[57] https://web.archive.org/web/20190331073031/https://www.lexus.com/safety (last visited April 9, 2020).

[58] *Id.*

[59] https://www.lexus.com/safety (last visited April 9, 2020).



171.     This section of the website describes additional safety features equipped in the Class Vehicles,[60] which also appeared on the website in 2018.[61]  An example of one image from the Lexus.com safety page as of July 10, 2018 is shown below.  It begins with identical language to that used in 2019, "ONE STEP CLOSER TO A WORLD WITHOUT ACCIDENTS.  LEXUS SAFETY.  … At Lexus, we're constantly looking out for the driver.  It's why nearly every new Lexus model comes standard with Lexus Safety System+, a comprehensive suite of active safety equipment":

---

[60] https://web.archive.org/web/20190331073031/https://www.lexus.com/safety (last visited April 9, 2020).

[61] https://web.archive.org/web/20180710173356/https://www.lexus.com/safety (last visited April 9, 2020).



At Lexus, we're constantly looking out for the driver. It's why nearly every new Lexus model comes standard with Lexus Safety System+, a comprehensive suite of active safety equipment.* And now, with the introduction of the 2018 LS 500 and LS 500h, we're closer than ever to realizing our ultimate vision: an accident-free world. From technology designed to automatically brake and actively steer* to sensors that can help warn you of cross-traffic* in an intersection to its 24-inch high-resolution Heads-Up Display, this is not just the most sophisticated Lexus safety system yet. It's a preview of what's to come. Scroll for more information about Lexus safety. Or, to learn more about the driver-first innovations on the all-new Lexus LS, use the link below.

172.    As in 2019, in 2018, the website went on to describe numerous additional safety features equipped in the Class Vehicles.

173.    Toyota likewise touted the safety of older models, including those affected by the Second Recall.  For example, in 2014, Toyota's website featured pages dedicated to "safety." Here, Toyota again touted the safety and dependability of its vehicles, stating, "[l]et's go places, safely."[62]  As seen below, Toyota claimed it designed vehicles "with the knowledge that safety is more than features—it's the lives of the people who drive our cars."[63]

---

[62] http://web.archive.org/web/20140920203532/http://toyota.com/usa/safety/fast-facts (last visited April 9, 2020).

[63] *Id.*



174.    Toyota's 2015, 2016, 2017, and 2018 safety marketing materials carried forward its 2014 safety message.[64]

175.    Lexus.com, owned and operated by Toyota, conveyed a similar message.   In 2014, Lexus's website stated, "Discover the ways Lexus pursues perfection in everything we do."[65]  Here, Lexus also made public its manufacturing policy of the "Pursuit of Perfection," as shown in the screenshot below:[66]

---

[64] http://web.archive.org/web/20151006193804/http://www.toyota.com/usa/safety/helping-protect-people (last visited April 9, 2020); http://web.archive.org/web/20161006202909/http://www.toyota.com:80/usa/safety/ (last visited April 9, 2020); http://web.archive.org/web/20171223064632/https://www.toyota.com/usa/safety/ (last visited April 9, 2020).

[65] http://web.archive.org/web/20140226063004/http://www.lexus.com/about/ (last visited April 9, 2020).

[66] http://web.archive.org/web/20140324121308/http://www.lexus.com/about/corporate/manufacturing.html (last visited April 9, 2020).



176.     Lexus's 2015 website tracked the 2014 version, carrying forward its message of manufacturing perfection.[67]

177.     In 2017, Lexus updated its website to proclaim,"[y]our safety is a top priority for Lexus."[68]    The website also featured a "performance" page stating that Lexus exhibits "[f]lawless craftmanship."[69]

---

[67]http://web.archive.org/web/20150908063422/http://www.lexus.com/about/corporate/manufacturing.html (last visited April 9, 2020).

[68] http://web.archive.org/web/20170301045625/https://www.lexus.com/ (last visited April 9, 2020).

[69] http://web.archive.org/web/20170606084647/http://www.lexus.com/performance/ (last visited April 9, 2020).



178.    Lexus's 2018 website further conveys its "safety" focus stating, "At Lexus, we're constantly looking out for the driver."[70]



---

[70] http://web.archive.org/web/20180412233339/https://www.lexus.com/safety (last visited on April 9, 2020).

179.   In addition to its representations about Toyota and Lexus vehicles generally, Toyota's website contains specific representations about safety on the pages for specific models of the Class Vehicles.

180.   For example, webpages of various models of the Class Vehicles include multiple photographs and descriptions advertising the safety systems of each of the Class Vehicles. Those sections list an array of safety features equipped in the Class Vehicles.

181.   Point of sale communications for the Toyota models that are part of the First Recall proudly proclaim that the vehicles come standard with the "Star Safety System."  For example, below is a screenshot of the page for the 2019 4Runner, which is part of the Recall. [71]

# The peace of mind you need
# to enjoy the peace of nature.

While your many adventures have earned you a bold reputation, you're not a danger seeker. Neither are we. That's why we've equipped 4Runner with an array of active and passive safety features. The standard Star Safety System™ is designed to help you avoid trouble. Our rigorous crash testing has helped us develop a comprehensive occupant protection system that features eight standard airbags,[5] should trouble prove unavoidable.









**INTEGRATED BACKUP CAMERA[37] DISPLAY**

When backing up, the area visible to the camera is displayed on the touch-screen. 4Runner's available front and rear parking assist sonar[38] beeps to tell you how close the bumpers are from an object. The faster it beeps, the closer it is.

**TIRE PRESSURE MONITOR SYSTEM (TPMS)[37]**

Proper tire pressure is important not only for good handling and fuel economy, but for your safety. 4Runner's standard Tire Pressure Monitor System (TPMS) evaluates the pressure of the tires and issues a warning if the pressure becomes critically low.

**DRIVER AND FRONT PASSENGER ACTIVE HEADRESTS[36]**

Designed to optimize headrest position during certain types of rear-end collisions, driver and front passenger active headrests move slightly up and forward, helping to reduce neck injuries.

**EIGHT AIRBAGS[25]**

A driver and front passenger Advanced Airbag System, driver and front passenger TAP (Thorax, Abdomen, Pelvis) front seat-mounted side airbags, driver and front passenger knee airbags and all-row (third-row airbags on models so equipped) Roll-sensing Side Curtain Airbags (RSCA) are all part of a system designed to help keep you safe.

See numbered footnotes in Disclosures section.

---

[71] https://www.toyota.com/content/ebrochure/2019/4runner_ebrochure.pdf (last visited April 9, 2020).

182.    Similarly, below is a screenshot of the Star Safety page for the 2019 Camry:[72]



183.    The Lexus website makes similar representations about the safety of the individual Lexus models that are part of the First Recall.  For example, multiple Class Vehicles' individual pages contain the following statement: "LEXUS SAFETY SYSTEM+* … With an integrated suite of active safety equipment, security comes standard," and go on to list an array of safety features, from Fuel Pumps to computerized functions.[73]

---

[72] https://www.toyota.com/camry/2019/camry-features/ (last visited April 9, 2020).

[73] *See, e.g*, https://web.archive.org/web/20180506081936/http://www.lexus.com/models/RX/safety (last visited April 9, 2020); https://web.archive.org/web/20180525081736/http://www.lexus.com/models/NX/safety (last visited April 9, 2020).

184.   For the vehicles included in the Second Recall, Toyota conveyed identical safety messages.   For example, below is a screenshot of a sales brochure for a 2014 Toyota 4Runner sales brochure, which is a Class Vehicle:[74]



185.   Below is a screenshot of a sales brochure for a 2017 Toyota Sienna, which is a Class Vehicle:[75]

---

[74] https://cdn.dealereprocess.org/cdn/brochures/toyota/2014-4runner.pdf (last visited April 9, 2020).

[75]
https://webcache.googleusercontent.com/search?q=cache:JK9OKdXrCFYJ:https://directechs.blob.core.windows.net/directwirebrochures/brochure15691_0.pdf%3F+&cd=1&hl=en&ct=clnk&gl=us (last visited April 9, 2020).

# We've taken an active interest in your family.

—

Every new Toyota is equipped with the Star Safety System,™ a suite of six active safety features designed to help keep you out of harm's way. The system includes Enhanced Vehicle Stability Control (VSC),⁵ Traction Control (TRAC), Anti-lock Brake System (ABS), Electronic Brake-force Distribution (EBD), Brake Assist (BA)⁶³ and Smart Stop Technology® (SST).⁵³ What's more, Sienna's Vehicle Dynamics Integrated Management (VDIM)⁵⁴ system, available on the Limited Premium FWD model, enhances the effectiveness of Sienna's Star Safety System™ by coordinating with various active safety features to help anticipate potential trouble and react accordingly.

   

**BLIND SPOT MONITOR (BSM)⁵ AND REAR CROSS-TRAFFIC ALERT (RCTA)⁵**

Using radar technology, the available Blind Spot Monitor⁵ is designed to alert you when a vehicle enters a blind spot on either side. Available Rear Cross-Traffic Alert⁵ works similarly by providing you with audible and visual indicators to warn you of approaching vehicles.

**STANDARD INTEGRATED BACKUP CAMERA⁴**

A backup camera⁴ comes standard on Sienna. Available on Limited is a backup camera⁴ with 180-degree wide-angle view, both of which help make reversing and parking easier. You can choose from wide or normal views, plus guideline modes that show your distance and projected path.

**AUTOMATIC HIGH BEAMS (AHB)²**

The available Automatic High Beam² system allows for enhanced visibility, helping make nighttime driving easier. Using a camera to detect oncoming vehicles' headlights, Automatic High Beams² can switch between high and low beams for you.

**DYNAMIC RADAR CRUISE CONTROL (DRCC)³⁶**

Cruise with more control. The available Dynamic Radar Cruise Control³⁶ is designed to keep a preselected following distance between your Sienna and the vehicle traveling in front of you. If that vehicle slows down, so do you — and if it speeds back up or changes lanes, DRCC³⁶ will help you automatically accelerate back to your set cruising speed.

See numbered footnotes in Disclosures section.

186. Below is a screenshot of a sales brochure for a 2014 Toyota FJ Cruiser, which is a Class Vehicle:[76]

---

[76] https://cdn.dealereprocess.org/cdn/brochures/toyota/2014-fjcruiser.pdf (last visited April 9, 2020).

187. Lexus, through Toyota, made similar representations about Lexus branded vehicles. For example, below is a screenshot of a sales brochure for a 2013 Lexus GS 350, which a Class Vehicle:[77]



---

[77] https://www.lexus.com/documents/brochures/2013/2013-Lexus-GS-Brochure.pdf (last visited April 9, 2020).

188.    Below is a screenshot of a sales brochure for a 2017 Lexus RX 350, which is a Class Vehicle:[78]



189.    A car with a defective fuel pump that can cause the engine to stutter or stall while the vehicle is in motion, as do the Class Vehicles, and thereby exposes its occupants to the risk of injury and even death *is not a safe car*.  Thus, Toyota's marketing of the Class Vehicles as safe is false and misleading and omits facts that would be material to consumers such as Class members who purchased or leased Class Vehicles because they were consistently marketed as having the utmost safety on the road.

190.    In addition to its representations about safety, Toyota also made false and misleading representations about the durability, power and functioning of the engines of the Class Vehicles.  For vehicles included in the First Recall, such as the 2019 Toyota 4Runner, the Toyota webpage touts its "durability," that the 4Runner is "[f]itted to survive," and tells drivers:

---

[78] https://www.lexus.com/documents/brochures/2017/MY17-Lexus-RX-brochure.pdf (last visited April 9, 2020).

"You won't fall short of power." Below is a screenshot of the relevant page from Toyota's website:



191.    Similarly, with respect to the 2018 Lexus RX, the Lexus website touts the vehicle's "exceptionally smooth performance":[79]

**THE FEARLESS 2018 RX**

The RX pairs leading-edge technology with exceptionally smooth performance. Meanwhile, the first-ever three-row RXL delivers uncompromised styling with added passenger capacity.

192.    Toyota's representations about older vehicles affected by the Second Recall are consistent with its more recent representations.  For example, below is a screenshot of a sales brochure for a 2014 Toyota FJ Cruiser, which is a Class Vehicle:[80]

---

[79] https://web.archive.org/web/20180513215900/http://www.lexus.com/models/RX/features (last visited April 9, 2020).

The making of a legend

Separated by over two decades, FJ40 and its off-road heir, FJ Cruiser, share common DNA. With its box shape and lozenge grille, FJ40 is instantly recognizable, but it was its capability and durability that made it an icon. In fact, between 1960 and 1984 over 1,000,000 Land Cruisers were built. With FJ Cruiser, the legend lives on.

193.    Lexus, made similar representations about its older vehicles affected by the Second Recall.  For example, below is a screenshot of a sales brochure for a 2017 Lexus RX 350, which is a Class Vehicle:[81]

---

[80] https://cdn.dealereprocess.org/cdn/brochures/toyota/2014-fjcruiser.pdf (last visited April 9, 2020).

[81] https://www.lexus.com/documents/brochures/2017/MY17-Lexus-RX-brochure.pdf (last visited April 9, 2020).

**ENTICE WITH POWER**

Experience luxury that roars. A 3.5-liter V6 engine with direct and port fuel injection delivers exhilarating power with efficient fuel economy. With 295 horsepower, the RX 350 provides a continuous feeling of acceleration. For even greater control, an innovative dual Variable Valve Timing with intelligence (VVT-i) system offers precise engine performance as it reduces emissions and enhances fuel efficiency. VVT-i monitors the engine's speed and load, increasing torque at lower speeds for improved acceleration, and boosts performance at higher speeds by adjusting intake and exhaust valve timing.

194.    As with Toyota's representations about the safety of the Class Vehicles, these and similar representations about their performance are false and misleading.[82]    Toyota's representations that "you won't fall short of power," and that the Lexus has an "exceptionally smooth performance," are false and misleading because, as Toyota admits by virtue of the Recall, the Class Vehicles are unsafe and do not perform as advertised as they are prone to Fuel Pump failure that can lead to rough running, engine hesitation and stalling while the vehicle is in motion, and render the Class Vehicles inoperable while on the road.

195.    Similar representations to those that Toyota made on the Toyota and Lexus vehicles included above are also included in Toyota's marketing about the other Class Vehicles.

196.    Toyota's marketing of the Class Vehicles conveys a clear, uniform and pervasive message that Class Vehicles are to be equated with safety and dependability.    Safety and

---

[82] https://web.archive.org/web/20180513215900/http://www.lexus.com/models/RX/features (last visited April 9, 2020).

dependability are material to consumers when purchasing or leasing a vehicle, and, as the content of Toyota's marketing makes clear, are a big if not the biggest factor driving consumers' decision to purchase or lease their Class Vehicles.

197.    Toyota marketed the Class Vehicles as safe and dependable, but failed to disclose the existence, impact and danger of the Fuel Pump Defect and/or that the Class Vehicles were not safe or dependable.  Specifically, Toyota:

a.    Failed to disclose, at and after the time of purchase, lease, and/or service, any and all known material defects of the Class Vehicles, including the Fuel Pump Defect, despite its knowledge;

b.    Failed to disclose, at and after the time of purchase, lease, and/or service, that the Class Vehicles' Fuel Pumps were defective and not fit for their ordinary purpose, despite its knowledge; and

c.    Failed to disclose and actively concealed the existence and pervasiveness of the Fuel Pump Defect, despite its knowledge.

198.    Toyota's deceptive marketing and willful and knowing failure to disclose the Fuel Pump Defect damaged, and continues to damage, Plaintiffs and Class members.  If Plaintiffs and Class members had known of the Fuel Pump Defect and/or that the Class Vehicles were not safe and durable, they would not have purchased or leased the Class Vehicles or certainly would not have paid less to do so.

## VI.    TOYOTA ADMITTED THE FUEL PUMP DEFECT WAS DANGEROUSLY DEFECTIVE, BUT ISSUED AN INADEQUATE RECALL

199.    On January 13, 2020, Toyota instituted the First Recall, a voluntary safety recall of 695,541 vehicles admitting that the defective Fuel Pump prematurely fails, compromising consumer safety.

200.    On March 4, 2020, Toyota expanded the First Recall, and issued the Second Recall, enlarging the universe of Recalled Vehicles from 695,541 vehicles to 1,817,969 vehicles.

201.    In connection with the Recalls, Toyota identified as the root cause a Denso Fuel Pump with a plastic impeller which deforms due to fuel absorption.

202.    Toyota stated that it was aware of at least 81 Toyota Field Technical Reports and 3,225 warranty claims associated with the Fuel Pump Defect.  By instituting the Recall, Toyota admitted the Fuel Pump Defect is a serious safety defect that could lead to a crash, which can result in serious injury or death.  However, the Recall is inadequate.

203.    First, Toyota limited the Recall to a subset of the Class Vehicles.  Specifically, Toyota limited the Recall to the Recalled Vehicles, which are certain Toyota and Lexus Class Vehicles manufactured between September 2013 through July 2019 and equipped with a Denso made low-pressure fuel pump.  The Recall omits other Class Vehicles equipped with the same defective Fuel Pumps.

204.    The vast majority of Toyota's Hybrid variant Class Vehicles are not included in the Recall,[83] but Toyota admits in both the Recall Report and Second Recall Report that they too are equipped with the same defective Fuel Pump.  These Hybrid variant Class Vehicles also experience the Fuel Pump Defect, and should have been included in the Recall.

205.    For example, on carcomplaints.com, an owner of a 2018 Toyota Camry Hybrid stated about their vehicle:

> The vehicle did not respond properly to the driver pressing the accelerator. When the driver attempted to drive the vehicle after it had been parked for a few hours, with no problems previously, ***the vehicle would barely accelerate***. The vehicle felt very sluggish and even with the accelerator fully pressed it would not exceed 25

---

[83] The 2018-2019 Lexus LC500h and 2018-2019 Lexus LS500h hybrid variants are included in the Recall.

mph. The driver pulled the vehicle over and turned off the vehicle and turned it back on but this did not immediately resolved the issue. The driver drove the vehicle for a few blocks to a safer parking location and turned off the vehicle again to better inspect the vehicle. ***There were no warnings on the instrument panel and no obvious signs of mechanical issues***. The driver restarted the vehicle and attempted to drive it again the issue did not re-appear. This vehicle had not yet been inspected by the dealership since the incident but ***could have resulted in a tragic collision and needs to be addressed***.[84]

206.     On carcomplaints.com, an owner of a 2018 Toyota Camry Hybrid stated about their vehicle:

> The contact owns a 2018 Toyota Camry hybrid. While driving at lower speeds in both drive and reverse***, the vehicle would hesitate and jerk***. The contact indicated that the failure was more severe while driving in very cold weather temperatures and when the engine was not warmed up. In addition, ***the braking distance was extended when the brake pedal was depressed***. The vehicle was taken to the local dealer (crestmont Toyota, 730 NJ-23, pompton plains, New Jersey) where the failure was able to be duplicated, but indicated that the vehicle was operating as designed. The manufacturer was also notified and the contact was referred back to the dealer. The failure mileage was 1,000.[85]

207.     Omission of these Hybrid variants from the Recall is improper, as Toyota had ample knowledge the unreasonably dangerous Fuel Pump Defect also exists within these vehicles.

208.     Toyota manufactured other vehicles with the Fuel Pump Defect but dropped them from the Second Recall.   For example, Plaintiff SanFilipo owns a 2018 Lexus NX300 that continually experiences the Fuel Pump Defect.   Despite being equipped with the recalled Fuel Pump and exhibiting the Fuel Pump Defect, her vehicle is excluded from the Second Recall.

---

[84] http://m.carcomplaints.com/Toyota/Camry_Hybrid/2018/engine/vehicle_speed_control.shtml (last visited April 9, 2020).  (Emphasis added).

[85] http://m.carcomplaints.com/Toyota/Camry_Hybrid/2018/engine/engine.shtml (last visited April 9, 2020).   (Emphasis added).

209.    In connection with Toyota's exclusion of vehicles previously recalled on January 13, 2020 from the Second Recall of March 4, 2020, an analysis conducted by Plaintiffs' counsels' independent Automotive Expert reveals that the vehicles Toyota excluded are equipped with three wire Fuel Pumps. The three wire Fuel Pumps have variable input and output capability, which enables them to run cooler than the two wire Fuel Pumps in the vehicles covered by the Second Recall. However, because the vehicles removed from the Second Recall contain a substantially similar, if not identical, Fuel Pump impeller, they should have been included in the Second Recall.

210.    Notably, Class Vehicles omitted from the Second Recall will benefit from any remedy Toyota develops to address the Fuel Pump Defect.  Nonetheless, because the Second Recall does not cover them, drivers of the excluded vehicles will not be able to take advantage of the remedy.

211.    Toyota, despite issuing the Second Recall, has not notified the owners of the Fuel Pump Defect.  Toyota acknowledged the defect and the serious safety consequences it poses on January 13, 2020, and again on March 4, 2020, by submitting the Recall Report and Second Recall Report to NHTSA.  However, as Toyota stated in the Recall Report, it would not notify owners included in the first wave until March 13, 2020.[86]  Toyota expects to notify owners and lessees of Class Vehicles added to the Second Recall in May 2020.[87] Thus, while Toyota knows the Fuel Pump Defect can result in collision and serious injury, Toyota's business strategy is to remain silent and keep consumers in the dark about the dangerous defect until months after it acknowledged the defect to NHTSA.

---

[86] Exhibit A at 12.

[87] Exhibit B at 10.

212.    In the March 4, 2020 Second Recall, Toyota states it will be replace the Fuel Pump with a new fuel pump, but offers no pump specifications or a rollout date. This means Toyota is knowingly and intentionally permitting a minimum of 2,000,000 undeniably dangerous Toyota and Lexus vehicles to be driven by its customers throughout the United States, including in the states in which Plaintiffs reside.  It also means there is no guarantee that there will be a corrective remedy and even if there is one, that it will be effective.  Moreover, Toyota has provided no date by which its potential remedy will be completed let alone when it can be implemented.

213.    Consumers have continued to raise grave concerns after the announcement of the Recalls.

214.    For example, on January 16, 2020, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA:

> *Fuel pump stops working while driving on highway at high speeds,* vehicle rides rough intermittently then shuts down. Vehicle will not start up again.[88]

215.    On January 24, 2019, the owner of a 2019 Toyota Highlander filed the following complaint with NHTSA, expressly complaining about the dangerous lack of recall remedy, and stating that the owner had been forced to "park" (*i.e.*, not use) the car in the interim:

> First incident occurred in Dec 2019 and then again in Jan 2020. *While driving engine lost power and vehicle began lurching forward and back uncontrollably*. After pulling over engine shut down. *Thankfully we did not cause an accident*. Check engine light came on, also said reduced engine power and traction control off. First time dealer said it was bad gas. Second time they tested fuel pump and it was producing 5 psi. Way below 50-60 psi norm. *Now our vehicle is parked waiting for Toyota to develop a fix for their fuel pump.* No idea how long that will take. Our car is part of

---

[88] NHTSA Complaint ID No. 11299706. (Emphasis added.)

the almost 700,000 Toyota recalled. Toyota used to mean quality, not sure any more.[89]

216.     On March 18, 2020, the owner of a 2019 Lexus RX350 filed the following

complaint with NHTSA complaining about the adequacy of the Recall:

> Tl* the contact owns a 2019 Lexus RX350. The contact received notification of NHTSA campaign number: 20v012000 (fuel system, gasoline) however, *the part to do the recall repair was not yet available. The contact stated that the manufacturer had exceeded a reasonable amount of time for the recall repair.* The contact stated that dch Lexus of oxnard (located at 1640 auto center dr, oxnard, ca 93036), exceeded a reasonable amount of time for the recall repair. The manufacturer was made aware of the issue. The contact had not experienced a failure. Parts distribution DISCONNECT.[90]

217.     On March 25, 2020, the owner of a 2019 Lexus RX350 filed the following

complaint with NHTSA complaining about the inadequacy of the Recall:

> TL* the contact owns a 2019 Lexus RX350. The contact was notified through the Lexus app that the vehicle was included in NHTSA campaign number 20v012000 (fuel system, gasoline). The contact reached out to Lexus of orange county located at (3496 route us-6 middletown, new york, 10940, (845)589-5435, and *was informed that the part to do the recall would be available the beginning of the fall season.* The contact stated that the manufacturer had exceeded a reasonable amount of time for the recall repair. The manufacturer was not contacted or made aware of the issue. The contact had not experienced a failure. Vin tool confirms parts not available.[91]

218.     On April 1, 2020, the owner of a 2018 Toyota Tacoma filed the following

complaint with NHTSA expressly complaining about the inadequacy of the Recall:

> I have a 2018 Toyota Tacoma with an open recall on the fuel pump. The safety risk is that the vehicle may stall at higher speeds. *This recall came out in January 13, 2020, but there still isn't a*

---

[89] NHTSA Complaint ID No. 11301691. (Emphasis added.)

[90] NHTSA Complaint ID No. 11318626.  (Emphasis added.)

[91] NHTSA Complaint ID No. 11319355. (Emphasis added.)

*remedy to the issue.* My daily commute is on the highway approximately 40 miles one way. I feel very unsafe in my Toyota Tacoma as this vehicle is my daily driver. *It is now April 1, 2020 and Toyota has yet to release any fix or remedy to correct this safety recall. How long does Toyota have to remedy the issue and what are my options at this point with the vehicle?*[92]

219.   Although Toyota undeniably knows about the grave dangers posed by the Fuel Pump Defect, Toyota has not indicated that it intends to take the vehicles off the road—even temporarily—or enable Class members to stop driving the dangerous vehicles until and when (if ever) there is a repair by contacting them directly, through Toyota dealers, which are Toyota's agents, or state vehicle registry lists or otherwise, and offering them free loaner vehicles of comparable make, model, or value to the Class Vehicle they own or lease.  Thus, Toyota is knowingly keeping at least 2,000,000 of its customers, if not more, in danger.

220.   Therefore, the Recall is inadequate and unconscionable.  It fails to promptly alert Class members to the admittedly dangerous Fuel Pump Defect and provide them with a safe alternative, which inevitably will lead to more Fuel Pump failures, and possibly injury or death. The Recall is also inadequate in scope, omitting hybrid versions and other models equipped with the same defective Fuel Pump.  Moreover, there is no indication the repair will be executed anytime soon or whether it will be effective.  These actions are deceitful, unconscionable, and expose Class members to injury and death. In addition to these dangers, Toyota's actions have deprived purchasers and lessees of the Class Vehicles of the benefit of their bargain.

## VII.   APPLICABLE WARRANTIES

221.   Toyota sold and leased the Class Vehicles with written express warranties.

222.   For the Toyota branded Class Vehicles, Toyota offered a written express basic warranty covering Toyota brand vehicles for 36 months or 36,000 miles covering all components

---

[92] NHTSA Complaint ID No. 11319988.  (Emphasis added).

(except normal wear and tear). Toyota also offered a 60 month or 60,000 miles powertrain warranty.

223.    For the Lexus branded Class Vehicles, Toyota offered a written express Limited Warranty of four years or 50,000 miles.   Toyota also offered a six-year 70,000 miles powertrain warranty.

224.    Toyota provides these warranties to buyers and lessees after the purchase/lease of the Class Vehicles is completed; buyers and lessees have no pre-sale/lease knowledge or ability to bargain as to the terms of the warranties.

225.    However, Toyota admitted a breach of these warrantied in the Recall Report when it reported it did not have a repair or remedy for the defective Fuel Pump. Class members complain to dealers about the Fuel Pump Defect but do not receive an adequate repair, breaching the express and implied warranties provided by Toyota.

## VIII.    FRAUDULENT OMISSION/CONCEALMENT ALLEGATIONS

226.    Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Toyota and Denso responsible for making false and misleading statements regarding the Class Vehicles. Toyota and Denso necessarily are in possession of all of this information. Plaintiffs' claims arise out of Defendants' fraudulent omission/concealment of the Fuel Pump Defect, despite their representations about the quality, safety, and comfort of the Class Vehicles.

227.    Plaintiffs allege that at all relevant times, including specifically at the time they and Class members purchased their Class Vehicle, Defendants knew, or were reckless in not knowing, of the Fuel Pump Defect; Defendants had a duty to disclose the Fuel Pump Defect based upon their exclusive knowledge; and Defendants never disclosed the Fuel Pump Defect to

Plaintiffs or the public at any time or place in any manner other than a halfhearted, inadequate recall of a subset of the Class Vehicles.

228.   Plaintiffs make the following specific concealment/omission-based allegations with as much specificity as possible absent access to the information necessarily available only to Defendants:

a.   **Who**:  Defendants actively concealed and omitted the Fuel Pump Defect from Plaintiffs and Class members while simultaneously touting the safety and dependability of the Class Vehicles, as alleged herein. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Defendants responsible for such decisions.

b.   **What**:  Defendants knew, or were reckless or negligent in not knowing, that the Class Vehicles contain the Fuel Pump Defect, as alleged herein. Defendants concealed and omitted the Fuel Pump Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles, as alleged herein.

c.   **When**:  Defendants concealed and omitted material information regarding the Fuel Pump Defect at all times while making representations about the safety and dependability of the Class Vehicles on an ongoing basis, and continuing to this day, as alleged herein. Defendants still have not disclosed the truth about the full scope of the Fuel Pump Defect in the Class Vehicles to anyone outside of their respective entities. Defendants have never taken any action to inform consumers about the true nature of the Fuel Pump Defect in Class Vehicles. And when consumers brought their vehicles to Toyota complaining of the Fuel Pump failures, Toyota denied any knowledge of or repair for the Fuel Pump Defect.

- 68 -

d. **Where**:    Defendants concealed and omitted material information regarding the true nature of the Fuel Pump Defect in every communication they had with Plaintiffs and Class members and made representations about the quality, safety, and comfort of the Class Vehicles. Plaintiffs are aware of no document, communication, or other place or thing, in which Defendants disclosed the truth about the full scope of the Fuel Pump Defect in the Class Vehicles to anyone outside of their respective entities. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manuals, or on Defendants' websites.   There are channels through which Defendants could have disclosed the Fuel Pump Defect, including but not limited to, (1) point of sale communications; (2) the owner's manual; and/or (3) direct communication to Class members through means such as state vehicle registry lists.

e. **How**:    Defendants concealed and omitted the Fuel Pump Defect from Plaintiffs and Class members and made representations about the quality, safety, dependability, and comfort of the Class Vehicles. Defendants actively concealed and omitted the truth about the existence, scope, and nature of the Fuel Pump Defect from Plaintiffs and Class members at all times, even though it knew about the Fuel Pump Defect and knew that information about the Fuel Pump Defect would be important to a reasonable consumer, and Toyota promised in its marketing materials that Class Vehicles have qualities that they do not have.

f. **Why**:    Defendants actively concealed and omitted material information about the Fuel Pump Defect in the Class Vehicles for the purpose of inducing Plaintiffs and Class members to purchase and/or lease Class Vehicles, rather than

purchasing or leasing competitors' vehicles, and made representations about the quality, safety, durability, and comfort of the Class Vehicles. Had Defendants disclosed the truth, for example in its advertisements or other materials or communications, Plaintiffs and Class members (all reasonable consumers) would have been aware of it, and would not have bought or leased the Class Vehicles or would not have paid as much for them.

## IX.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.  Continuing Act Tolling

229.   Beginning in 2013, Toyota continuously marketed and sold Class Vehicles to unsuspecting customers.  It continuously represented the Class Vehicles as safe and dependable despite their propensity to lose fuel pressure, hesitate under acceleration and/or experience engine shutdown. By making these false representations, and failing to disclose the existence of the Fuel Pump Defect in the Class Vehicles and thereby exposing occupants to risk of injury and death, Toyota engaged in a continuing wrong sufficient to render inapplicable any statute of limitations that Toyota might seek to apply.

230.   Pursuant to the TREAD Act, 49 U.S.C. § 30118, manufacturers are required to report information regarding customer complaints and warranty claims to NHTSA, and federal law imposes criminal penalties against manufacturers who fail to disclose known safety defects. Toyota owed a continuing duty to Plaintiffs and Class members to disclose to any risks to life and limb that its products pose.  It continually breached that duty.

231.   Toyota breached its duties to consumers by knowingly selling Class Vehicles with the defective Fuel Pumps on an ongoing basis.

232.     Toyota's knowledge of the Fuel Pump Defect is evidenced by numerous NHTSA complaints by consumers, many of whom reported contacting Toyota directly about the Defective Fuel Pump.  Other NHTSA complainants reported taking their vehicles to Toyota's dealers, who are agents of Toyota and, on information and belief, report consumer complaints back to Toyota.

233.     Thus, Toyota had continuing knowledge of the Fuel Pump Defect and the dangers it posed, yet continued to market, sell and lease the Class Vehicles. Plaintiffs' and other Class members' claims are not time barred.

**B.  Fraudulent Concealment Tolling**

234.     Toyota had a duty to disclose to Plaintiffs and the Class members the true quality and nature of the Class Vehicles, that the Class Vehicles had uniform defect; and that the Fuel Pump Defect requires repairs, poses a safety risk, and reduces the intrinsic and resale value of the affected vehicles.

235.     This duty arose, inter alia, under the TREAD Act, 49 U.S.C. § 30118.

236.     Toyota knew, or was reckless or negligent in not knowing, that the Class Vehicles contain the Fuel Pump Defect, as alleged herein. Toyota concealed and omitted the Fuel Pump Defect while making representations about the safety, dependability, and other attributes of the Class Vehicles, as alleged herein.

237.     Despite its knowledge of the Fuel Pump Defect, Toyota failed to disclose and concealed this material information from Plaintiffs and other Class members, and instead continued to market the Class Vehicles as safe and durable.

238.     The purpose of Toyota's concealment of the Defective Fuel Pump was to prevent Plaintiffs and other Class members from seeking redress.

239.     Plaintiffs and the other Class members justifiably relied on Toyota to disclose the existence of dangerous defects, including the Fuel Pump Defect, in the Class Vehicles that they purchased or leased, because that defect was not discoverable by Plaintiffs and the other Class members through reasonable efforts.

240.     Any applicable statute of limitations has been tolled by Toyota's knowledge, active concealment, and denial of the facts alleged herein, which behavior was ongoing.

**C. Discovery Rule Tolling**

241.     Even through the exercise of reasonable diligence, Plaintiffs and other Class members could not have discovered, prior to Toyota's issuance of the Recall Report on January 13, 2020 and/or the Second Recall Report on March 4, 2020, that Toyota was concealing and misrepresenting the existence of a dangerous defect, the Fuel Pump Defect, in the Class Vehicles and the risks it posed.

242.     Plaintiffs and the other Class members could not have reasonably discovered, and could not have known of facts that would have caused a reasonable person to suspect, that Toyota failed to disclose material information within its knowledge about a dangerous defect to consumers worldwide.

**X.    CLASS ACTION ALLEGATIONS**

243.     Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of herself and all others similarly situated.

244.     Plaintiffs seeks to represent an Alabama statewide class ("Alabama Class") defined as follows:

> All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Alabama.

245.     Plaintiffs seeks to represent a Florida statewide class ("Florida Class") defined as follows:

> All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Alabama.

246.     Plaintiffs seeks to represent a New York statewide class ("New York Class") defined as follows:

> All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of New York.

247.     Plaintiffs seeks to represent an Ohio statewide class ("Ohio Class") defined as follows:

> All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the State of Ohio.

248.     Plaintiffs also seeks to represent a class ("Nationwide Class") defined as:

> All current and former owners or lessees of a Class Vehicle (as defined herein) that was purchased or leased in the fifty States, the District of Columbia, Puerto Rico, and all other United States territories and/or possessions.

249.     Excluded from the New York, Alabama, Florida and Ohio classes ("Statewide Classes") and Nationwide Classes (together, "Classes") are Toyota and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case.  Plaintiffs reserve the right to modify or amend definitions of the Classes, and to add additional classes and sub-classes, as appropriate, during the course of this litigation.

250.     This action has been brought and may properly be maintained on behalf of the Classes proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

251.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the Classes are so numerous and geographically dispersed that individual joinder of all class members is impracticable.  While Plaintiffs is informed and believes that there are not less than at least approximately 2,000,000 members of the Classes, the precise number of Class Vehicles is unknown to Plaintiffs, but may be ascertained from Toyota's books and records.  Nationwide and Statewide Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

252.   **Commonality and Predominance – Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, without limitation:

  a.   whether Defendants engaged in the conduct alleged herein;

  b.   whether Defendants' alleged conduct violates applicable law;

  c.   whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

  d.   whether Defendants made false or misleading statements about the quality and safety of the Class Vehicles;

  e.   whether the Class Vehicles contain the Fuel Pump Defect;

  f.   whether Defendants had actual or implied knowledge about the alleged defect but failed to disclose it to Plaintiffs and the other members of the Classes;

g.   whether Defendants' omissions and concealment regarding the quality of the Class Vehicles were likely to deceive the Statewide Class members in violation of the state consumer protection statutes alleged herein;

h.   whether Toyota breached its express warranties with respect to the Class Vehicles;

i.   whether Toyota breached its implied warranties with respect to the Class Vehicles;

j.   whether the members of the Classes overpaid for their Class Vehicles as a result of the defect alleged herein;

k.   whether the members of the Classes are entitled to damages, restitution, disgorgement, statutory damages, exemplary damages, equitable relief, and/or other relief; and

l.   the amount and nature of relief to be awarded to Plaintiffs and the other members of the Classes.

253.   **Typicality – Federal Rule of Civil Procedure 23(a)(3).**   Plaintiffs' claims are typical of the claims of the other members of the Classes because Plaintiffs and the members of the Classes purchased or leased Class Vehicles that contain defective Fuel Pumps, as described herein.   Neither Plaintiffs nor the other members of the Classes would have purchased the Class Vehicles, or would have as much as they did for the Class Vehicles, had they known of the Fuel Pump Defect.   Plaintiffs and the other members of the Classes suffered damages as a direct proximate result of the same wrongful practices in which Defendants engaged.   Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the other members of the Classes.

254.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).**
Plaintiffs are adequate Class representatives because their interests do not conflict with the
interests of the other members of the Classes that they seek to represent. Plaintiffs have retained
counsel competent and experienced in complex class action litigation, including automotive
litigation, and Plaintiffs intend to prosecute this action vigorously.  The interests of the members
of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

255.    **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**
Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the
other members of the Classes, thereby making appropriate final injunctive relief and declaratory
relief, as described below, with respect to the Nationwide and Statewide Class members as a
whole.

256.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is
superior to any other available means for the fair and efficient adjudication of this controversy,
and no unusual difficulties are likely to be encountered in the management of this class action.
The damages or other financial detriment suffered by Plaintiffs and the other members of the
Classes are relatively small compared to the burden and expense that would be required to
individually litigate their claims against Defendants, so it would be impracticable for the other
members of the Classes to individually seek redress for Defendants' wrongful conduct.  Even if
these Class members could afford individual litigation, the court system could not.  Individual
litigation creates a potential for inconsistent or contradictory judgments, and increases the delay
and expense to all parties and the court system.  By contrast, the class action device, as intended
by Congress, presents far fewer management difficulties, and provides the benefits of single
adjudication, economy of scale, and comprehensive supervision by a single court.

XI.    **CLAIMS FOR RELIEF**

A.  **Claims Brought on Behalf of the New York Class**

**COUNT 1**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW,**
**N.Y. GEN. BUS. LAW § 349**
(Individually and on Behalf of the New York Class)
(As to all Defendants)

257.    Plaintiffs Cheng, Dias, and SanFilipo ("Plaintiffs" for purposes of this Count) incorporates by reference each allegation as if set forth fully herein.

258.    This Count is brought on behalf of Plaintiffs and the New York Class ("Class" for the purposes of this Count) for violation of New York General Business Law § 349 ("GBL § 349"), which prohibits deceptive acts or practices in the conduct of any business, trade or commerce in New York State.

259.    GBL § 349(h) provides that "any person who has been injured by reason of any violation of this section may bring . . . an action to recover his actual damages or fifty dollars, whichever is greater."

260.    GBL § 349(h) further provides that "[t]he court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section," and that "[t]he court may award reasonable attorney's fees to a prevailing Plaintiffs."

261.    Defendants' design, engineering, testing, manufacture, distribution, marketing, advertising, labeling, and sale of the Class Vehicles constitutes "business, trade or commerce" under GBL § 349(a).

262.    Defendants' conduct violates GBL § 349 because Defendants engaged in the deceptive acts and practices described above.

263.    Defendants' deceptive conduct and its false and misleading statements about Class Vehicle and Fuel Pump safety and dependability and omissions regarding the Fuel Pump Defect, which causes the Fuel Pumps to prematurely fail, are facts that a reasonable person would have considered material in deciding whether or not to purchase or lease (or how much they were willing to pay to purchase or lease) the Class Vehicles.

264.    Defendants' acts and practices described above were likely to mislead a reasonable consumer acting reasonably under the circumstances, including Plaintiffs and members of the Class.

265.    Plaintiffs and the other Class members justifiably acted or relied to their detriment upon Defendants' misrepresentations and omissions of fact, as evidenced by Plaintiffs and the other Class members' leasing and purchasing of Class Vehicles.

266.    Defendants' materially misleading statements and deceptive acts and practices were directed at the public at large, including Plaintiffs and members of the Class.

267.    Had Defendants disclosed all material information regarding the Fuel Pump Defect to Plaintiffs and the other Class members, Plaintiffs and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

268.    Defendants' deceptive acts and practices, and/or misrepresentations and omissions, have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

269.    Toyota also engaged in deceptive conduct by issuing defective Recall that provide no remedy for the Fuel Pump Defect, does not notify Class members about the Fuel Pump Defect, does not instruct consumers to stop driving the dangerous Class Vehicles, does not notify consumers and offer them free loaner vehicles of comparable make, model, or value as their own

Class Vehicles to enable them to cease driving their dangerous Class Vehicles until a remedy is available and can be implemented.

270.    Denso also engaged in deceptive conduct by manufacturing and placing in the stream of commerce a Fuel Pump it knew, or should have known, was materially defective.

271.    Defendants' actions impact the public interest because Plaintiffs and the members of the Class have been injured in exactly the same way as millions of other consumers by Defendants' deceptive acts and practices as described herein.

272.    As a direct and proximate result of Defendants' deceptive trade practices, Plaintiffs and the other Class members have suffered ascertainable loss and actual damages. Plaintiffs and the other Class members would not have purchased or leased the Class Vehicles or would have paid less for them had Defendants disclosed the truth about the Fuel Pump Defect. Plaintiffs and the other Class members also suffered diminished value of their vehicles.

273.    As a direct and proximate result of Defendants' deceptive trade practices, Plaintiffs and the other Class members were harmed by Toyota's inadequate Recall, described above, including Defendants' failure to notify them of the Fuel Pump Defect, failure to direct them to stop driving their Class Vehicles, and failure to offer Class members a free loaner vehicle of comparable make, model, or value as their Class Vehicles until Defendants are able to devise a remedy that that is safe and dependable  (if ever) and implement it in each Class Vehicle. Defendants' failure to do so continues to expose Plaintiffs and the Class to the risk of injury and death.

274.    Defendants' violation of GBL § 349 was willful and knowing.  Defendants knowingly and willfully marketed the Class Vehicles as safe and dependable all the while knowing they were not; admit in the Recall Reports the fact of the Fuel Pump Defect, the

thousands of warranty claims and more than 60 field technical reports it received about the Fuel Pump Defect, and that the Fuel Pump Defect poses a serious risk of injury rendering the Class Vehicles unsafe; and the facts of the defect Recall are incontrovertible. Defendants, through their willful and knowing deceptive acts and practices, as detailed above, have willfully and knowingly exposed Plaintiffs and the Class to the risk of serious injury and death, and continue to do so by virtue of having issued the deficient Recall.

275.     As a direct and proximate result of Defendants' conduct in violation of GBL § 349, Plaintiffs and the members of the Class have been injured in an amount to be proven at trial, with a statutory minimum of fifty dollars per Class member. Because Defendants' violation was knowing and willful, Plaintiffs is entitled to treble damages under GBL § 349(h).

276.     Plaintiffs also seek injunctive relief, including requiring Toyota to engage in a state of the art notice program to notify owners and lessees to stop using their Class Vehicles and to offer Class Members free loaner vehicles of comparable make, model, or value as their own Class Vehicles until their Class Vehicles can be repaired and rendered safe.

277.     Additionally, pursuant to GBL § 349, Plaintiffs and the Class seek attorneys' fees and costs.

## COUNT 2
### Strict Product Liability: Design Defect
(Individually and on behalf of the New York Class)
(As to all Defendants)

278.     Plaintiffs Cheng, Dias, and SanFilipo ("Plaintiffs" for purposes of this Count) incorporate by reference each allegation as if set forth fully herein.

279.     Plaintiffs bring this claim individually and on behalf of other members of the New York Class (the "Class," for purposes of this Count).

280.    Defendants are strictly liable for designing, engineering, testing, validating, manufacturing, and placing in the stream of commerce an unreasonably dangerous Fuel Pump.

281.    Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the unreasonable dangerous Fuel Pump.

282.    The Class Vehicles and Fuel Pumps are being used in an intended and/or foreseeable manner.  Plaintiffs and Class members have not misused or materially altered the Class Vehicles or Fuel Pumps.  The Class Vehicles and Fuel Pumps are in the same or substantially similar condition as they were at the time of purchase/lease.

283.    The Class Vehicles and Fuel Pumps are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Fuel Pump Defect that can cause Class Vehicles to suddenly and unexpectedly stall or lose engine power.

284.    The Fuel Pump Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of providing safe and reliable transportation and places Plaintiffs, Class members, and others on the road at an unreasonable and substantial risk for injury or death.

285.    Defendants were aware of feasible alternative designs which would minimize or eliminate the Fuel Pump Defect and the risk it poses.  Such alternative designs were known and available when the Class Vehicles and Fuel Pumps were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

286.    Defendants failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and Fuel Pump that is free from the Fuel Pump Defect and the unreasonable safety risks it poses.

287.     As a result of Defendants' actions as described herein, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

**COUNT 3**
**BREACH OF EXPRESS WARRANTY**
**N.Y. U.C.C. § 2-313**
(Individually and on Behalf of the New York Class)
(As to Toyota)

288.     Plaintiffs Cheng, Dias, and SanFilipo ("Plaintiffs" for purposes of this Count) incorporate by reference each allegation as if set forth fully herein.

289.     Plaintiffs bring this claim individually and on behalf of the other members of the New York Class.

290.     Toyota is and was at all relevant times a merchant with respect to the Class Vehicles.

291.     Pursuant to N.Y. U.C.C. § 2-313(i)(a), "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."

292.     In its written express warranties, Toyota expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

293.     Toyota's written express warranties formed the basis of the bargain that was reached when Plaintiffs and the other Class members purchased or leased their Class Vehicles.

294.     Toyota breached its express warranty to repair defective parts in the Class Vehicles. Toyota admittedly has not repaired the Class Vehicles' Fuel Pump Defect.

295.     Further, Toyota has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above,

customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repairs.

296.   The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because Toyota has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

297.   Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited remedy of repair, and Plaintiffs, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

298.   Also, as alleged in more detail herein, at the time that Toyota warranted and sold or leased the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Toyota improperly concealed material facts regarding its Class Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the Class Vehicles under false pretenses.

299.   As a direct and proximate result of Toyota's breach of its express warranty, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 4
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### N.Y. U.C.C. § 2-314
(Individually and on Behalf of the New York Class)
(As to Toyota)

300.   Plaintiffs Cheng, Dias, and SanFilipo ("Plaintiffs" for purposes of this Count) incorporates by reference each allegation as if set forth fully herein.

301.    This Count is brought on behalf of Plaintiffs and the New York Class ("Class" for the purposes of this Count).

302.    Toyota is a "merchant" and the Class Vehicles are "goods" as defined in N.Y. U.C.C. §§ 2-104 and 2-105 .

303.    Pursuant to N.Y. U.C.C. § 2-314, a warranty that the Class Vehicles were in merchantable condition was implied by law in the sale or lease of the product.  Toyota impliedly warranted that the Class Vehicles were of a merchantable quality.

304.    By placing the Class Vehicles in the stream of commerce, Toyota impliedly warranted that the Class Vehicles are safe, and that all claims in their advertising and marketing of the Class Vehicles were true.

305.    The Class Vehicles did not comply with the implied warranty of merchantability because, at the time of sale or lease and at all times thereafter, the Class Vehicles were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the Fuel Pump Defect which causes the Class Vehicles' Fuel Pump to prematurely fail, which can cause the engine to run rough, and the vehicle to stall while being driven or become inoperable.

306.    Further, Toyota has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repair.

307.    Plaintiffs and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Toyota's breach of the warranty of merchantability.

308.   At all times that Toyota warranted and sold the Class Vehicles, they knew or should have known that their warranties were false, and yet they did not disclose the truth, or stop manufacturing or selling the Class Vehicles, and instead continued to issue false warranties, and continued to insist the products were safe.  The Class Vehicles were defective when Toyota delivered them to their resellers, dealers, and distributors which sold the Class Vehicles, and the Class Vehicles were therefore still defective when they reached Plaintiffs and the Class.

309.   Toyota's resellers, dealers, and distributors are intermediaries between Toyota and consumers.  These intermediaries sell Class Vehicles to consumers and are not, themselves, consumers of Class Vehicles, and therefore have no rights against Toyota with respect to Plaintiffs and all other Class members' acquisition of Class Vehicles.  Toyota's warranties were designed to influence consumers who purchased and/or owned Class Vehicles.

310.   Plaintiffs and each Class member's acquisition of the Class Vehicles suffices to create privity of contract between Plaintiffs and all other members of the Class, on the one hand, and Toyota, on the other hand; however, privity of contract need not be established nor is it required because Plaintiffs and the Class members are intended third-party beneficiaries of contracts between Toyota and their resellers, authorized dealers, and, specifically, of Toyota's implied warranties.

311.   As a direct and proximate result of Toyota's breach of implied warranties of merchantability, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial.

**COUNT 5**
**NEGLIGENT RECALL/UNDERTAKING**
(Individually and on Behalf of the New York Class)
(As to Toyota)

312.    Plaintiffs Cheng, Dias, and SanFilipo ("Plaintiffs" for purposes of this Count) incorporates by reference each allegation as if set forth fully herein.

313.    Plaintiffs brings this Count individually and on behalf of the other members of the New York Class (the "Class," for purposes of this Count).

314.    Prior to the events made the basis of this action, Toyota designed, engineered, manufactured, marketed, and placed the Class Vehicles in the stream of commerce.

315.    On January 13, 2020, and again on March 4, 2020, Toyota initiated a voluntary recall of the Recalled Vehicles.  Toyota's recall was voluntary and not initiated by NHTSA.

316.    Toyota owed a duty to use reasonable care to Plaintiffs and Class members based on its undertaking of the Recall.

317.    As described above, Toyota breached its duty by conducting the Recall negligently and/or wantonly by, among other things, failing to notify Plaintiffs and the Class of the Fuel Pump Defect, failing to direct Class members to stop driving their Class Vehicles, and failing to offer Class members a free loaner vehicle of comparable make, model, or value as their Class Vehicles until Toyota is able to devise a remedy that is safe and dependable (if ever) and implement it in each Class Vehicle. Toyota's failure to do so continues to expose Plaintiffs and the Class to the risk of injury and death.

318.    For the reasons set for the above, Toyota knew, or should have known through the exercise of ordinary care, the Recall was not being performed in a reasonable manner.

319.    As a direct and proximate result, Plaintiffs and the other Class members have been and continue to be damaged in an amount to be determined at trial.

**COUNT 6**
**FRAUDULENT OMISSION**
(Individually and on behalf of the New York Class)
(As to all Defendants)

320.     Plaintiffs Cheng, Dias, and SanFilipo ("Plaintiffs" for purposes of this Count) incorporate by reference each allegation as if fully set forth herein.

321.     Plaintiffs bring this Count individually and on behalf of the other members of the New York Class (the "Class," for purposes of this Count).

322.     Defendants were aware of the Fuel Pump Defect within the Class Vehicles when the Class Vehicles were marketed and sold to Plaintiff and the other members of the Class.

323.     Having been aware of the Fuel Pump Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Fuel Pump Defect, Defendants had a duty to disclose the defect to Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

324.     Defendants did not disclose the Fuel Pump Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

325.     For the reasons set forth above, the Fuel Pump Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

326.     In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Defendants to disclose known material defects with respect to the Class Vehicles.

327.     Had Plaintiff and the other members of the Class known of the Fuel Pump Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

328.     Through their omissions regarding the Fuel Pump Defect within the Class Vehicles, Defendants intended to induce, and did induce, Plaintiff and the other members of the

Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

329.   As a direct and proximate result of Defendants' omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Fuel Pump Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT 7**
**UNJUST ENRICHMENT**
(Individually and on Behalf of the New York Class)
(As to all Defendants)

330.   Plaintiffs Cheng, Dias, and SanFilipo ("Plaintiffs" for purposes of this Count) incorporates by reference each allegation as if set forth fully herein.

331.   Plaintiffs brings this Count individually and on behalf of the other members of the New York Class (the "Class," for purposes of this Count).

332.   Defendants have benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Defendants' concealment of the Fuel Pump Defect, and Plaintiffs and the other members of the Class have overpaid for these vehicles.

333.   Defendants have unjustly received and retained benefits from Plaintiffs and the other members of the Class, which is contrary to equity and good conscience.

334.   It is inequitable and unconscionable for Defendants to retain these benefits.

335.   Because Defendants wrongfully concealed their misconduct, Plaintiffs and the other members of the Class were not aware of the omitted facts concerning the Class Vehicles and did not benefit from Defendants' misconduct.

336.   Defendants knowingly accepted the unjust benefits of their wrongful conduct.

337.    As a result of Defendants' misconduct, the amount of their unjust enrichment should be disgorged and returned to Plaintiffs and the other members of the Class in an amount to be proven at trial.

**B.  Claims Brought on Behalf of the Alabama Class**

**COUNT 8**
**VIOLATIONS OF ALABAMA'S DECEPTIVE TRAE PRACTICES ACT**
**ALA. CODE §§ 8-19-1 ET SEQ.**
(Individually and on behalf of the Statewide Class)
(As to all Defendants)

338.    Plaintiff Pruitt ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

339.    Plaintiff brings this claim individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

340.    The Alabama Deceptive Trade Practices Act, Ala. Code. § 8-19-5, prohibits "[e]ngaging in . . . unconscionable, false, or deceptive act[s] or practice[s] in business, commerce, or trade."

341.    By the conduct described in detail above and incorporated herein, Defendants engaged in deceptive trade practices.

342.    Plaintiff, individually and on behalf of the other Class members, notified Toyota of the Fuel Pump Defect in the Class Vehicles, and its violation of the Alabama Deceptive Trade Practices Act, through a notice letter hand delivered to Toyota's registered agent in Montgomery, Alabama on January 24, 2020, which Toyota acknowledged the same day. Toyota was also provided notice of the Fuel Pump Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.

343.    Defendants' omissions regarding the Fuel Pump Defect, described above, which causes the Fuel Pump to prematurely fail, are material facts that a reasonable person would have

considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

344.    Defendants intended for Plaintiff and the other Class members to rely on the omissions regarding the Fuel Pump Defect.

345.    Plaintiff and the other Class members justifiably acted or relied to their detriment upon Defendants' omissions of fact concerning the above-described Fuel Pump Defect, as evidenced by Plaintiff and the other Class members' purchases of Class Vehicles.

346.    Had Defendants disclosed all material information regarding the Fuel Pump Defect to Plaintiff and the other Class members, Plaintiff and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

347.    Defendants' omissions have deceived Plaintiff, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

348.    As a direct and proximate result of Defendants' deceptive trade practices, Plaintiff and the other Class members have suffered ascertainable loss and actual damages. Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Fuel Pump Defect been disclosed. Plaintiff and the other Class members also suffered diminished value of their vehicles. Plaintiff and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under Ala. Code. §§ 8-19-1, *et seq.*

**COUNT 9**
**Strict Product Liability: Design Defect**
(Individually and on behalf of the Alabama Class)
(As to all Defendants)

349.    Plaintiff Pruitt ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

350.    Plaintiff brings this claim individually and on behalf of other members of the Alabama Class (the "Class," for purposes of this Count).

351.    Defendants are strictly liable for designing, engineering, testing, validating, manufacturing, and placing in the stream of commerce an unreasonably dangerous Fuel Pump.

352.    Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the unreasonable dangerous Fuel Pump.

353.    The Class Vehicles and Fuel Pumps are being used in an intended and/or foreseeable manner.  Plaintiff and Class members have not misused or materially altered the Class Vehicles or Fuel Pumps.  The Class Vehicles and Fuel Pumps are in the same or substantially similar condition as they were at the time of purchase/lease.

354.    The Class Vehicles and Fuel Pumps are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Fuel Pump Defect that can cause Class Vehicles to suddenly and unexpectedly stall or lose engine power.

355.    The Fuel Pump Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of providing safe and reliable transportation and places Plaintiff, Class members, and others on the road at an unreasonable and substantial risk for injury or death.

356.    Defendants were aware of feasible alternative designs which would minimize or eliminate the Fuel Pump Defect and the risk it poses.  Such alternative designs were known and

available when the Class Vehicles and Fuel Pumps were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

357.    Defendants failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and Fuel Pump that is free from the Fuel Pump Defect and the unreasonable safety risks it poses.

358.    As a result of Defendants' actions as described herein, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

**COUNT 10**
**BREACH OF EXPRESS WARRANTY**
**ALA. CODE §§ 7-2-313 AND 7-2A-210**
(Individually and on behalf of the Statewide Class)
(As to Toyota)

359.    Plaintiff Pruitt ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

360.    Plaintiff brings this claim individually and on behalf of the other members of the Alabama Class (the "Class" for purposes of this Count).

361.    Toyota is a merchant with respect to the Class Vehicles.

362.    In its written express warranties, Toyota expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

363.    Toyota's written express warranties formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles.

364.    Toyota breached its express warranty to repair defective parts in the Class Vehicles. Toyota admittedly has not repaired the Class Vehicles' Fuel Pump Defect.

365.     Plaintiff, individually and on behalf of the other Class members, notified Toyota of the Fuel Pump Defect in the Class Vehicles, and its corresponding breach of warranty, through a notice letter hand delivered to Toyota's registered agent in Montgomery, Alabama on January 24, 2020, which Toyota acknowledged the same day. Toyota was also provided notice of the Fuel Pump Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge. Toyota has not remedied its breach.

366.     Further, Toyota has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repairs.

367.     The written express warranties fail in their essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Toyota has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

368.     Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited remedy of repair, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

369.     Also, as alleged in more detail herein, at the time that Toyota warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Toyota improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were therefore induced to purchase or lease the Toyota Vehicles under false pretenses.

370.    As a direct and proximate result of Toyota's breach of its express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 11
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## ALA. CODE §§ 7-2-314 AND 7-2A-314
(Individually and on behalf of the Statewide Class)
(As to Toyota)

371.    Plaintiff Pruitt ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

372.    Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

373.    Toyota is a merchant with respect to motor vehicles under Ala. Code § § 7-2-104 and 7-2A-103.

374.    Pursuant to Ala. Code §§ 7-2-314 and 7-2A-212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

375.    The Class Vehicles do not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used. Specifically, the Class Vehicles suffer from the Fuel Pump Defect which causes the Class Vehicles' Fuel Pump to prematurely fail.

376.    Plaintiff, individually and on behalf of the other Class members, notified Toyota of the Fuel Pump Defect in the Class Vehicles, and its corresponding breach of warranty, through a notice letter hand delivered to Toyota's registered agent in Montgomery, Alabama on January 24, 2020, which Toyota acknowledged the same day. Toyota was also provided notice of

- 94 -

the Fuel Pump Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge. Toyota has not remedied its breach.

377.     Further, Toyota has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile. As stated above, customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied adequate repair.

378.     Plaintiff and the other Class members suffered injuries due to the defective nature of the Class Vehicles and Toyota's breach of the warranty of merchantability.

379.     As a direct and proximate result of Toyota's breach of the warranty of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT 12**
**Negligent Recall/Undertaking**
(Individually and on behalf of the Statewide Class)
(As to Toyota)

380.     Plaintiff Pruitt ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

381.     Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

382.     Prior to the events made the basis of this action, Toyota designed, engineered, manufactured, marketed, and placed the Class Vehicles in the stream of commerce.

383.     On January 13, 2020, and again on March 4, 2020, Toyota initiated a voluntary recall of the Recalled Vehicles.  Toyota's recall was voluntary and not initiated by NHTSA.

384.     Toyota owed a duty to use reasonable care to Plaintiff and Class members based on its undertaking of the Recall.

385.    As described above, Toyota breached its duty by conducting the Recall negligently and/or wantonly by, among other things, failing to notify Plaintiff and the Class of the Fuel Pump Defect, failing to direct Class members to stop driving their Class Vehicles, and failing to offer Class members a free loaner vehicles of comparable make, model, or value as their Class Vehicles until Toyota is able to devise a repair that works (if ever) and implement it in each Class Vehicle.  Toyota's failure to do so continues to expose Plaintiff and the Class to the risk of injury and death.

386.    For the reasons set for the above, Toyota knew, or should have known through the exercise of ordinary care, the Recall was not being performed in a reasonable manner.

387.    As a direct and proximate result, Plaintiff and the other Class members have been and continue to be damaged in an amount to be determine at trial.

## COUNT 13
## FRAUDULENT OMISSION
### (Individually and on behalf of the Statewide Class)
### (As to all Defendants)

388.    Plaintiff Pruitt ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

389.    Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

390.    Defendants were aware of the Fuel Pump Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other members of the Class.

391.    Having been aware of the Fuel Pump Defect within the Class Vehicles, and having known that Plaintiff and the other members of the Class could not have reasonably been expected to know of the Fuel Pump Defect, Defendants had a duty to disclose the defect to

Plaintiff and the other members of the Class in connection with the sale or lease of the Class Vehicles.

392.    Defendants did not disclose the Fuel Pump Defect to Plaintiff and the other members of the Class in connection with the sale of the Class Vehicles.

393.    For the reasons set forth above, the Fuel Pump Defect within the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

394.    In purchasing the Class Vehicles, Plaintiff and the other members of the Class reasonably relied on Defendants to disclose known material defects with respect to the Class Vehicles.

395.    Had Plaintiff and the other members of the Class known of the Fuel Pump Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

396.    Through its omissions regarding the Fuel Pump Defect within the Class Vehicles, Defendants intended to induce, and did induce, Plaintiff and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

397.    As a direct and proximate result of Defendants' omissions, Plaintiff and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Fuel Pump Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT 14**
**ENJUST ENRICHMENT**
(Individually and on behalf of the Statewide Class)
(As to all Defendants)

398.     Plaintiff Pruitt ("Plaintiff" for purposes of this Count) incorporates by reference each allegation as if fully set forth herein.

399.     Plaintiff brings this Count individually and on behalf of the other members of the Alabama Class (the "Class," for purposes of this Count).

400.     Defendants have benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Defendants' concealment of the Fuel Pump Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

401.     Defendants have received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

402.     It is inequitable and unconscionable for Defendants to retain these benefits.

403.     Because Defendants concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Defendants' misconduct.

404.     Defendants knowingly accepted the unjust benefits of its wrongful conduct.

405.     As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

**C.  Claims Brought on Behalf of the Florida Class**

**COUNT 15**
**VIOLATIONS OF THE FLORIDA DECEPTIVE**
**AND UNFAIR TRADE PRACTICES ACT**
**Fla. Stat. §§ 502.201, et seq.**
(Individually and on behalf of the Statewide Class)
(As to all Defendants)

252.    Plaintiffs Rudolph and Barlow ("Plaintiffs," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

253.    Plaintiffs bring this claim individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

254.    The Florida Deceptive and Unfair Trade Practices Act, F.S.A. §§ 501.201, et seq., states that, "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

255.    By the conduct described in detail above and incorporated herein, Defendants engaged in unfair or deceptive acts in violation of F.S.A. § 501.204.

256.    Defendants' omissions regarding the Fuel Pump Defect, described above, that causes the Fuel Pump to prematurely fail, are material facts that a reasonable person would have considered in deciding whether or not to purchase (or to pay the same price for) the Class Vehicles.

257.    Defendants intended for Plaintiffs and the other Class members to rely on Defendants' omissions regarding the Defect.

258.    Plaintiffs and the other Class members justifiably acted or relied to their detriment upon Defendants' omissions of fact concerning the above-described Fuel Pump Defect, as evidenced by Plaintiffs and the other Class members' purchases of Class Vehicles.

259.    Had Defendants disclosed all material information regarding the Fuel Pump Defect to Plaintiffs and the other Class members, Plaintiffs and the other Class members would not have purchased or leased Class Vehicles or would have paid less to do so.

260.    Defendants' omissions have deceived Plaintiffs, and those same business practices have deceived or are likely to deceive members of the consuming public and the other members of the Class.

261.    In addition to being deceptive, the business practices of Defendants were unfair because they knowingly sold Plaintiffs and the other Class members Class Vehicles with defective Fuel Pumps that are essentially unusable for the purposes for which they were sold. The injuries to Plaintiffs and the other Class members are substantial and greatly outweigh any alleged countervailing benefit to Plaintiffs and the other Class members or to competition under all of the circumstances. Moreover, in light of Defendants' exclusive knowledge of the Fuel Pump Defect, the injury is not one that Plaintiffs or the other Class members could have reasonably avoided.

262.    As a direct and proximate result of Defendants' unfair and deceptive trade practices, Plaintiffs and the other Class members have suffered ascertainable loss and actual damages. Plaintiffs and the other Class members who purchased or leased the Class Vehicles would not have purchased or leased the Class Vehicles, or, alternatively, would have paid less for them had the truth about the Fuel Pump Defect been disclosed. Plaintiff and the other Class members also suffered diminished value of their vehicles. Plaintiffs and the other Class members are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under F.S.A. §§ 501.201, *et seq.*

**COUNT 16**
**Strict Product Liability: Design Defect**
(Individually and on behalf of the Florida Class)
(As to all Defendants)

263.    Plaintiffs Rudolph and Barlow ("Plaintiffs," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

- 100 -

264.    Plaintiffs bring this claim individually and on behalf of other members of the Florida Class (the "Class," for purposes of this Count).

265.    Defendants are strictly liable for designing, engineering, testing, validating, manufacturing, and placing in the stream of commerce an unreasonably dangerous Fuel Pump.

266.    Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the unreasonable dangerous Fuel Pump.

267.    The Class Vehicles and Fuel Pumps are being used in an intended and/or foreseeable manner.  Plaintiffs and Class members have not misused or materially altered the Class Vehicles or Fuel Pumps.  The Class Vehicles and Fuel Pumps are in the same or substantially similar condition as they were at the time of purchase/lease.

268.    The Class Vehicles and Fuel Pumps are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Fuel Pump Defect that can cause Class Vehicles to suddenly and unexpectedly stall or lose engine power.

269.    The Fuel Pump Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of providing safe and reliable transportation and places Plaintiffs, Class members, and others on the road at an unreasonable and substantial risk for injury or death.

270.    Defendants were aware of feasible alternative designs which would minimize or eliminate the Fuel Pump Defect and the risk it poses.  Such alternative designs were known and available when the Class Vehicles and Fuel Pumps were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

271.    Defendants failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and Fuel Pump that is free from the Fuel Pump Defect and the unreasonable safety risks it poses.

272.    As a result of Defendants' actions as described herein, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

**COUNT 17**
**BREACH OF EXPRESS WARRANTY**
**Fla. Stat. §§ 672.313 and 680.21**
(Individually and on behalf of the Statewide Class)
(As to Toyota)

273.    Plaintiffs Marlene Rudolph and Patricia Barlow ("Plaintiffs," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

274.    Plaintiffs bring this Count individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

275.    Toyota is a merchant with respect to the Class Vehicles.

276.    In its written express warranties, Toyota expressly warranted that it would repair or replace defective parts free of charge if the defects became apparent during the warranty period.

277.    Toyota's express written warranty formed the basis of the bargain that was reached when Plaintiffs and the other Class members purchased or leased their Class Vehicles equipped with the defective Fuel Pumps.

278.    Toyota breached the express warranty to repair defects in materials and workmanship within the Class Vehicles. Defendant have not repaired, and have been unable to repair, the Class Vehicles' materials and workmanship defects.

279.    Toyota was notified of its breach via letter from Plaintiff Pruitt on behalf of herself and the Class which was hand delivered to Toyota's registered agent in Montgomery, Alabama on January 24, 2020, which Toyota acknowledged the same day. Toyota was also provided notice of the Fuel Pump Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.

280.    Furthermore, the express written warranty fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because Toyota has failed and/or has refused to adequately provided the promised remedies within a reasonable time.

281.    Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiffs, individually and on behalf of the other Class members, seeks all remedies allowable by law.

282.    Also, and as alleged in more detail herein, at the time that Toyota warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Toyota improperly concealed material facts regarding its Class Vehicles. Plaintiffs and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

283.    Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to 's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs and the other Class members' remedies would be insufficient to make them whole.

284.    As a direct and proximate result of Toyota's breach of its express warranty, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 18
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
## FLA. STAT. §§ 672.314 AND 680.212
(Individually and on behalf of the Statewide Class)
(As to Toyota)

252.    Plaintiffs Marlene Rudolph and Patricia Barlow ("Plaintiffs," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

253.    Plaintiffs bring this Count individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

254.    Toyota is a merchant with respect to motor vehicles under Fla. Stat. §§ 672.104 and 680.103.

255.    Pursuant to Fla. State §§ 672.314 and 680.212, a warranty that the Class Vehicles were in merchantable condition was implied by law, and the Class Vehicles were bought and sold subject to an implied warranty of merchantability.

256.    The Class Vehicle did not comply with the implied warranty of merchantability because, at the time of sale and all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which vehicles were used.  Specifically, the Class Vehicles suffer from the Fuel Pump Defect which causes the Class Vehicles' Fuel Pump to prematurely fail.

257.    Toyota was notified of its breach via letter from Plaintiff Pruitt on behalf of herself and the Class which was hand delivered to Toyota's registered agent in Montgomery, Alabama on January 24, 2020, which Toyota acknowledged the same day. Toyota was also

provided notice of the Fuel Pump Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.

258.     Further, Toyota has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile.  As states above, customers that have presented their vehicles for warranty repair due to Fuel Pump failure have been denied.

259.     Plaintiff and other Class members suffered injuries due to the defective nature of the Class Vehicles and Toyota's breach of the warrant of merchantability.

260.     As a direct and proximate result of Toyota's breach of the warranty of merchantability, Plaintiff and the other Class members have been damages in an amount to be proven at trial.

**COUNT 19**
**NEGLIGENT RECALL/UNDERTAKING**
(Individually and on behalf of the Statewide Class)
(As to Toyota)

252.     Plaintiffs Marlene Rudolph and Patricia Barlow ("Plaintiffs," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

253.     Plaintiffs bring this Count individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

254.     Prior to the events made the basis of this action, Toyota designed, engineered, manufactured, marketed, and placed the Class Vehicles in the stream of commerce.

255.     On January 13, 2020, and again on March 4, 2020, Toyota initiated a voluntary recall of the Recalled Vehicles.  Toyota's recall was voluntary and not initiated by NHTSA.

256.     Toyota owed a duty to use reasonable care to Plaintiffs and Class members based on its undertaking of the Recall.

- 105 -

257.     As described above, Toyota breached its duty by conducting the Recall negligently and/or wantonly by, among other things, failing to notify Plaintiffs and the Class of the Fuel Pump Defect, failing to direct Class members to stop driving their Class Vehicles, and failing to offer Class members a free loaner vehicles of comparable make, model, or value as their Class Vehicles until Toyota is able to devise a repair that works (if ever) and implement it in each Class Vehicle.  Toyota's failure to do so continues to expose Plaintiff and the Class to the risk of injury and death.

258.     For the reasons set for the above, Toyota knew, or should have known through the exercise of ordinary care, the Recall was not being performed in a reasonable manner.

259.     As a direct and proximate result, Plaintiffs and the other Class members have been and continue to be damaged in an amount to be determine at trial.

**COUNT 20**
**FRAUDULENT OMISSION**
(Individually and on behalf of the Statewide Class)
(As to all Defendants)

260.     Plaintiffs Marlene Rudolph and Patricia Barlow ("Plaintiffs," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

261.     Plaintiffs bring this Count individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

262.     Defendants were aware of the Fuel Pump Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiffs and the other members of the Class.

263.     Having been aware of the Fuel Pump Defect within the Class Vehicles, and having known that Plaintiffs and the other members of the Class could not have reasonably been expected to know of the Fuel Pump Defect, Defendants had a duty to disclose the defect to

Plaintiffs and the other members of the Class in connection with the sale or lease of the Class Vehicles.

264.    Defendants did not disclose the Fuel Pump Defect to Plaintiffs and the other members of the Class in connection with the sale of the Class Vehicles.

265.    For the reasons set forth above, the Fuel Pump Defect comprises material information with respect to the sale or lease of the Class Vehicles.

266.    In purchasing the Class Vehicles, Plaintiffs and the other members of the Class reasonably relied on Defendants to disclose known material defects with respect to the Class Vehicles.

267.    Had Plaintiffs and the other members of the Class known of the Fuel Pump Defect within the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

268.    Through its omissions regarding the Fuel Pump Defect, Defendants intended to induce, and did induce, Plaintiffs and the other members of the Class to either purchase a Class Vehicle that they otherwise would not have purchased, or pay more for a Class Vehicle than they otherwise would have paid.

269.    As a direct and proximate result of Defendants' omissions, Plaintiffs and the other members of the Class either overpaid for the Class Vehicles or would not have purchased the Class Vehicles at all if the Fuel Pump Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT 21**
**UNJUST ENRICHMENT**
(Individually and on behalf of the Statewide Class)
(As to all Defendants)

270.    Plaintiffs Marlene Rudolph and Patricia Barlow ("Plaintiffs," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

271.    Plaintiffs bring this Count individually and on behalf of the other members of the Florida Class (the "Class," for purposes of this Count).

272.    Defendants have benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Defendants' concealment of the Fuel Pump Defect, and Plaintiffs and the other members of the Class have overpaid for these vehicles.

273.    Defendants have received and retained unjust benefits from Plaintiffs and the other members of the Class, and inequity has resulted.

274.    It is inequitable and unconscionable for Defendants to retain these benefits.

275.    Because Defendants concealed their fraud and deception, Plaintiffs and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Defendants' misconduct.

276.    Defendants knowingly accepted the unjust benefits of its wrongful conduct.

277.    As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and the other members of the Class in an amount to be proven at trial.

### D.  Claims Brough on Behalf of the Ohio Class

**COUNT 22**
**VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT**
**Ohio Rev. Code Ann. §§ 1345.01, *et seq.***
(Individually and on Behalf of the Ohio Class)
(As to all Defendants)

406.    Plaintiff Kristi Rock ("Plaintiff," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

407.    Plaintiff brings this Count individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

408.    Defendants, Plaintiff, and the other Class members are "persons" within the meaning of Ohio Rev. Code Ann. § 145.01(B). Defendants are a "supplier" as defined by Ohio Rev. Code Ann. § 1345.01(c).

409.    Plaintiff and the other Class members are "consumers" as that term is defined in Ohio Rev. Code Ann. § 1345.01(D), and their purchase and lease of the Class Vehicles are "consumer transactions" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

410.    Ohio Rev. Code Ann. § 1345.02 prohibits unfair or deceptive acts or practices in connection with consumer transactions, such as those described herein.

411.    In the course of Defendants' business, Defendants violated the Ohio Consumer Sales Practices Act ("CSPA") by selling Class Vehicles with the Fuel Pump Defect that may result in Fuel Pumps failing prematurely, leading to an unreasonable likelihood of serious bodily injury or death to vehicle occupants, or negligently concealing or suppressing material facts concerning the Fuel Pump Defect in the Class Vehicles.

412.    Further, as a result of placing a defective product into the stream of commerce, Defendants have breached their implied warranty in tort, which is an unfair and deceptive act, as defined in Ohio Rev. Code Ann. § 1345.09(B).

413.    Defendants have committed unfair and deceptive acts in violation of the Ohio CSPA by knowingly placing into the stream of commerce the Class Vehicles with the Fuel Pump Defect.

414. Moreover, Defendants have committed an unfair and deceptive act by knowingly concealing the Fuel Pump Defect in the Class Vehicles and failing to inform Plaintiff and the other Class members of this defect.

415. Defendants' unfair or deceptive acts or practices were likely to, and did, in fact, deceive consumers, including Plaintiff and the other Class members, about the true reliability, dependability, efficiency, and quality of the Class Vehicles.

416. Plaintiff and the other Class members suffered ascertainable loss and actual damages as a direct result of Defendants' concealment of and failure to disclose material information, namely, the Fuel Pump Defect. Plaintiff and the other Class members who purchased or leased the Class Vehicles would not have done so, or would have paid significantly less, if the true nature of the Class Vehicles had been disclosed. Plaintiff and the other Class members also suffered diminished value of their vehicles.

417. Defendants are liable to Plaintiff and the other Class members for compensatory damages, injunctive/equitable relief, and attorneys' fees pursuant to Ohio Rev. Code Ann. § 1345.09.

## COUNT 23
### Strict Product Liability: Design Defect
(Individually and on behalf of the Ohio Class)
(As to all Defendants)

418. Plaintiff Rock ("Plaintiff" for purposes of this Count) incorporate by reference each allegation as if fully set forth herein.

419. Plaintiff brings this claim individually and on behalf of other members of the Ohio Class (the "Class," for purposes of this Count).

420. Defendants are strictly liable for designing, engineering, testing, validating, manufacturing, and placing in the stream of commerce an unreasonably dangerous Fuel Pump.

421.    Defendants designed, engineered, tested, validated, manufactured, and placed in the stream of commerce the unreasonable dangerous Fuel Pump.

422.    The Class Vehicles and Fuel Pumps are being used in an intended and/or foreseeable manner.  Plaintiff and Class members have not misused or materially altered the Class Vehicles or Fuel Pumps.  The Class Vehicles and Fuel Pumps are in the same or substantially similar condition as they were at the time of purchase/lease.

423.    The Class Vehicles and Fuel Pumps are unreasonably dangerous and defective because they were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce with the Fuel Pump Defect that can cause Class Vehicles to suddenly and unexpectedly stall or lose engine power.

424.    The Fuel Pump Defect causes an unreasonably dangerous condition when Class Vehicles are used for their intended and foreseeable purpose of providing safe and reliable transportation and places Plaintiff, Class members, and others on the road at an unreasonable and substantial risk for injury or death.

425.    Defendants were aware of feasible alternative designs which would minimize or eliminate the Fuel Pump Defect and the risk it poses.  Such alternative designs were known and available when the Class Vehicles and Fuel Pumps were designed, engineered, tested, validated, manufactured, and placed in the stream of commerce.

426.    Defendants failed to design, test, validate, manufacture, and place in the stream of commerce a Class Vehicle and Fuel Pump that is free from the Fuel Pump Defect and the unreasonable safety risks it poses.

427.    As a result of Defendants' actions as described herein, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

**COUNT 24**
**BREACH OF EXPRESS WARRANTY**
**Ohio Rev. Code Ann. §§ 1302.26 and 1310.17**
(Individually and on behalf of the Ohio class)
(As to Toyota)

428.    Plaintiff Kristi Rock ("Plaintiff," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

429.    Plaintiff brings this Count individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

430.    Toyota is a merchant with respect to the Class Vehicles.

431.    In their written express warranty, Defendants expressly warranted that it would repair or replace defects in material or workmanship free of charge if they became apparent during the warranty period.

432.    Toyota's Limited Warranty formed the basis of the bargain that was reached when Plaintiff and the other Class members purchased or leased their Class Vehicles equipped with the defective Fuel Pumps.

433.    Toyota breached the express warranty to repair defects in materials and workmanship within the Class Vehicles. Toyota has not repaired, and has been unable to repair, the Class Vehicles' materials and workmanship defects.

261.    Toyota was notified of its breach via letter from Plaintiff Pruitt on behalf of herself and the Class which was hand delivered to Toyota's registered agent in Montgomery, Alabama on January 24, 2020, which Toyota acknowledged the same day. Toyota was also provided notice of the Fuel Pump Defect through numerous complaints filed against it directly and through its dealers, as well as its own internal engineering knowledge.

- 112 -

434.     Furthermore, the limited warranty of repair fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other Class members whole and because Toyota has failed and/or have refused to adequately provided the promised remedies within a reasonable time.

435.     Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair to parts defective in materials and workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

436.     Also, as alleged in more detail herein, at the time that Toyota warranted and sold the Class Vehicles it knew that the Class Vehicles did not conform to the warranty and were inherently defective, and Toyota improperly concealed material facts regarding its Class Vehicles. Plaintiff and the other Class members were, therefore, induced to purchase or lease the Class Vehicles under false pretenses.

437.     Moreover, much of the damage flowing from the Class Vehicles cannot be resolved through the limited remedy of repairs, as those incidental and consequential damages have already been suffered due to Toyota's improper conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

438.     As a direct and proximate result of Toyota's breach of express warranty, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

**COUNT 25**
**BREACH OF IMPLIED WARRANTY IN TORT**
(Individually and on behalf of the Ohio class)
(As to Toyota)

439.     Plaintiff Kristi Rock ("Plaintiff," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

440.     Plaintiff brings this Count individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

441.     Toyota manufactured and sold the defective Class Vehicles to Plaintiff and the other Class members.

442.     The Class Vehicles are defective because they have a defective Fuel Pump, which may result in Fuel Pumps failing prematurely, leading to an unreasonable likelihood of serious bodily injury or death to vehicle occupants.

443.     These defects existed at the time the Class Vehicles left the control of Toyota.

444.     Based upon these defects, Toyota has failed to meet the expectations of a reasonable consumer. The Class Vehicles have failed in their ordinary, intended use, because they suffer from the Fuel Pump Defect, causing Fuel Pumps to potentially fail to deploy in a crash event, leading to an unreasonable likelihood of serious bodily injury or death to vehicle occupants.

445.     The above-described defects in the Class Vehicles were the direct and proximate cause of economic damages to Plaintiff and the other Class members.

**COUNT 26**
**NEGLIGENT RECALL/UNDERTAKING**
(Individually and on behalf of the Ohio class)
(As to Toyota)

446.     Plaintiff Kristi Rock ("Plaintiff," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

447.     Plaintiff brings this Count individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

448.     Prior to the events made the basis of this action, Toyota designed, engineered, manufactured, marketed, and placed the Class Vehicles in the stream of commerce.

449.     On January 13, 2020, and again on March 4, 2020, Toyota initiated a voluntary recall of the Recalled Vehicles.  Toyota's recall was voluntary and not initiated by NHTSA.

450.     Toyota owed a duty to use reasonable care to Plaintiff and Class members based on its undertaking of the Recall.

451.     As described above, Toyota breached its duty by conducting the Recall negligently and/or wantonly by, among other things, failing to notify Plaintiff and the Class of the Fuel Pump Defect, failing to direct Class members to stop driving their Class Vehicles, and failing to offer Class members a free loaner vehicles of comparable make, model, or value as their Class Vehicles until Toyota is able to devise a repair that works (if ever) and implement it in each Class Vehicle.  Toyota's failure to do so continues to expose Plaintiff and the Class to the risk of injury and death.

452.     For the reasons set for the above, Toyota knew, or should have known through the exercise of ordinary care, the Recall was not being performed in a reasonable manner.

453.     As a direct and proximate result, Plaintiff and the other Class members have been and continue to be damaged in an amount to be determine at trial.

## COUNT 27
## FRAUDULENT OMISSION
(Individually and on behalf of the Ohio class)
(As to all Defendants)

454.     Plaintiff Kristi Rock ("Plaintiff," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

455.     Plaintiff brings this Count individually and on behalf of the other members of the Ohio Class (the "Class," for purposes of this Count).

- 115 -

456.     Defendants were aware of the Fuel Pump Defect within the Class Vehicles when it marketed and sold the Class Vehicles to Plaintiff and the other Class members.

457.     Having been aware of the Fuel Pump Defect, and having known that Plaintiff and the other Class members could not have reasonably been expected to know of this defect, Defendants had a duty to disclose the Fuel Pump Defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

458.     Defendants did not disclose the Fuel Pump Defect to Plaintiff and the other Class members in connection with the sale or lease of the Class Vehicles.

459.     For the reasons set forth above, the Fuel Pump Defect in the Class Vehicles comprises material information with respect to the sale or lease of the Class Vehicles.

460.     In purchasing or leasing the Class Vehicles, Plaintiff and the other Class members reasonably relied on Defendants to disclose known material defects with respect to the Class Vehicles. Had Plaintiff and the other Class members known of the Fuel Pump Defect in the Class Vehicles, they would have not purchased the Class Vehicles or would have paid less for the Class Vehicles.

461.     Through their omissions regarding the Fuel Pump Defect in the Class Vehicles, Defendants intended to induce, and did induce, Plaintiff and the other Class members to purchase or lease a Class Vehicle that they otherwise would not have purchased, or to pay more for a Class Vehicle than they otherwise would have paid.

462.     As a direct and proximate result of Defendants' omissions, Plaintiff and the other Class members either paid too much for the Class Vehicles or would not have purchased the Class Vehicles if the Fuel Pump Defect had been disclosed to them, and, therefore, have incurred damages in an amount to be determined at trial.

**COUNT 28**
**UNJUST ENRICHMENT**
(Individually and on behalf of the Ohio class)
(As to all Defendants)

463.     Plaintiff Kristi Rock ("Plaintiff," for purposes of this Count) incorporates by reference all preceding allegations as if fully set forth herein.

464.     Plaintiff brings this Count individually and on behalf of the other members of the Ohio Class ("Class," for purposes of this Count).

465.     Defendants have benefitted from selling and leasing at an unjust profit defective Class Vehicles that had artificially inflated prices due to Defendants' concealment of the Fuel Pump Defect, and Plaintiff and the other members of the Class have overpaid for these vehicles.

466.     Defendants have received and retained unjust benefits from Plaintiff and the other members of the Class, and inequity has resulted.

467.     It is inequitable and unconscionable for Defendants to retain these benefits.

468.     Because Defendants concealed its fraud and deception, Plaintiff and the other members of the Class were not aware of the true facts concerning the Class Vehicles and did not benefit from Defendants' misconduct.

469.     Defendants knowingly accepted the unjust benefits of its wrongful conduct.

470.     As a result of Defendants' misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiff and the other members of the Class in an amount to be proven at trial.

**E.  Claim Brought on Behalf of the Nationwide Class**

**COUNT 29**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**15 U.S.C. §§ 2301, *et seq*.**
(Individually and on Behalf of the Nationwide Class)
(As to Toyota)

- 117 -

471.    Plaintiffs Sharon Cheng, Marlene Rudolph, Patricia Barlow, Rhonda SanFilipo, Christina Dias, Kristi Rock and Zina Pruitt ("Plaintiffs " for purposes of this Count) incorporate by reference each allegation as if fully set forth herein.

472.    Plaintiffs bring this Count individually and on behalf of the other members of the Nationwide Class (the "Class," for purposes of this Count).

473.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. §§ 1332 (a) and (d).

474.    Plaintiffs is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

475.    Toyota is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

476.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

477.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written warranty.

478.    In its express written warranties, Toyota expressly warranted that it would repair or replace defects in material or workmanship free of charge if those defects become apparent during the warranty period.

479.    Toyota's warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).   The Class Vehicles' implied warranty of merchantability is covered by 15 U.S.C.  § 2301(7).

480.    With respect to Class members' purchases or leases of the Class Vehicles, the terms of Toyota's written warranties and implied warranty became part of the basis of the bargain between Toyota and Plaintiffs and other Class members.

481.    Toyota breached the implied warranty of merchantability.  Without limitation, the Class Vehicles have Fuel Pumps that prematurely fail, as described above, which renders the Class Vehicles unmerchantable.

482.    Toyota breached its express warranties by not offering a functioning repair for the defective Fuel Pump in the Class Vehicles as evidenced by Toyota's own admission in the Recall Report that it has not identified a remedy.

483.    Further, Toyota has refused to provide an adequate warranty repair for the Fuel Pump Defect, thus rendering the satisfaction of any notice requirement futile.  As stated above, Class members report Fuel Pump failure to their dealer, but Toyota has failed to repair the defect.

484.    At the time of sale or lease of each Class Vehicle, Toyota knew, should have known, or was reckless in not knowing of the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Fuel Pump Defect.

485.    The amount in controversy of Plaintiffs' individual claim exceeds the sum of $25. The amount in controversy in this action exceeds the sum of $50,000, exclusive of costs and interest, computed on the basis of all claims to be determined in this lawsuit.

486.    Plaintiffs, individually and on behalf of the Class members, seeks all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

## XII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests relief against Defendants as set forth below:

1.    Certifying the proposed Nationwide and Statewide Classes;

2.    Appointing Plaintiffs as the Class representative and Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. and Demet Basar as Class counsel;

3.    Ordering Defendants to pay actual and statutory damages (including punitive damages) and restitution to Plaintiffs and the other Class members, as allowable by law;

4.    Enjoining Defendants from continuing the unfair business practices alleged in this Complaint;

5.    Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded;

6.    Ordering Defendants to pay attorneys' fees and costs of suit;

7.    Awarding injunctive relief requiring Toyota promptly and fully inform Class members of the Fuel Pump Defect and its associated dangers and instructing such Class members to cease driving their vehicles, and ordering Toyota provide free loaner vehicles of comparable make, model, or value to the Class Vehicle each Class member owns or leases until a remedy for the Fuel Pump Defect is installed in the Class Vehicles; and

8.    Granting such additional relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiffs demand a jury trial on all issues so triable.

Dated:    New York, New York
          April 14, 2020

- 120 -

/s/ W. Daniel "Dee" Miles, III
W. Daniel "Dee" Miles, III (*pro hac vice*)
H. Clay Barnett, III (*pro hac vice*)
J. Mitch Williams (*pro hac vice*)
**BEASLEY, ALLEN, CROW,**
**METHVIN, PORTIS & MILES, P.C.**
272 Commerce Street
Montgomery, Alabama 36104
Telephone: 334-269-2343
Dee.Miles@Beasleyallen.com
Clay.Barnett@BeasleyAllen.com
Mitch.williams@Beasleyallen.com

Demet Basar
**DEMET BASAR LAW**
2728 Thomson Ave., Unit 442
Long Island City, NY 11101
(917) 667-0730
demet.basar@protonmail.com


*Counsel for Plaintiffs*



Elbert F. Nasis
**FORCHELLI DEEGAN TERRANA LLP**
333 Earle Ovington Blvd., Suite 1010
Uniondale, New York 11553
(516) 248-1700
enasis@forchellilaw.com


*Additional Plaintiffs' Counsel*